UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.: 18-CV-24594-CIV-ALTONAGA/GOODMAN

ELGIN HILLIARD, SR.,

      Plaintiff,

vs.

CITY OF HIALEAH, et al.,

      Defendants.

-----------------------------------/

              DATE TAKEN: October 8, 2019
              TIME:  2:02 p.m.- 6:57 p.m.
              LOCATION: Switkes & Zappala, P.A.
                    407 Lincoln Road, PH SE
                    Miami Beach, Florida 33139

         DEPOSITION OF ELGIN HILLIARD SR.

      Taken Before Adriana Reyes, Notary
Public in and for the State of Florida at
Large, pursuant to Notice of taking
Deposition filed in the above cause.

               - - - - - - - -

Page 2

```
 1   APPEARANCES:

 2    ON BEHALF OF THE PLAINTIFF:

 3         The Goodwin Firm
           801 West Bay Drive
 4         Suite 705
           Largo, Florida 33770
 5         BY:  APRIL S. GOODWIN  ESQUIRE

 6

     ON BEHALF OF THE DEFENDANT:
 7
           Switkes & Zappala, P.A.
 8         704 Lincoln Road
           PH SE
 9         Miami Beach, Florida 33139
           BY:  ROBERT L. SWITKES, ESQUIRE
10
     Also Present:
11
     Michael Massa - Videographer
12
     Nicole Bates
13

14                   - - - - - - -

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                      Page 3
 1                    I N D E X

 2   Witness:  Elgin Hilliard Sr.
                                Direct      Redirect
 3

 4   BY MR. SWITKES:                  5           312

 5
     BY MS. GOODWIN:          Cross
 6
                             308
 7

 8               - - - - - - -

 9               EXHIBIT INDEX

10
          DEFENDANT'S              PAGE NO.
11
          Exhibit No. 1            87
12
          Exhibit No. 2            89
13
          Exhibit No. 3            301
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1          (Whereupon, the following was had.)

2          THE VIDEOGRAPHER:  Good afternoon.

3     Today is Tuesday the 8th day of October

4     2019.  We're commencing at approximately

5     2:02.  This is the videotaped deposition

6     of Elgin Hill -- Hilliard.  We're located

7     at 407 Lincoln Road Penthouse Southeast

8     Miami Beach, Florida.

9          This is taken on behalf of the

10     defendants in case number

11     18-CV-24594-CIV-ALTONAGA/GOODMAN in the

12     matter of Hilliard versus The City of

13     Hialeah.  Filed in the U.S. District

14     Court Southern District of Florida.

15          Our court reporter is Adriana Reyes

16     with Fernandez and Associates.  My name

17     is Mike Massa, I'm the videographer with

18     Fernandez and Associates.

19          Would counsel please state your

20     appearance for the record after which our

21     court reporter will swear the witness.

22          MS. GOODWIN:  April Goodwin, counsel

23     for plaintiff Elgin Hilliard, Sr.

24          MR. SWITKES:  Bob Switkes on behalf

25     of Hialeah Housing Authority.

1            THE COURT REPORTER:  Please raise

2      your right hand.

3            Do you swear or affirm that the

4      testimony you're about to give will be

5      the truth, the whole truth, and nothing

6      but the truth?

7            THE WITNESS:  Yes.

8                 DIRECT EXAMINATION.

9  BY MR. SWITKES:

10     Q.   Sir, could you please state your

11  full name?

12     A.   Elgin Charles Hilliard.

13     Q.   Sir, have you ever had your

14  deposition taken before?

15     A.   Yes.

16     Q.   Okay.  So you know, the rules are

17  that even though we have a videographer

18  that's going to record everything that's

19  said, you have a court reporter sitting to

20  your left so we need you to answer verbally.

21  Please don't nod your head or point to any

22  area of your body, say "my shoulder" if you

23  want to do that.  Don't --

24     A.   Yes.

25     Q.   If you don't understand any of my

Page 6

1    questions during the course of the

2    deposition, ask me to rephrase it and I'll be

3    glad to do so, okay?

4        A.   Okay.

5        Q.   Please answer out loud as opposed to

6    nodding your head.

7             If at any time during the deposition

8    you need a break, just let us know we'll be

9    glad to do that.

10            Are you under the medication of any

11   prescribed medication, drugs, or alcohol at

12   the present time?

13       A.   High blood pressure medication and

14   high cholesterol medication.

15       Q.   And who prescribed that?

16       A.   My primary care physician.

17       Q.   And what's his or her name?

18       A.   Dr. Marc Joseph.

19       Q.   Could you keep your voice up as well

20   because we all have to hear you.

21       A.   I'll try my best.

22       Q.   The medication you're under would

23   not in any way impair your ability to give

24   truthful answers today, will it?

25       A.   No.

1      Q.   Okay.  What is your current address,

2    sir?

3      A.   1861 Northwest 69 Street Miami,

4    Florida 33147.

5      Q.   And who do you live there with?

6      A.   My kid's mother.

7      Q.   And is that your ex-wife?

8      A.   You can say so.

9      Q.   What's --

10     A.   If you count ten years.  If it's ten

11   years or less it's not, but if it's ten years

12   or more, yeah, but -- so I don't say

13   "ex-wife" anymore because it's the mother of

14   my kids.

15     Q.   Okay.  But let's get something

16   straight, when I say "ex-wife," that means

17   you were married to her at one time.  Were

18   you married to her at one time?

19     A.   Yes.

20     Q.   And what is her name?

21     A.   Tiandria Richardson.

22     Q.   And when did you get married to her?

23     A.   Let me think.

24          My daughter was born it was 2003.

25     Q.   And you were divorced when?

```
 1       A.   2010.
 2       Q.   And you mentioned you currently live
 3  with her.  Does anybody else reside at that
 4  same location?
 5       A.   Yes.
 6       Q.   And who is that?
 7       A.   Our daughter.
 8       Q.   What is her name?
 9       A.   ███████  Hilliard.
10       Q.   And how old is she?
11       A.   She's 16.
12       Q.   And how many other children do you
13  have?
14       A.   One more.
15       Q.   And what is his or her name?
16       A.   Elgin Hilliard Jr., my son.
17       Q.   And how old is he?
18       A.   He's 25.
19       Q.   What does he currently doing?
20       A.   Living.
21       Q.   He's living?
22       A.   Yeah.
23       Q.   Im -- Okay.  But does he do anything
24  for a living work wise?
25       A.   Oh, I didn't -- I didn't really
```

1    understand the question.  You just said what

2    is he currently doing.

3        Q.   Okay.

4        A.   He does -- he drives Lyft, Uber.  He

5    -- he plays indoor football.  As far as I

6    know those are his -- his means of income.

7        Q.   Okay.  And what's your date of

8    birth, sir?

9        A.   ████/74.

10       Q.   And where were you born?

11       A.   Miami, Florida.  Jackson Memorial

12   Hospital.

13       Q.   Have you ever been married other

14   than to Tiandria?

15       A.   No.

16       Q.   And if you can give me your

17   educational background starting with high

18   school.

19       A.   Graduated high school and I went on

20   to college.

21       Q.   You have to tell me where, that's

22   the question.  Where did you go to high

23   school?

24       A.   Oh, the great Miami Northwestern

25   Senior High School.

1     Q.   And you graduated when?

2     A.   1993.

3     Q.   And after high school what did you

4   do?

5     A.   After high school I went on to Carson

6   and Newman College.

7     Q.   And did you get any degree there?

8     A.   No.

9     Q.   Were you suspended from either high

10   school or Carson-Newman?

11     A.   Initially from Carson-Newman I was.

12     Q.   What were you suspended for?

13     A.   Not doing well in my classes.  I

14   wasn't focusing on -- focusing on my

15   academics.

16     Q.   Okay.  And you said "initially."

17   What happened after the initial suspension?

18     A.   I actually got back -- I actually got

19   reenrolled in school.

20     Q.   And -- but you didn't obtain a

21   degree?

22     A.   No, I only stayed there one year.

23     Q.   And then after Carson-Newman where

24   did you go?

25     A.   I came back home.  After my son -- my

```
 1   son actually was born that year.  I came back

 2   home.  So I came home for two years and then

 3   I -- where -- I worked for those two years

 4   and then I decided that I wanted to get back

 5   in school again.  I had a -- I had a urge to

 6   play football again so I got a chance and

 7   enrolled in Central State University.

 8        Q.   And where is Central State

 9   University?

10        A.   That's in Wilberforce, Ohio.

11        Q.   What was the name of the city?

12        A.   Wilberforce.  Wilberforce.

13        Q.   Wilberforce?

14             MS. GOODWIN:  Wilberforce.

15        Wilberforce.

16             THE WITNESS:  Will -- yeah,

17        Wilberforce.

18             MS. GOODWIN:  Yeah, I -- I'm from

19        Ohio.

20             MR. SWITKES:  Thanks.

21             THE WITNESS:  Yeah, it's been one of

22        the top historically black colleges in

23        the nation.

24   BY MR. SWITKES:

25        Q.   And you went there from when to
```

Page 12

1    when?

2         A.   I went there from 1996 to 1997.

3         Q.   And why did you leave there?

4         A.   They actually canceled the football

5    program the year I was there.  They were

6    dealing with some personal issues and I just

7    came back home, I came back home.  I wanted

8    to help out with my son so I came back -- I

9    came back here to Miami.

10        Q.   You mentioned that you worked two

11   years after you left Carson-Newman.  Where

12   did you work?

13        A.   I worked at Jerry Basin.  Back then

14   it was a warehouse, a music distribution

15   warehouse.

16        Q.   And what did you do there?

17        A.   Just basic warehouse work.  _____

18   forklift driving.

19        Q.   And why did you leave there?

20        A.   Got back in school.

21        Q.   Okay.

22        A.   I wanted to go back to college.  I

23   wanted to continue my education.

24        Q.   And you never obtained a degree from

25   Central State, correct?

Page 13

1      A.    No.

2      Q.    And then you went to work where

3   after that university?

4      A.    I left Central State, I came back

5   home.  I got a job with -- I think it was

6   Initial Talent Tree Staffing.  It was a

7   talent -- it was a staffing agency.

8      Q.    What was the name of the staffing

9   agency?

10     A.    Initial Talent Tree.

11     Q.    And what did you do there?

12     A.    It was just various warehouse jobs.

13     Q.    How long were you there?

14     A.    I was with the agency for like, like

15   a year.

16     Q.    Why did you leave?

17     A.    The agency?

18     Q.    Yes.

19     A.    I just wanted to find something full

20   time.  I wanted something permanent, full

21   time because they was signing people to

22   temporary job assignments, but they weren't

23   really turning out the full time work.

24     Q.    So you went where?

25     A.    1997 -- that was 1997.  Let me ask

1   you, how far back are you taking me?

2       Q.   Well, you gave an answer to

3   interrogatories talking about the last 15

4   years so that's a good place to start.

5       A.   But you asked for how many years?

6   Ten?

7       Q.   Let's go in order.

8       A.   No, I'm ask -- I want to ask you that

9   question.

10      Q.   That's not the way it works.  Let me

11  explain something to you, Mr. Hilliard.

12      A.   Go ahead.

13      Q.   I get to ask the questions and you

14  get to answer them.

15      A.   All right.

16      Q.   So when I ask you where you work

17  next, it's not telling me how many years

18  you're going to tell me about --

19      A.   I'm just curious.

20      Q.   Okay.  Well, where did you work

21  next --

22      A.   I know what -- I know what you're

23  interri -- your interrogation asked for.

24  They asked for ten years.

25      Q.   Okay.  I asked you a question and

Page 15

1   it's a very simple one.

2       A.   Uh-huh.

3       Q.   Where did you work after you left

4   that creative action agency?

5       A.   Let's see, that's so far back.

6            I'm gonna be honest with you, man, I

7   can't think that far back, man.

8       Q.   Did you work for the Division of

9   Vocational Rehabilitation?

10      A.   Did I work for the Division of

11  Vocational Rehabilitation?

12      Q.   Okay.  Let's go through what you put

13  down on your answers to interrogatories.

14      A.   That -- that -- that'll be more

15  helpful.

16      Q.   But this is way later.

17      A.   I can cooperate with you before --

18  better, better.

19      Q.   See that's my problem, it doesn't go

20  back as far as I want to go.  So I'm going to

21  start with where I want to go.

22      A.   That's cool.

23      Q.   And we're at 1997.

24           So where did you work after the

25  creative agency?

1     A.    Let's see, 1997, think, think.

2           I'm gonna be honest with you, man, I

3     write -- I write stuff down.  I'll have to

4     look back over it.

5     Q.    Well, I see you wrote stuff down and

6     then --

7     A.    To remember.

8     Q.    -- the stuff you wrote down under

9     your interrogatories, you put down employment

10    search information from 2015 to now, 2019,

11    and you wrote down Creative Action, Inc.

12    A.    I went -- put down from 2015 to 2019?

13    Q.    That's what you wrote in your --

14    A.    Three years?

15    Q.    That's what you wrote in your

16    handwriting, sir.

17    A.    No, I put --

18    Q.    Four years is the way I count.

19    A.    I put more -- I put more than four

20    years.

21    Q.    Okay.  So that's why I'm asking you.

22    This doesn't make sense if you said you

23    worked there in 1997 and your answers to

24    interrogatories you said it was from 2015 to

25    2019.  So let's --

Page 17

1      A.   I'ma let you -- I'ma let you ask my

2   lawyer these questions because --

3      Q.   No.

4      A.   -- what -- what I recall.

5           What?

6           What I recall is you asking for ten

7   years.

8      Q.   I don't know where you got that

9   from --

10      A.   I sent --

11      Q.   -- and let me explain something to

12   you.

13      A.   I sent 15 years.  I sent 15 years to

14   my -- I sent that personally to my lawyer.

15      Q.   Okay.  Let me explain something to

16   you, we have a videographer here, we have a

17   court reporter sitting to your left.

18      A.   I know.

19      Q.   All you have to do is answer my

20   questions --

21      A.   And I'm doing my best to answer them.

22      Q.   -- and everybody's going to be able

23   to see the questions in the order in which we

24   did.

25      A.   And I'm answering them to the best --

Page 18

1    to the best I can.

2         Q.   Okay.  So let's go in order.  Where

3    did you work after you --

4         A.   With my -- with my disabilities, I'm

5    answering -- I'm answering them to the best

6    that I can.

7         Q.   And what disabilities might that be,

8    sir?

9         A.   Oh, you know.

10        Q.   I know that no one has described the

11   disability in regard to the Social Security

12   Administration; isn't that correct?

13        A.   Nah, they did.

14        Q.   They did?

15        A.   They did, they did.

16        Q.   So they didn't deny your Social

17   Security?

18        A.   The -- that's -- that's Social

19   Security benefits.

20        Q.   Okay.  Social Security you

21   applied --

22        A.   We talking about -- we talking about

23   disabilities.

24        Q.   Okay.  You applied for SSI recently?

25        A.   No.  And that's still going on.

1      Q.   And they denied your SSI, correct?

2      A.   It's still in the process.

3      Q.   You've got to answer the questions

4   that are before you and if you go in order --

5   because it's going to take a long time if you

6   answer your questions not mine.

7           So my question was Social Security

8   denied your application, correct?

9      A.   In the first stage.

10     Q.   And then you appealed that, correct?

11     A.   Yes.

12     Q.   And then they denied it again,

13  correct?

14     A.   Yes.

15     Q.   Okay.

16     A.   And I'm appealing it again.

17     Q.   When you went to Workman's Comp --

18     A.   It's still -- it's still appealing.

19     Q.   Okay.  You can appeal, that's fine.

20     A.   So it's not done.

21     Q.   You had Workman's Comp, correct,

22  from C&S?

23     A.   C&S, yes.

24     Q.   And they said you could return to

25  work with zero percent disability, correct?

Page 20

1       A.    Not to my knowledge, I retired from

2    there.   That's -- what I -- I retired from

3    there.   We agreed that I retired.

4       Q.    So you're not aware of the fact that

5    the doctors said you can return to work and

6    there's zero percent disability based upon

7    the injury you suffered in C&S?

8       A.    That there I'm not aware of, but the

9    injuries that I suffered at C&S, yeah.   I

10   suffered an injury to my ankle and to my

11   lower back but the hips that I have -- the

12   history that I have with my hips, the birth

13   -- the birth defects that I have with my

14   hips, you know, I didn't -- I didn't suffer

15   those from the job so that's what I'm dealing

16   with right now, physically.

17      Q.    So you're only dealing with your hip

18   you're claiming is your disability?

19      A.    No, that's not the only thing I'm

20   dealing with.   That's the main thing I'm

21   dealing with.

22      Q.    The main thing?

23      A.    Yes.

24      Q.    Okay.   When you brought up that

25   injury that happened at C&S, how did that

Page 21

1    accident happen?

2       A.   Well, it was just a typical day at

3    work.  I came into work like I usually do, we

4    got prepared, we operate electric forklifts.

5             You know what a electric forklift

6    is?

7       Q.   Just go ahead and tell me how the

8    accident happened.

9       A.   I'm trying to get you to visualize

10   it.

11            We operate electric fork --

12   forklifts.  Evidently, when I -- I found out

13   that the lift I had it was -- it was

14   defaulted, it had an issue.  I didn't know,

15   but as I was operating it to go retrieve my

16   -- my work order, when I jumped off it it

17   kept going and ran into the back of my ankle,

18   it knocked me down.  I sustained like a shock

19   to my back, but, you know what I'm saying,

20   being a warrior I am I kept working.

21      Q.   Okay.  So let me make sure.  So you

22   were on the forklift, you jumped off?

23      A.   You got to get off to go get -- to

24   go --

25      Q.   Just listen to my question.  If we

1    go in order, it will get done a lot quicker.

2        A.   What's the order?

3        Q.   The order is my questions and your

4    answer to my questions, okay?

5             So did you ever tell anybody that

6    someone rolled a pallet and it hit your ankle

7    and that's the way you got injured on the

8    job?

9        A.   That's the only way -- actually,

10   that's actually how everything came about.

11       Q.   So you didn't have two different

12   stories of how the accident happened?

13       A.   No.  I had --

14       Q.   So when the doctor wrote down that

15   one story was you jumped off the forklift and

16   injured your ankle and your back and the

17   other story you told them was you were

18   standing and the pallet rolled into you.

19       A.   No.  I won that case so the story I

20   said was correct.

21            There -- yeah, there was a -- there

22   was a guy he was shadowing me so he saw the

23   whole incident, he saw it.  And when I told

24   him, I said, Man, you saw the machine hit my

25   ankle?  I said, Man, I just need to go get an

Page 23

1    Ace bandage.

2        Q.   What was name of that person that

3    saw that?

4        A.   I can't recall that.  I can't recall

5    his name, but I told him I just wanted an Ace

6    bandage.  He took me to the office and

7    reported the whole injury and the next thing

8    I know I was taken off the floor, I was being

9    drug tested, everything.  And a couple --

10   couple of years later the matter was resolved

11   and I was right and they were wrong.

12       Q.   Okay.  So let's go back to where you

13   were.  After the agency, creative agency,

14   where did you go to work?

15       A.   All right.  You taking me here, you

16   taking me there, all right, let me think.

17            The staffing creative agency so we

18   talking about '97.  I don't know, man, I got

19   this thing.  Some things in my brain is

20   sharper than others.  '97.

21            That's why I have a situation when I

22   need to retrac -- retract something I need to

23   see it.  That's one of my reasons why I write

24   stuff down.  That's why I wrote that --

25   that's why I write -- I wrote all those jobs

Fernandez & Associates Court Reporters
305-374-8868    service@fernandezcr.com

Page 24

1    down.  I didn't write those -- honestly, I

2    didn't write those down for you.

3        Q.   I don't know what you're talking

4    about "those."  I'm looking at a chart that I

5    prepared.  So let's go --

6        A.   No, I know my job history because I

7    wrote it down and I gave it to my lawyer.

8        Q.   Yeah, I know.  And is this you're

9    handwriting?

10           I'm going to show you some answers

11   to interrogatories.

12       A.   Yes, it is.

13       Q.   So that's your handwriting?

14           MS. GOODWIN:  Yes, I just ask if

15       you're going to show it to him, you show

16       him the whole thing.  I have in my copies

17       that he actually did produce.  It starts

18       with past -- Exhibit A past 15 year work

19       history.

20           MR. SWITKES:  That's exactly what I

21       got.

22           MS. GOODWIN:  Yes.

23           MR. SWITKES:  But I'm not --

24           THE WITNESS:  '97?

25           MR. SWITKES:  -- referring to that

Page 25

```
 1      now so don't think that I'm referring to

 2      your answers?

 3           THE WITNESS:  No, I'm okay.  I'm

 4      cool with it.  I'm okay with whatever,

 5      but I just wanna -- I wanna do my best

 6      to, you know what I'm saying, to keep up

 7      -- to keep up with -- with this you're

 8      doing, but it's not -- I'm not hiding

 9      anything 'cause you have it.

10  BY MR. SWITKES:

11      Q.   Okay.  So let's go in some kind of

12  order that you might remember.

13      A.   Okay.

14      Q.   You went to work at Medi Nurse

15  Behavorial Solutions, correct?

16      A.   Yes.

17      Q.   And what was your job there?

18      A.   I was a behavorial tech -- technician

19  if I'm not mistaken.

20      Q.   And why did you leave there?

21      A.   That was just a temporary -- that was

22  a part time -- a part time --

23      Q.   So you quit?

24      A.   You going to let me answer the

25  question?
```

Page 26

1             That was a part-time job.

2       Q.    Okay.  And I asked you why you left.

3  Did you get terminated or did you quit?

4       A.    No, I didn't get terminated from that

5  job.  Them people wanted me to stay there.

6       Q.    Did you quit?

7       A.    I don't recall quitting.  I had an

8  issue with my car, I couldn't continue -- I

9  couldn't continue with the job anymore.  I

10  liked -- I -- I loved that job.

11      Q.    Okay.

12      A.    I really enjoyed that job, but I was

13  driving from -- I was driving from Miami to

14  Oakland Park Boulevard.

15      Q.    The question was did you quit or

16  were you terminated?

17      A.    No, I wasn't terminated.

18      Q.    So you quit?

19      A.    I don't like the word "quit."  I put

20  in my resignation.

21      Q.    Okay.

22      A.    So I reside.

23      Q.    So you were there for all of about

24  six months, right?

25      A.    Could have been six, could have been

1   three, could have been eight.  But I was one

2   of the best workers like everywhere,

3   everywhere I worked at.  Could have been one

4   week.

5        Q.   You were one of the best workers --

6        A.   Yes.

7        Q.   -- everywhere you worked?

8        A.   Yes.

9        Q.   Are you aware of the fact of how

10   many times you've been terminated from

11   employment?

12       A.   After 2008.

13       Q.   Are you aware of how many times

14   you've been terminated?

15       A.   After 2008 I am.

16       Q.   So how could you say you are one of

17   the best workers everywhere you worked if you

18   were terminated from most of your employment?

19       A.   That's how it all started.  My

20   lawyer, she has the documents, she has all

21   the certificates.

22       Q.   Let me explain something to you.

23       A.   I got promoted within two years.  I

24   did too -- I did too well too quick too soon

25   as a black man.  That's what happened.

Page 28

1      Q.    Each place you were terminated

2    because you did too --

3      A.    I'm talking about --

4      Q.    -- well and your learned too quick?

5      A.    I'm talking about -- I'm talking

6    about the inception.  I'm talking about when

7    it -- when it -- when it all started.

8      Q.    Okay.

9      A.    From 2006 to 2008 --

10     Q.    If we start from there --

11     A.    No, you're talking about my

12   termination from 2006 to 2008.  Go check it.

13     Q.    Try to listen to my question.

14     A.    I'm listening to them as best as I

15   can.

16     Q.    I'm glad because we're all watching

17   and there's a video of this.

18     A.    I'm cool.  I'm okay.

19     Q.    So once --

20     A.    I'm not gonna say okay because right

21   now that's not a good term to use this day

22   and time, but I'm all right with it.

23     Q.    I have no idea what you're all right

24   with, I want you to answer my questions.

25           So when I asked you why were you

Page 29

1    terminated from so many of your employers

2    when you're telling me you were the best

3    employee ---

4         A.   What job was I terminated from?

5         Q.   What job weren't you terminated

6    from?  Let's go down the list.

7         A.   Do it.

8         Q.   Were you terminated at TSA?

9         A.   No, I resigned for personal reasons.

10        Q.   After you were terminated?

11        A.   Yeah.  After I fought that case and

12   won it.

13        Q.   So when I asked you if you were

14   terminated, why did you say no?

15        A.   Because I wasn't.  I resigned for

16   personal reasons.

17        Q.   After you were terminated?

18        A.   Yes.

19             MS. GOODWIN:  Object to the form of

20        the question.

21   BY MR. SWITKES:

22        Q.   Okay.  So let's go back --

23        A.   I was -- I was terminated, I fought

24   that, and they were wrong there and I was

25   allowed to resign for personal reasons.

Page 30

1      Q.   You did that almost every place you

2   ever worked, right?

3           MS. GOODWIN:  Objection to form.

4           THE WITNESS:  No, not after 2008.

5   BY MR. SWITKES:

6      Q.   Okay.  So you worked at --

7      A.   And I'm here in the flesh to talk

8   about it.

9      Q.   Okay.

10      A.   Just like I am with this case here.

11      Q.   Okay.  You worked at United Cerebral

12   Palsy, correct?

13      A.   Yes.

14      Q.   From when to when?

15      A.   Let me see.  That was after-school

16   program I was -- I was the best staff member

17   there, I have the award.  I have the award to

18   prove it.

19      Q.   I asked you -- this is going to take

20   forever if you keep --

21      A.   It may do.  I'ma answer your

22   questions, I'ma answer them.

23      Q.   You can't ask me any questions.  All

24   you have to do is answer my questions.

25      A.   If you keep interr -- if you keep

1   interrupting me it's going to take forever.

2       Q.   'Casue I asked you when you worked

3   some place and you're telling me --

4       A.   I'm telling you --

5       Q.   -- how great you were at every place

6   you worked.

7       A.   It's gon' take a while -- it's gon'

8   take a while for me to recall.  I don't know

9   exactly, you know what I'm saying, what it

10  is, what the reason is, but I don't want to

11  feel like I'm being picked at due to my

12  disabilities and my disability.

13      Q.   Sir, you filed this federal lawsuit.

14      A.   Uh-huh.

15      Q.   And this federal lawsuit I'm allowed

16  to depose you which is what we're doing

17  today.

18      A.   I got no problem with that.

19      Q.   Excuse me?

20      A.   I have -- I have no problem with

21  that.

22      Q.   Okay.

23      A.   That still doesn't take away from me

24  being disabled so you bear with me.  So

25  lets's answer -- let's -- let's -- let's try

Page 32

1   to get through this as best as we could with

2   my disabilities.  I don't know your

3   disabilities.  You know mines.

4        Q.   Sir, I'm going to ask you questions,

5   if you answer my questions we'll get done

6   today.  If you continue like this --

7        A.   I understand that.

8        Q.   -- we won't get done today.

9        A.   I understand that and I'm telling --

10       Q.   Okay.  Sir --

11       A.   -- you I'm doing my best and I'ma do

12   my best.

13       Q.   Well, do a little better and just

14   answer my questions.

15            You left the United Cerebral Palsy

16   because?

17       A.   Because I felt like it.  I didn't --

18   I --

19       Q.   Okay.  And then you went to Miami

20   Behaviorial Spectrum Program, correct?

21       A.   Yes.

22       Q.   And that was from 11/2005 to April

23   of 2006, right?

24       A.   Yeah, that was a temporary hurricane

25   relief project so that was only for a few --

Page 33

1          Q.    And you quit or you -- or you --

2          A.    I just told you it was temporary.  I

3     -- I didn't get fired from that.  That --

4     that was temporary assignment.  The funding

5     -- the funding ran out.

6          Q.    Okay.  And then you went to --

7          A.    I just felt like working.  I -- I

8     wanted to work.  I don't know what's the

9     problem with me wanting to work, I worked.

10    All of those are jobs.

11         Q.    Where are you working now?

12         A.    I'm disabled right now.

13         Q.    When was the last time you worked?

14         A.    Last time I worked was C&S.

15         Q.    And that was in what year?

16         A.    That was 2000 -- I got injured 2014.

17    2014.

18         Q.    I thought you said you always

19    worked?  You haven't worked in the last five

20    years?

21         A.    I have always worked.

22               MS. GOODWIN:  Object to the form.

23               THE WITNESS:  I have -- I have --

24    BY MR. SWITKES:

25         Q.    You haven't worked in the last five

Page 34

1   years?

2           MS. GOODWIN:  Object to the form.

3           THE WITNESS:  I actually had a job

4       offer two months ago.

5   BY MR. SWITKES:

6       Q.   And what happened?

7       A.   They told me I was -- they told me I

8   had a felony.

9       Q.   I thought you had a job offer?

10      A.   I did.  I had a job offer.

11      Q.   Job offer means they offered you the

12  job --

13      A.   Meaning I was --

14      Q.   And you either accepted or rejected.

15      A.   -- prepared to get -- I was prepared

16  to get fired -- I was prepared to get hired

17  with the security.  The security license that

18  I obtained, I was prepared to get hired until

19  they told me that I was a felon.

20      Q.   So in the last five years that's the

21  only place that someone wants to work has

22  been able to find work?

23      A.   No, I've been dealing with a

24  disability for the past -- let me see, has it

25  been five years?

Page 35

```
 1              2014, '15, '16, '17, '18.

 2              Yeah, from 2014 to now I've been

 3    dealing with a disability.  I'm still -- I'm

 4    still dealing with it and I'm still trying.

 5        Q.   Have you applied for more than one

 6    job in the --

 7        A.   You know what, I'm --

 8        Q.   Excuse me, listen to my question.

 9              Have you applied for more than one

10    job in the last five years?

11        A.   That's the first job I applied for

12    since.

13        Q.   Okay.  So --

14        A.   I mustered the strength to apply for

15    that and I did it.

16        Q.   Okay, great.

17              Now you worked at All Roving Leaders

18    Alternative Educational Program, correct?

19        A.   Yes.

20        Q.   And you were working security?

21        A.   Yes.

22        Q.   And you worked there for how long?

23        A.   Let me see.  It probably was like

24    about four months.

25        Q.   And you quit or you were --
```

Page 36

1      A.   No they --

2      Q.   -- terminated?

3      A.   They lost funding to the program.

4  That was unfortunate, man.  You ever heard of

5  Justca (phonetic) Program?  Dorian Rowe?

6  That was another program.

7      Q.   And you next -- and you next went to

8  work at the TSA?

9      A.   That's when.  That's when it all

10 started when I went to TSA.

11     Q.   Okay.  And you worked there from

12 when to when?

13     A.   That was from 2006 to 2008.  From --

14     Q.   And you were terminated there?

15     A.   Initially I was terminated two months

16 before my two year probationary period, but

17 there was an -- there was an EEO claim

18 against that and I proved that.  That's --

19 that's one of my proudest moments there.  I

20 proved that here in Miami, Florida that a

21 black man can be singled out and

22 discriminated against --

23     Q.   So the TSA --

24     A.   -- for just doing his job.

25     Q.   So the TSA discriminated against

Page 37

1    you?

2         A.    It was TSA/DHS, yes.

3         Q.    And you collected unemployment

4    compensation?

5         A.    Yeah.  You know when I got -- when I

6    initially got terminated from them they --

7    they tried to claim that I didn't deserve the

8    benefits because I was terminated and I

9    proved that I did.

10        Q.    How many times have you collected

11   unemployment compensation?

12        A.    Let me see.  I definite -- TSA --

13   honestly, if I -- you tell me.  I've been

14   terminated so many times.  If I ever been

15   terminated, I applied for unemployment.  And

16   if I was -- and if I was granted in my

17   unemployment, that meant I was right.

18        Q.    How many times?

19        A.    I can't recall.

20        Q.    Give me your best estimate?

21        A.    Two.

22        Q.    After being terminated at TSA you

23   went to General Hauling Services, correct?

24        A.    No, after being terminated from TSA,

25   I fought that case and I was allowed to

Page 38

1    resign for personal reasons.

2        Q.    Okay.

3        A.    So on paper it's actually just a --

4    it's a resignation.

5        Q.    Okay.  And then --

6        A.    I don't understand why you don't want

7    to -- why you don't want to honor that and

8    respect that.

9        Q.    And then you went to General Hauling

10   Service, correct?

11       A.    Yeah, I went and got my CDL Class B

12   license and I went on General Hauling.

13       Q.    And you were a driver/helper,

14   correct?

15       A.    Yes.

16       Q.    For the trash company?

17       A.    Yes.

18       Q.    And you were terminated there,

19   right?

20       A.    I was terminated there and that

21   business been around for about 50 years.  The

22   business doesn't even exist anymore.

23       Q.    All I asked you was, you were

24   terminated --

25       A.    I felt like saying that.  I felt like

Page 39

1   saying that.

2       Q.    -- you can answer yes or no.

3       A.    That business been around for 50

4   years.  It seems like anywhere where I go,

5   I'm being targeted.  To the point where

6   they'd take a whole business down.

7       Q.    So you're saying the whole business

8   went down --

9       A.    Yeah.

10      Q.    -- just because of you?

11      A.    I don't know if it's just because of

12  me, I don't know if that's a coincidence.

13  That's a big coincidence to me.

14      Q.    Mmm-hmm.

15            And then you went to work for Kelly

16  Services as a temp, right?

17      A.    Yeah, Kelly Staff and Services.

18      Q.    And you worked there for all of one

19  month, right?

20      A.    It's a temporary -- it's a temporary

21  agency.  I can go -- I can go back there and

22  work right now if I want to.  It's a staffing

23  agency.

24      Q.    Okay.  You --

25      A.    If I need --

Page 40

1        Q.    The question was you worked there

2    one month; is that correct?

3        A.    I can't recall if it was one month.

4        Q.    And then you went to work for AAA

5    Auto Club South, correct?

6        A.    Yes, Triple A.

7        Q.    And you were terminated there,

8    right?

9        A.    Yeah, a state trooper -- yes, yeah.

10   I can prove everything.

11       Q.    And you got unemployment

12   compensations --

13       A.    From them?

14       Q.    -- from there, correct?

15       A.    If I was right I did.

16       Q.    Did you get unemployment

17   compensation?

18       A.    If I unfairly got terminated, I did.

19       Q.    Did you get --

20       A.    If I was unfairly terminated, I did.

21   That's my answer.

22            MS. GOODWIN:  Are you asking him if

23       he remembers if he got unemployment from

24       that --

25            MR. SWITKES:  I asked him if he got.

Page 41

1       I don't think that question is --

2            THE WITNESS:  More than likely.

3            MR. SWITKES:  -- very difficult.

4            THE WITNESS:  More than likely I

5       did.  If I was unfairly terminated.

6    BY MR. SWITKES:

7       Q.   And then you --

8       A.   Because you don't get -- you don't

9    get unemployment benefits if you're fairly

10   terminated and you know that.

11      Q.   And then you went to Mac Town,

12   correct?

13      A.   Yes, good-ole Mac Town.

14      Q.   And you worked at good-ole Mac Town

15   for how long?

16      A.   Let me see.  That's with the disabled

17   adults, I did a lot of guards work.  I was

18   there for I think a year it was like -- No, I

19   think it was like two years.

20      Q.   And then you got terminated?

21      A.   Yes.

22      Q.   Ah.

23      A.   Now ask about employment.

24      Q.   Did you collect unemployment?

25      A.   Yeah, and they -- they --

Page 42

1     Q.   Yeah.

2     A.   -- they initially tried to fight it,

3  but I won that too.

4     Q.   And then you went to work at C&S

5  Wholesale, correct?

6     A.   Yes.

7     Q.   And that's where we talked about you

8  got injured, correct?

9     A.   Yes.

10    Q.   And the doctor that was treating you

11 said you --

12    A.   Hold up.

13    Q.   -- had healed and that you had --

14    A.   I -- I --

15    Q.   Excuse me, you can't talk over me.

16    A.   Go ahead.

17    Q.   The court reporter sitting to your

18 left is going to take down both of us so when

19 I'm done with the question you're going to

20 have all time you need to answer.

21    A.   Go ahead.

22    Q.   After --

23    A.   No, start from the beginning.  You

24 said doc -- you said doctor or doctors.

25    Q.   The doctor, one doctor.

Page 43

1      A.    Okay.

2      Q.    Found that you had no disability and

3   you return -- you could return to work and

4   you told him you have no intention of

5   returning to work, correct?

6      A.    I don't recall that.

7      Q.    Okay.

8      A.    I've seen numerous doctors.  That's

9   why --

10      Q.    Okay.  Do you remember Dr. Meli?

11      A.    Dr. Meli.

12      Q.    Yeah.  Oh, excuse me for

13   mispronouncing it.

14          Do you remember him?

15      A.    Yeah.

16      Q.    Didn't he tell you, you were cleared

17   with zero disability and you could return to

18   work?

19          MS. GOODWIN:  Object to the form.

20          THE WITNESS:  He treated me for my

21      ankle.  He treated me for one thing.

22   BY MR. SWITKES:

23      Q.    The question is yes or no.

24      A.    I don't -- I don't -- I don't recall

25   that.

Page 44

1     Q.   You don't recall that?

2     A.   If he treated me for my ankle and he

3  felt like his time was up with me for my

4  ankle, that's one doctor.  I was seeing

5  another doctor.

6     Q.   So the answer is yes he told you

7  that?

8     A.   I was cleared for my ankle by Dr.

9  Meli, yes.

10    Q.   Okay.

11    A.   And do you know that --

12         MS. GOODWIN:  There's not a

13    question.

14         THE WITNESS:  Go ahead.

15  BY MR. SWITKES:

16    Q.   You ever been arrested?

17    A.   Yeah, you know that.

18    Q.   How many times?

19    A.   That's why -- that's why I'm here

20  now.

21    Q.   How many times?

22    A.   I was arrested in 1999.

23    Q.   For what?

24    A.   For resisting arrest without

25  violence.  That's nolle pros, that case was

Page 45

1    thrown out.

2         Q.    What department were you arrested by

3    in 1999?

4         A.    That was probably City of Miami.

5         Q.    And your next arrest?

6         A.    Two -- when was that?

7               2016.

8               No, it wasn't --

9         Q.    Are you forgetting a few?

10        A.    I forget them all because they was

11   all B.S. but.

12        Q.    Whether you think they were B.S. or

13   not, I asked you have you ever been arrested.

14        A.    And I told you --

15        Q.    Give me the dates.

16        A.    And I told you, yes.

17        Q.    Okay.  You told me about the first

18   arrest in 1999 resisting without.  And I

19   asked you what other arrests have you had?

20        A.    And I'm trying my best to recall.

21        Q.    And you don't recall them?

22        A.    And you're still being insensitive to

23   my disabilities.

24        Q.    I'm asking you questions --

25        A.    Speaking on --

Page 46

1      Q.    -- because you filed a lawsuit and I

2   am not going to discuss this --

3      A.    And I'm going to prove my lawsuit

4   too.

5      Q.    Okay.

6      A.    Speaking on -- speaking on my arrest,

7   it kind of takes me back and it's kind of

8   putting me in a dark place right now so I

9   want to take a break right now.

10     Q.    You can --

11     A.    And then I'll --

12     Q.    You can take a break.

13     A.    And then I'll come back.

14     Q.    Okay.

15     A.    Hopefully I can, you know what I'm

16   saying, answer questions.

17     Q.    We've been going all of about 30

18   minutes, but we'll take the --

19     A.    I don't need 30 minutes.

20     Q.    -- first break right ahead.

21          THE VIDEOGRAPHER:  We'll go off the

22     record, standby.

23     (A brief recess was taken at 2:35 p.m.)

24          THE VIDEOGRAPHER:  We're back on the

25     record, sir.

Page 47

1    BY MR. SWITKES:

2        Q.    Now that you've had a short break,

3    can you recall your other arrests?

4        A.    Not mistaken 2009.

5        Q.    And what were you arrested for in

6    2009?

7        A.    I think it was for -- they said doing

8    business without a license.

9        Q.    And what were you doing at the time

10   that they said that?

11       A.    I was just talking into the store,

12   that was it.  When I came back out I was

13   arrested.

14       Q.    Excuse me?

15       A.    When I came back out the store I was

16   arrested.

17       Q.    And you weren't doing any business?

18       A.    No.

19       Q.    Okay.  And what was the next arrest?

20       A.    I think that's the last time I was

21   targeted until this arrest here.

22       Q.    That was the last time you were

23   targeted you said?

24       A.    Yes.

25       Q.    Okay.  And have you been involved in

Page 48

1    any accidents, sir, other than the C&S we

2    already heard about that?

3        A.    No.

4        Q.    You didn't have any automobile

5    accidents?

6        A.    No, I don't do that stuff.  I've been

7    blessed.

8        Q.    Have any accidents while playing

9    football?

10       A.    No, acc -- no, no accidents.

11       Q.    How about injuries playing sports or

12   anything else --

13       A.    Yes.

14       Q.    -- during your lifetime before you

15   applied for H.H.A.?

16       A.    Yes.

17       Q.    Where and when?

18       A.    My junior year in high school I

19   fractured my right hand and I had a cast on

20   that hand for about two months.  They wanted

21   me to have one more four, but I took it off

22   in two and a half.

23       Q.    And your next injury?

24       A.    That's it.  That's the only football

25   injury I ever had.

1      Q.    Have you ever been treated by a

2   psychologist or psychiatrist?

3      A.    Yes.

4      Q.    When was the first time?

5      A.    From what I know first time it was

6   when I went to New Horizon.

7      Q.    And when is that, sir?

8      A.    That was 2015.

9      Q.    And why did you go to New Horizons?

10     A.    I -- that was right after the work

11   injury at C&S and when I found out about the

12   history with my hips it was just a

13   coincidence that I found out about my hip

14   injuries during the Work Comp situation.

15          The doctor, she was looking at my

16   lower back and she noticed both of my hips.

17   She said, Your hips are about to go.

18          I was like, What?

19          I didn't understand it and that

20   actually is what really sent me into

21   depression because I was wondering what --

22   what was some of the pain I was dealing with,

23   with my hips.  I tried to find out for years

24   and years and years and years. I never could

25   find out and that's when I found out that I

Page 50

1   have a hip deformity in both of my hips

2   and that's what sent me into a depression.

3        Q.   You have a case of mild arthritis in

4   both hips; isn't that correct?

5        A.   Case of mild arthritis?

6        Q.   Yes, sir.

7        A.   No, that's not -- that's not --

8   that's not true.

9        Q.   Okay.  What -- what do you think the

10  records show that your hip diagnosis was?

11       A.   That's not what I think.  My doctor,

12  Dr. Edward Silverman.

13       Q.   Yeah.

14       A.   He told me my hips are to the point

15  where I can get two hip replacements next

16  year if I need so to, but he won't recommend

17  it 'cause I'm too young and they're too --

18  they're too far gone to do any corrective

19  surgery so that's what I'm swallowing in life

20  right now.

21       Q.   Okay.  But my question was why did

22  you go to New Horizons way back when when I

23  asked that question?

24       A.   For that reason.

25       Q.   'Cause your hip diagnosis?

1      A.    Yes, it sent me into a depression.

2      Q.    Had you ever been diagnosed with

3   depression before 2015?

4      A.    No.

5      Q.    And who placed you in New Horizons?

6      A.    I volunt --

7      Q.    Did you voluntarily go in?

8      A.    I volunteered myself.

9      Q.    Did you ever threaten suicide?

10      A.    That's not a hospital.  That's --

11   that's -- that's -- that's a walk in, walk

12   out facility.

13      Q.    Okay.  So you went into New Horizons

14   because you were depressed about your hip

15   diagnosis?

16      A.    Hips.

17      Q.    Hips.

18      A.    Plural.

19      Q.    Both hips.  You have a mild

20   deformity of the femoral --

21      A.    You keep saying I have --

22      Q.    Listen to my question and don't talk

23   over me --

24      A.    You keep saying --

25      Q.    -- because the court reporter --

Page 52

1       A.   You keep saying I have a mild hip

2   deformity.

3       Q.   If you listen to my question you can

4   say anything you want after.

5       A.   Okay.  Let's go.

6       Q.   I've read the records.  Your records

7   indicate that you have a small growth at the

8   end of your fibula which is a arthritic

9   problem and it is a mild to moderate

10  condition that many people have.  You were

11  only in your 40s when it was diagnosed,

12  correct?  And you've had some injections for

13  that condition, correct?

14      A.   No, I guess --

15           MS. GOODWIN:  Object to the form.

16  BY MR. SWITKES:

17      Q.   Correct?

18           MS. GOODWIN:  You can answer if you

19      know the answer.

20           THE WITNESS:  Nope.

21  BY MR. SWITKES:

22      Q.   You haven't had injections into your

23  hip?

24      A.   I don't want to answer your question.

25      Q.   Well, you have to answer my

Page 53

1    question.

2         MS. GOODWIN:  Answer the question.

3         THE WITNESS:  Oh.  Yes, that's

4    what's getting me through.  Thank God for

5    those injections.  I'ma get them every

6    three months for the rest of my life

7    until I get hip replacements.

8  BY MR. SWITKES:

9    Q.   Okay.  And you're saying the hip

10  depression was the reason why you were put in

11  there, in New Horizons?

12   A.   You keep saying I was put in

13  somewhere.  New Horizons isn't a place -- are

14  you familiar with New Horizons?  That's not a

15  place you're put into.

16   Q.   Okay.

17   A.   That's a walk -- that's a, you know

18  what I'm saying --

19   Q.   How long were you at New Horizons?

20   A.   I was going to New Horizon seeing

21  Dr. Poitier for about two years.

22   Q.   Okay.  Have you been placed in any

23  other psychiatric facility?

24   A.   I never was placed in a psychiatric

25  facility.

Page 54

1      Q.   So you voluntarily went in what

2   other psychiatric facility?

3      A.   Yeah, that's my right.  I went there

4   voluntarily.

5      Q.   What other was the question not if

6   you have a right.

7      A.   No, I don't like the way you're

8   phrasing the question.

9           MS. GOODWIN:  Just answer the

10      question, Elgin.

11          THE WITNESS:  I'ma take -- I'ma take

12      another break.

13   BY MR. SWITKES:

14      Q.   If you need a break, you'll tell us

15   whenever you need it and we'll start taking

16   how much time on these breaks --

17      A.   One thing about it, when you're wrong

18   I'ma correct you.

19      Q.   I'm not going to get into dialogue,

20   that's what you're attorney's for, but we'll

21   take another break.

22      A.   Let's do it.

23          MS. GOODWIN:  We're off the record

24      at 2:44.

25      (A brief recess was taken at 2:44 p.m.)

Page 55

1          THE VIDEOGRAPHER:  And we're back on

2      the record at 2:48.

3  BY MR. SWITKES:

4      Q.   Sir, I think the question was have

5  you ever been in any other psychiatric

6  facilities?

7      A.   I never been in one before.

8      Q.   So you weren't placed in a facility

9  because you claimed you were going to commit

10  suicide?

11      A.   No.

12      Q.   You didn't tell someone working at

13  C&S's claim department that you were going to

14  be a threat to yourself or others and you

15  intended to take a knife and cut your throat?

16      A.   No, I didn't say a that.

17      Q.   Did you go to Jackson Memorial

18  Hospital for psychiatric treatment?

19      A.   Yes.

20      Q.   I thought you weren't in any other

21  psychiatric facilities?

22      A.   I wasn't placed in that facilities, I

23  volunteered myself there.   Actually my wife

24  -- my ex-wife volunteered me.  That's how --

25  that's how I wound up going in.

Page 56

1      Q.   See it's difficult for someone else

2    to volunteer you.

3      A.   No, it's not.  That's how it went.

4      Q.   You can volunteer yourself when

5    someone else takes you some place, it isn't

6    you volunteering.  Do you understand the

7    distinction?

8      A.   I know -- I -- I -- I know.

9      Q.   And isn't the record from Jackson

10   that you threatened to commit suicide --

11     A.   No, it's not.

12     Q.   -- by taking a knife and cutting

13   your throat?

14     A.   That's not what I said.  That's what

15   she said.

16     Q.   Who is "she"?  Your wife?

17     A.   Yeah.

18     Q.   Your ex-wife?

19     A.   Yeah.

20     Q.   So your ex-wife lied about the

21   reason why she brought you there?

22     A.   I don't know if she lied or not, but

23   that's what she said.  What I was saying they

24   were ready to send me home.  They wasn't even

25   going to do the intake on me until she said

Page 57

1    that.

2           Do your research, man.

3      Q.   Okay.  So your wife lied about what

4    she heard you say?

5      A.   I don't know what she --

6           MS. GOODWIN:  Object to the form.

7           THE WITNESS:  I don't know if she

8      lied or told the truth, man.

9    BY MR. SWITKES:

10     Q.   It's in the medical records.

11     A.   That's what she said.

12     Q.   Yeah, that's what she said.

13     A.   You said, I said it.  Who said it?

14     Q.   Well, actually --

15     A.   I said it or she said it?

16     Q.   Both of you.

17     A.   I didn't say it.

18     Q.   Didn't you tell the claim worker

19   at C&S --

20     A.   I wouldn't have been let out if I

21   said that.

22     Q.   Excuse me, you keep interrupting me.

23     A.   And like I told you before --

24          Go ahead.  Go ahead.

25          MS. GOODWIN:  Listen to him and

Page 58

1      answer.

2              THE WITNESS:  All right.

3              MR. GOODWIN:  Ask the question.

4      Take a breath, then answer.

5              THE WITNESS:  Go ahead.  Nah, go

6      ahead, man.

7   BY MR. SWITKES:

8      Q.   Did you call a claims officer at C&S

9   and tell her that you are a danger to

10  yourself and others?

11     A.   No, I don't know where you're getting

12  that from.

13     Q.   From the records at C&S.

14     A.   That's not true.

15     Q.   So she lied about it?  So now we

16  have your wife lying about it and the

17  caseworker lying about it?

18     A.   This issue you're talking about, I

19  have no clue who you talking about.

20     Q.   It's the claims person who was

21  handling your Workman's Comp claim.

22             MS. GOODWIN:  Object to the form.

23             THE WITNESS:  I'm saying no.  I'm

24     saying I don't rec'it, under oath.

25  BY MS. SWITKES:

Page 59

1      Q.   Okay.  How many hours were you at

2   Jackson after your wife placed you at

3   Jackson?

4      A.   I'm not saying she placed me in

5   there.  She's the one that said about me

6   cutting my knife -- my neck with a knife.  I

7   didn't -- I didn't say that.

8      Q.   How long were you at Jackson, sir?

9      A.   I was in there -- let me use your

10   term.  Every little bit of -- what's two and

11   a half days?  It wasn't even a full three

12   days.  At one point I said, I'm ready to go

13   home and they let me go.

14      Q.   Okay.  Did you go to treatment

15   sessions while you were there?

16      A.   Yes.

17      Q.   And did you tell them that the

18   treatment was helping you?

19      A.   I don't even think it was about the

20   treatment help -- helping me or not.

21      Q.   The question was --

22      A.   That's their -- that's their --

23   that's their -- their decision, that's not my

24   decision.  I can't tell -- I can't tell them

25   if something's helping me.  They gotta tell

Page 60

1    me how to help me.

2        Q.    Okay.  But sir --

3        A.    Go ahead.

4        Q.    -- the records say that the patient

5    advised that the treatment is helping.  Are

6    you denying you said that to them?

7        A.    No, if I was there two and a half

8    days and I was released, evidently, whatever

9    -- whatever they were doing it helped for

10   that time period.

11       Q.    Okay.

12       A.    And I'm here.

13       Q.    Okay.  And then you were seeing Dr.

14   Poitier, correct?

15       A.    That's the first person I saw.

16       Q.    You saw him before you went to

17   Jackson?

18       A.    Give me a minute, man.  I'm going to

19   sip this water real quick.

20       Q.    Excuse me?

21       A.    I said give me one, let me sip on

22   this water.  I got to take a sip of water.

23   Like you sip tea, I'm going to sip this

24   water.

25             You ready?

Page 61

1        Q.    Okay.   The question was did you see

2    Dr. Poitier before you went to Jackson or

3    after?

4        A.    Like I told you, Dr. Poitier that's

5    the psychiatrist that I was seeing at New

6    Horizons.   That's the first psychiatrist I

7    ever saw.

8        Q.    And what did you tell him about

9    substance abuse?

10       A.    Poitier?

11       Q.    Yeah.

12       A.    I don't do drugs.   I don't -- I don't

13   -- I don't do drugs.

14       Q.    So --

15       A.    I may -- I may have told him when I

16   first went there in 2015 that my pain was so

17   severe that I considered doing -- doing

18   illegal drugs, but I don't -- I don't do

19   illegal drugs.

20       Q.    So if his records says you gave him

21   history of using cocaine and alcohol --

22       A.    That's not true.

23       Q.    -- and medication, Dr. Poitier would

24   have not taken down the correct history from

25   you?

Page 62

1          A.   Dr. Poitier?

2          Q.   Yeah.

3          A.   If his words were bond, I would have

4     -- I would have been received my disability

5     because he say a lot of stuff.  He was the

6     one that said I was disabled, but they

7     didn't hold his -- his --

8               MS. GOODWIN:  Just answer the

9          question he asked.

10              THE WITNESS:  He have no way.

11    BY MR. SWITKES:

12         Q.   You're not answering my questions.

13         A.   I am.  I did answer your question.  I

14    told you --

15         Q.   Did you tell him that you were using

16    cocaine?

17         A.   No.

18         Q.   So the records say that he's

19    mistaken?

20              MS. GOODWIN:  Object to the form.

21              THE WITNESS:  You tell me.  I'm

22         telling you what I said.

23    BY MR. SWITKES:

24         Q.   Okay.

25         A.   I can't tell you what he said.

Page 63

1       Q.    Have you ever filed any lawsuits,

2    sir?

3       A.    Yes.

4       Q.    Against who?

5       A.    C&S.   You know that, we talked about

6    it.

7       Q.    Any other lawsuits, sir?

8       A.    If you call EEO -- EEOC that's --

9    EEOC if you call that a lawsuit, yes.

10      Q.    You filed a claim with EEOC against

11   TSA?

12      A.    Yeah.

13      Q.    Any other, sir?

14      A.    No, that's it.   The only -- the only

15   two times I had to fight and win.

16      Q.    How many Workman's Comp claims have

17   you ever filed?

18      A.    How many Workman's Comp claims have I

19   filed?

20      Q.    Yes, sir.

21      A.    Workman Comp lawsuits?

22      Q.    Workman's Comp claims.   Injuries on

23   the job that lasted more than 14 days?

24      A.    I had a -- I had a injury on the job

25   with Three Springs.   I had a hernia.

Page 64

1       Q.    How did that happen?

2       A.    Working through the night we -- we

3  were responsible for doing laundry.  And the

4  laundry bucket, it was heavy, heavier than I

5  suspected.  I don't know, 75 pounds.  I tried

6  to pick it up and damaged, I sustained a

7  hernia.

8       Q.    And who treated you for the hernia?

9       A.    Dr. Maria.

10      Q.    And then what treatment did she

11  provide?

12      A.    It's called inaugural hernia surgery.

13  She's -- she's the one did my surgery.

14      Q.    And where was the surgery?

15      A.    Let me think.

16            I'd be guessing.  I think it was

17  Mercy Hospital.

18      Q.    And approximately when was that,

19  sir?

20      A.    It was -- it happened like a few

21  months after the injury.  Everything -- it

22  was all quick.

23      Q.    In what year, sir?

24      A.    That was two thousand -- yeah, it had

25  to been 2003 if it I'm not mistaken.

Page 65

1      Q.    Any other Workman's Comp injury,

2   sir?

3      A.    No, that's the only -- that's the

4   only other one.

5      Q.    Okay.

6      A.    That was just an injury.  I was back

7   to work I think four months after that.

8      Q.    Okay.  And what were you doing at

9   Three Springs.

10     A.    We working with youth sex offenders

11  that were ordered by the courts.

12     Q.    And how long did you stay there?

13     A.    I stayed at Three Springs if I'm not

14  mistaken about a year.

15     Q.    Why'd you leave?

16     A.    I just decided not to be there

17  anymore.  I don't know, I get --

18     Q.    So you quit?

19     A.    I reside.  Once I do certain -- one

20  thing for sure, I like to work because I'm

21  always working.  I just don't like to hang

22  around too long.

23     Q.    You haven't worked for the last five

24  years, but you like to work?

25         MS. GOODWIN:  Object to the form.

Page 66

1          THE WITNESS:  Huh?

2     BY MR. SWITKES:

3          Q.   You haven't worked for the last five

4     years, but you like to work?

5          A.   If I kick this disability I will.

6          Q.   Are you -- do you think that with

7     what you think are your disabilities there

8     are no jobs out there that you can perform?

9          A.   No, there may be.  I don't know but

10    -- I don't know, maybe, it's a black male

11    thing.  It's hard for black men to find jobs

12    here in Miami.

13         Q.   I asked you are there any jobs that

14    you could perform.  It had nothing to do with

15    race.  Can you answer my question?

16         A.   If I was to get another job, I feel

17    like I'm gonna be targeted again, I'm gonna

18    be terminated again.

19         Q.   So why --

20         A.   That's why --

21         Q.   So you haven't looked for a job

22    because you think you're going to be

23    targeted?

24         A.   I'm dealing with my disability.  Once

25    I get over the disability -- aside from the

Page 67

1    security thing, I looked for the job with the

2    security thing but they sent me -- this

3    arrest set me back, man.

4        Q.   So if you can apply for a job as a

5    security guard --

6        A.   Uh-huh.

7        Q.   -- are there any other jobs you

8    think you can perform?

9        A.   That's the thing, see, even with the

10   security thing I don't know because I haven't

11   even done it yet.  And do you know that I'm

12   -- I'm going to through that.  Through a

13   disability program so that disability program

14   deemed me disabled.  They're the ones that

15   recommended the security career for me.

16       Q.   What disability program are you

17   there for?

18       A.   What's that thing called?

19            The Vocational Rehabilitation

20   Program.  That's the disability program that

21   actually paid for my security license.  And

22   if I wasn't deemed disabled, I wouldn't -- I

23   wouldn't even be a part of that program so

24   thank God for that program, I'ma part of it

25   and I'm in pretty good hands with them right

1   now.

2       Q.   When did you apply for the

3   Vocational Rehabilitation Program?

4       A.   That was around Thanksgiving time

5   2018.

6       Q.   So for --

7       A.   November 2018.

8       Q.   You didn't apply anywhere else to

9   work between --

10      A.   That's -- that's --

11      Q.   -- that date and the date --

12      A.   That's a disability program.

13      Q.   Okay.

14      A.   I was trying to figure out why am I

15  having all these issues with jobs and I kind

16  of got the idea when I got -- when I went to

17  the disability program.  So that's where I'm

18  at.  I'm with them right now and no telling

19  how long I'm going to be there with them, but

20  I'm in pretty good hands with them and I feel

21  -- I feel safe with them.

22      Q.   Okay.  My question was how many

23  other jobs between the time that you were

24  denied with Hialeah Housing Authority and the

25  present time have you applied for jobs?

Page 69

1      A.    During my disability, none.

2      Q.    None.

3      A.    And if it wasn't for -- if it wasn't

4  for this work program who knows.

5            MS. GOODWIN:  Just answer the

6      question.

7            THE WITNESS:  That stuff eventually

8      plays on people psyche, man.

9  BY MR. SWITKES:

10     Q.    Had you ever applied at Hialeah

11 Housing Authority for housing assistance

12 before you went there in 2016?

13     A.    No.

14     Q.    That's not true.  There's a record

15 of you doing that back in the late 1990s.

16     A.    Me?

17     Q.    You don't -- you don't remember

18 that?

19     A.    Me?

20     Q.    Yeah, you.

21     A.    That's not true.

22     Q.    Okay.  Did your mother do that?

23     A.    I don't know, man, I can't tell you.

24 I couldn't tell you that, I don't know.

25     Q.    What medications are you presently

Page 70

1    taking --

2        A.    Like I said.

3        Q.    -- besides those two drugs you told

4    me about?

5        A.    That's it.

6        Q.    Were you taking OxyContin at any

7    time after the H.H.A. denial?

8        A.    I never took OxyContin.

9        Q.    So if you told doctors you were

10   taking it four to five days -- times a day

11   that would be incorrect?

12       A.    OxyContin?

13       Q.    Yeah, OxyContin.

14       A.    I never -- I never take OxyContin.

15             You're not as sharp as I thought you

16   were.

17       Q.    Excuse me?

18             MS. GOODWIN:  Just --

19   BY MR. SWITKES:

20       Q.    I couldn't hear what you said

21   underneath your breath.  What'd you say?  You

22   don't remember what you said?

23             MS. GOODWIN:  You have to answer the

24       question now.

25             THE WITNESS:  Oh, I said you're not

Page 71

1      as sharp as I thought you were.

2   BY MR. SWITKES:

3      Q.   Okay.  When you applied at H.H.A.

4   who were you living with at the time?

5      A.   My kid's mother, my ex-wife.

6      Q.   And how long had you been living

7   there?

8      A.   Off and on however long she let me

9   live there.  It's her place, it's her house,

10  you know what I'm saying?  It's not my place.

11  She -- she allows me to come there and sleep

12  there and bring my clothes there.  As long as

13  she's at her place.

14     Q.   Listen to my question.  When did you

15  first start living there?  Give me a date.

16  That was the question.

17     A.   Let me think.  She -- honestly I

18  can't recall that.

19     Q.   Give me a year.  I'm not asking you

20  for a specific day.

21     A.   I start living there with her -- I

22  don't know, man, that's hard to answer.

23     Q.   I have no idea what that answer

24  means.

25     A.   It means during the period of time I

Page 72

1    was homeless, I was living in my car so if I

2    had a opportunity to go in her house and

3    sleep -- I don't know that constitute me

4    living there with her.

5        Q.   Living there means sleeping there.

6    Going into a bed or a couch or the floor and

7    sleeping there.  I asked you a date and time

8    because when you applied for H.H.A. that's

9    where you were living, correct?

10       A.   Possibly.

11       Q.   Okay.  So how long before your

12   application did you start living there?

13       A.   Like I said off and on -- let me see,

14   she got her place.  Let me see.  When did

15   they get that place?  I'm trying to see when

16   they got that place.

17            I think they got that place in 2010

18   or 2011 so as long -- as long as she had the

19   place, we had decent accord with each other,

20   I can say yes.

21       Q.   So you're living there from 2010

22   till 2016.  Were you ever paying rent?

23       A.   It's her place so if I'm able to pay

24   her -- I pay -- I paid her whenever I was

25   able to.

Page 73

1      Q.   Okay.  And how much rent were you

2  paying her?

3      A.   There's times when I had the money

4  when I was working I was giving her excess up

5  to 400 a month when I was working.

6      Q.   Okay.  When you say while you were

7  working, from 2010 to 2016 were you working

8  most of that time?

9      A.   Yes.

10     Q.   Okay.  And you had the accident when

11  at C&S?

12     A.   I had it 2014.

13     Q.   And after 2014 you continued to live

14  there.  Did you continue to pay her the

15  $400.00 a month?

16     A.   That's when it kind of went down

17  because I was receiving Work Comp.

18     Q.   And how much was your salary before

19  Work Comp?

20     A.   Before Work Comp I was receiving -- I

21  was earning 500 a week.

22     Q.   And then after Work Comp you were

23  receiving how much?

24     A.   After Work Comp or after the injury

25  in the job?

Page 74

1     Q.    That's the same thing.

2     A.    No, it's not.

3     Q.    After you started getting Work

4  Comp --

5     A.    After Work Comp I wasn't receiving

6  anything.

7     Q.    Okay.  While you're on Work Comp how

8  much were you getting?

9     A.    Oh, okay.

10          I was receiving like 350 a week

11  through Work Comp.

12    Q.    And what were you other expensis

13  besides paying your ex-wife $400.00 a month

14  while you're on Work Comp?

15    A.    That was basically it, basically, you

16  know what I'm saying?  We got a daughter

17  together however much I can contribute toward

18  my daughter during that period, but I didn't

19  really have any other expenses -- any other

20  expenses.

21    Q.    Okay.  Did you own a car?

22    A.    Eventually I got a vehicle.

23    Q.    While you were on Work Comp did you

24  buy the car?

25    A.    Yes.

Page 75

1      Q.   And what kind of car was that?

2      A.   It was a Hyundai Elantra.

3      Q.   A Hyundai Elantra two thousand and

4  what?

5      A.   If I'm not mistaken it was brand new,

6  2016.

7      Q.   And how did you pay for that?

8      A.   I had pretty decent credit at that

9  time, my credit was good so I had a few

10 credit cards.  Work Comp income and I

11 actually -- I actually got that vehicle -- it

12 really was to get up and down the roads to

13 support my son for his last year of college.

14     Q.   Okay.  How much was the car when you

15 purchased it?

16     A.   The car was 19,000 if I'm not

17 mistaken.

18     Q.   And where did you purchase it from?

19     A.   The Hyundai dealership on 441 I can't

20 remember the street.

21     Q.   And you filled out a financial

22 affidavit for that?

23     A.   Yeah.

24     Q.   And how much did you put down?

25     A.   If I'm not mistaken I think it was

Page 76

1    1,000.  $1,000.00 I had to put down.  Two

2    credit cards, 500 a piece.

3        Q.   Okay.  Did you have a cell phone?

4        A.   Probably did have a cell phone.

5             Honestly, back then I'm trying to

6    see.  Did I have a cell phone, my own cell

7    phone?

8             I probably did have a cell phone

9    back then of my own

10       Q.   Do you remember what brand cell

11   phone it was?

12       A.   I can't remember.

13       Q.   How much a month were you paying for

14   that?

15       A.   For the cell phone bill?

16       Q.   Yeah.

17       A.   That's what I'm trying to recall if I

18   was paying it.

19       Q.   Does $80.00 sound about right?

20       A.   $80.00 for one phone bill?

21       Q.   Yeah, her phone bill.

22       A.   Nah, I doubt that.  I doubt that I

23   paid for a phone bill.

24       Q.   Okay.  Do you remember what you were

25   paying?

1    A.    I'd be assuming.  Probably $40 or

2    $50.

3    Q.    Okay.  What other expenses?  You had

4    health insurance?

5    A.    If I was still on Work Comp I had the

6    health insurance from the job --

7    Q.    Yeah.

8    A.    -- if I'm not mistaken.

9    Q.    How much was that costing you a

10   month?

11   A.    A month?

12   Q.    Yeah.

13   A.    I was paying $25.00.

14   Q.    Are you sure it wasn't $68.00 a

15   month?

16   A.    I can't -- I can't -- I can't get my

17   answers out.  You keep interrupting me.

18   Q.    Well, you said you think and I think

19   you put down somewhere it was 68 so I'm just

20   trying to refresh your recollection.  If you

21   disagree, just say it on the record.

22   A.    Whatever I put down, that is what it

23   is.

24   Q.    Ah, okay.

25   A.    I can assure you that.

Page 78

1      Q.   Okay.

2      A.   But trying to make me recall, I don't

3  know if it's something with -- with -- with

4  me.

5      Q.   So remember when I said at the

6  beginning if you don't know the answer just

7  ask me to rephrase the question and if you

8  don't know the answer to a question say you

9  don't know.

10      A.   I don't recall.

11      Q.   Okay.

12      A.   I -- I don't even remember you saying

13  that.

14      Q.   I do.  Remember I said $68.00 --

15      A.   I don't.  I don't recall, but if --

16  But I'm telling you, if -- if I wrote it, I

17  said it.  If it's there, I said it.

18      Q.   Okay.  And when you say "it's

19  there," I've got a lot of documents on my

20  desk so it doesn't mean that you said it, it

21  means that I got it from some source so don't

22  look at my desk and think I got it.

23      A.   I'm saying if -- if I wrote it.  If I

24  said it.

25      Q.   If you said it?

Page 79

1      A.    If it's my handwriting, I said it.

2      Q.    Okay.  So your on Worker's Comp,

3   you're getting $350.00.

4      A.    Mmm-hmm.

5      Q.    You're living with Ms. Richardson --

6      A.    Yes.

7      Q.    -- since 2010, and you put your name

8   on an application at the Hialeah Housing

9   Authority; is that correct?

10     A.    Yes.

11     Q.    And as a result of putting your name

12   on the Hialeah Housing Authority, you were

13   brought to an orientation, weren't you?

14     A.    Yes.

15     Q.    And at the orientation they told you

16   all of the things that you had to do to

17   justify getting public assistance for

18   housing; isn't that correct?

19     A.    Yes.

20     Q.    And they also told you, you were

21   going to have to bring in all kinds of

22   financial information relating to your

23   applicability for public housing, correct?

24     A.    Yes.

25     Q.    And you produced a few documents

Page 80

1    that said you're homeless, but that wasn't

2    true because you were living with Mrs.

3    Richardson, correct?

4        A.   I just answered that question before

5    that.  I said there was a period of time I

6    was homeless.  If you constitute homeless --

7    that's why I said what do you consider me

8    living there with her.  Like I told you,

9    there was times I was living --

10        Q.   Homeless is living on a street.

11   Living in your ex-wife's house or apartment

12   is not homeless.  You consider living with

13   your ex-wife homeless?

14        A.   If I stayed there one day out the mon

15   -- out the week, where was I staying the rest

16   of the time?

17        Q.   You tell me that.  You were paying

18   her $400.00 a month.  Why would you pay her

19   $400.00 a month if you were staying there one

20   -- one day a week?

21        A.   We have a daughter together.

22        Q.   Excuse me?

23        A.   We have a daughter together.

24        Q.   But why would you pay her $400.00 a

25   month if you staying one day a week?

Page 81

1      A.   I'm telling you why.

2           Actually, I should've been giving

3   her more.

4      Q.   So you're paying her $100.00 a day

5   to stay at her house?

6      A.   Actually, I should have been giving

7   her more than that, we have a daughter

8   together.  Ask me about child support.

9      Q.   What does that have to do with

10  whether you're living with your ex-wife or

11  you're homeless?

12     A.   You tell me.

13     Q.   Well, I'm asking you.

14          While you're living with you ex-wife

15  you weren't homeless, were you?

16     A.   You could roll the tape.  I told you,

17  there was a period of time I was homeless.

18  If you constitute me staying in -- sleeping

19  in somebody's house here and there, me

20  staying there that's -- that's what you say.

21  I don't know what to tell you, honestly.

22     Q.   Okay.  Well, honestly were you

23  living at her house or weren't you living at

24  her house?

25     A.   I answered that question already.

Page 82

1      Q.   And the answer is?

2      A.   I'm not gonna answer it again.

3      Q.   Well, you are going to answer it.

4      A.   It's on -- it's on -- it's on tape.

5    I answered it, I recall answering it.

6      Q.   Were you living there one day a week

7    or were you living there permanently for six

8    years like you testified under oath today?

9      A.   Who -- who said that they lived there

10   six years?  You said that, I didn't say that.

11     Q.   No, you said you lived there from

12   2010 --

13          MS. GOODWIN:  Objection.

14   BY MR. SWITKES:

15     Q.   -- to 2016.

16     A.   I told you she got a place in 2010.

17   However long she had that place, there was a

18   period of time I was homeless, there was a

19   period of time I was working, there was a

20   period of time I wasn't working.  There were

21   times I was staying there with her, there was

22   times I wasn't staying there with her.  There

23   were times we were on good terms, there were

24   times we were on bad terms.

25     Q.   Sir --

Page 83

1      A.    It's not my place.

2      Q.    Did you ever --

3      A.    It's not my house.

4      Q.    Did your wife -- ex-wife throw you

5    out?

6      A.    Of course she threw me out.  I got

7    thrown out plenty -- a few times just

8    sleeping there, but like I said, how can

9    somebody throw me out of some place that's

10   not mines?  If she wants me to stay there, I

11   stay there.  If she don't, I got to find

12   somewhere else to stay.

13     Q.    So when you said you were paying her

14   $400.00 a month for what period of time was

15   that?

16     A.    I was giving her -- I was giving her

17   $400.00 a month.  Like I told you, I wasn't

18   paying child support so I calculated that and

19   decide that.  $400.00 when I was working I'd

20   pay $400.00, you gotta make that work.

21     Q.    Your wife said that that was the

22   rent you were paying.

23     A.    Okay.

24     Q.    Was she telling the truth or --

25     A.    Whatever she --

Page 84

1      Q.    -- is that not the truth?

2            MS. GOODWIN:   Object to the form.

3            THE WITNESS:   If that's what she

4      said, that's what she said.

5   BY MR. SWITKES:

6      Q.    Is that the truth or is that not the

7   truth?

8      A.    However you want to put it.

9      Q.    I want you to tell me how you put

10  it.  You're the deponent, sir.

11     A.    One thing I don't want to do I don't

12  want to waste too much time on something like

13  this.

14     Q.    It's not --

15     A.    I was -- I was fal --

16     Q.    It's not your place to tell --

17     A.    I was falsely arrested, let's focus

18  on that.  I was falsely denied my housing,

19  let's focus on that.  I don't want to waste

20  my time with little penny-nanny stuff like

21  he-he-he $400.00 there $400.00.

22            Come on, man.

23     Q.    Let me explain something to you --

24     A.    Come on, man.

25     Q.    -- if you don't want to answer my

Page 85

1    questions --

2         A.    I'ma answer those -- I'ma answer

3    those questions.

4         Q.    You're interrupting me.

5               If you won't answer my questions,

6    we're going to ask the federal judge to get

7    involved.

8         A.    We can ask the federal Judge --

9         Q.    You're interrupting me.

10              It's not your position to tell me

11   what questions you're going to answer and

12   what you aren't.

13        A.    My livelihood had been interrupted

14   with this arrest, man.

15        Q.    Are you going to answer my

16   questions?

17        A.    I'm trying to best to answer them.

18        Q.    Okay.

19        A.    I've answered them.

20        Q.    So when you went to Hialeah Housing

21   Authority after the orientation, they asked

22   you to produce documents as to your financial

23   well being, correct?

24        A.    Uh-huh.

25        Q.    What is that?  "Uh-huh" doesn't --

Page 86

1    you have to say yes, no, or I don't know.

2    "Uh-huh" doesn't read back when we read the

3    deposition.  Remember I instructed you at the

4    beginning?

5         A.   I can't remember that.  See, my

6    memory -- my memory span is -- is short.  I

7    don't know that's part of my disability or

8    what, but I do have that issue, but I do -- I

9    do -- I do have that issue.  I'm going to try

10   my best to recall and remember.

11            Yes.

12        Q.   Okay.  Now it's yes, okay.

13        A.   "Uh-huh" means yes.

14        Q.   When I started off we said the court

15   reporter can't write down what --

16        A.   I can't remember that, man.  I

17   can't --

18        Q.   That's why I reminded you.

19        A.   But you keep holding a disabled

20   person to something that they may can't

21   remember.

22        Q.   Okay.

23        A.   I'm trying to figure out what type of

24   person are you, man?  I'm disabled, I worked

25   with disabled people.  I don't have -- I've

1    never handled them in the manner that you're

2    trying to handle me.

3         Q.   You work with disabled people right

4    now?

5         A.   I not working with anybody right now.

6         Q.   Okay.  So let's talk about right now

7    and not what you did in the past.

8              They asked you to --

9         A.   You asked me about my past.

10        Q.   You ask -- they asked you to produce

11   information as to your income and you

12   produced a letter to them talking about

13   leaving your job.

14        A.   Mmm-hmm.

15        Q.   And I'm going to have the court

16   reporter mark this --

17        A.   Yes.

18        Q.   -- this as Defendant Exhibit No. 1.

19        (Whereupon, Defendant's Exhibit No. 1

20         was marked for Identification.)

21             THE WITNESS:  This what --

22             MR. SWITKES:  You can hand it to the

23   witness.

24   BY MR. SWITKES:

25        Q.   Wait till she gets back on the

Page 88

1    record before you say anything.

2         MS. GOODWIN:  And wait till a

3    question is asked.

4    BY MR. SWITKES:

5    Q.    There's not question asked yet.

6         Do you recognize this document?

7    A.    Yes.

8    Q.    And is that your handwriting?

9    A.    Yes.

10   Q.    And did you submit that to the

11   Hialeah Housing Authority?

12   A.    Yes.

13   Q.    Dated April 25, 2016?

14   A.    Yes.

15   Q.    And this states that you officially

16   resigned from your job for personal reasons,

17   correct?

18   A.    Yes.

19   Q.    And that was referring to C&S,

20   correct?

21   A.    Yes.

22   Q.    Okay.  You can hand that back to the

23   court reporter.

24   A.    That there --

25   Q.    There's no question pending.

Page 89

```
 1              And then --

 2     A.    That --

 3     Q.    There's no question pending.

 4              And then when they said to you we

 5   need documents to reflect what your income

 6   was, I'm going to hand you another document

 7   that you submitted to them and see -- this is

 8   your handwriting, as well.  This is

 9   Defendant's Exhibit No. 2.

10        (Whereupon, Defendant's Exhibit No. 2

11         was marked for Identification.)

12              THE WITNESS:  I have no idea what he

13      said.

14   BY MR. SWITKES:

15     Q.    Do you recall that letter, sir?

16     A.    Yes.

17     Q.    And this letter talks about your

18   lump-sum settlement from your previous job,

19   correct?

20     A.    Yes.

21     Q.    And then you say that you are on

22   light duty -- I'm reading, you can read along

23   with me if you want.

24     A.    I don't.

25     Q.    For about two years and eventually
```

Page 90

1    started receiving partial Work Comp checks

2    for about half of that.  And then it goes on

3    that says, "I was in a huge financial

4    gambling debt's."  D-E-B-T-'S.

5         Do you recall writing this letter,

6    sir?

7        A.   Yes.

8        Q.   Okay.  What gambling debts did you

9    have at the time you applied for H.H.A.?

10       A.   Oh, man, it was -- it was a few of

11   them.

12       Q.   Well, give me all of your gambling

13   debts at the time.  I want to know first of

14   all what kind of gambling were you doing?

15       A.   Just betting on games foot --

16   anything, anything to try to -- to try to

17   make money.  I just lost.

18       Q.   Betting on games, what kind of

19   games?

20       A.   Yes, it could be just watching a

21   football game, just simple stuff.  I bet I

22   can -- I can cough louder than you, just any

23   -- anything to make money.

24       Q.   And who were you betting with?

25       A.   Different people.

Page 91

1      Q.   Give me the names of the people.

2      A.   I'm not giving you any names.

3      Q.   What do you mean you're not giving

4  me names?

5      A.   I'm not --

6      Q.   You filed this lawsuit, I'm asking

7  you to give me the names of people --

8      A.   And I'm telling you I'm not giving

9  you any names.

10      Q.   If you don't provide the

11  information, sir, this lawsuit that you

12  filed, there could be sanctions imposed

13  against you by the Judge.  I can't force you

14  to answer --

15      A.   I know you can't.

16      Q.   -- but I'm asking.

17          Well, that's very clever, but the

18  question is you filed a lawsuit on a claim

19  that you're entitled to public housing

20  assistance and you're telling me you're

21  gambling.  I want to know who you're gambling

22  with --

23      A.   It's actually Section 8 --

24      Q.   Okay.

25      A.   -- not public housing.

Page 92

1    Q.   Okay.  Well, that's part of public

2  housing.

3         Let's talk about the names of the

4  people you were gambling with.  You're not

5  going to provide that answer?

6    A.   Nope.

7    Q.   And how much were you gambling?

8    A.   Different amounts.  Just different

9  amounts.

10   Q.   How much?

11   A.   Over a period of -- over a period of

12  four years, that's a long time, man.  There

13  was times I was playing poker.

14   Q.   You were playing poker where?

15   A.   Yeah, lot of different things.

16   Q.   Where were you playing poker?

17   A.   Lot of different things.

18   Q.   Where were you playing poker?

19   A.   In my head.

20   Q.   You were gambling with yourself?

21   A.   Yes.

22   Q.   Okay.  So that way you won or lost

23  so it would be a wash.  Who were you gambling

24  with that you lost money?

25   A.   I probably lost it to myself.

1    Q.   Then you didn't really lose money?

2    A.   No, a loss is a loss.

3    Q.   No, a loss to yourself is not a

4    loss.

5    A.   A loss is a loss.

6    Q.   You're playing games and it's

7    obvious.

8    A.   No, I'm not.

9    Q.   Okay.  Well, I asked you -- you said

10   you're playing poker and I said where?

11   A.   I'm not telling you.

12   Q.   Okay.  But you filed this lawsuit --

13   A.   Exactly.

14   Q.   -- on a claim that you have --

15   A.   And I'ma go forward with it for being

16   falsely arrested.

17   Q.   -- on a financial basis --

18   A.   For being falsely arrested.

19   Q.   You're interrupting me.

20   A.   Go ahead.

21        For being falsely arrested.

22   Q.   You're interrupting me.

23        You're claiming --

24        MS. GOODWIN:  Elgin, listen to the

25   question.

Page 94

```
 1    BY MR. SWITKES:

 2       Q.    -- you need financial assistance for

 3    housing --

 4       A.    I did when I start out.

 5       Q.    -- but you were asked specifically

 6    what happened to the money and you said you

 7    were gambling so I'm going to ask you

 8    questions about that.

 9       A.    That's my settlement.  I should have

10    just said none of y'all -- none of your

11    business.

12       Q.    Well --

13       A.    That's my settlement.  That's not an

14    income.

15       Q.    Let's talk about the gambling --

16       A.    Let's talk about that being --

17       Q.    Let's talk about --

18       A.    Let's talk about that being a

19    settlement or income.

20       Q.    Let's talk about the gambling,

21    that's where we're at.

22             Are you refusing to answer my

23    questions?

24       A.    I'm not refusing to answer your

25    questions.
```

Page 95

1        Q.    Who were you gambling with?

2        A.    I don't want to talk about -- I don't

3    want to talk about gambling.  I don't want to

4    -- I don't want to be taken back to stuff

5    that puts me in a -- it a awkward place.  I

6    don't like to think about that.

7        Q.    Well, you have to --

8        A.    Because that's money -- that's my

9    that my -- that my family could have.  That's

10   money that could have went, you know what I'm

11   saying, to a better cause but -- it is what

12   it is.  I got through that time, I'm standing

13   here today, and that's what I'm leaving it

14   at.

15       Q.    Okay.

16       A.    Now you can waste your time focusing

17   on that or you can move forward.

18       Q.    Well, let the record reflect that

19   you're refusing to answer the questions and

20   I'm going to ask the Judge to impose

21   sanctions against you.

22       A.    Do what you do, man.

23       Q.    I'm going to ask you the last

24   time --

25       A.    I'm not going to answer that

Page 96

1   question.

2       Q.   -- who are were you gambling with?

3            You refuse to answer?

4       A.   I'm not gonna -- I'm not gonna

5   incriminate anybody.  I'm not going to tell

6   you who I was gambling with.

7       Q.   How much --

8       A.   You don't tell me who you gamble

9   with.

10      Q.   That's easy, I don't gamble.

11           So tell me --

12      A.   You're gambling right now with me.

13      Q.   Is that a threat?

14      A.   No, I'm just saying you gam -- you

15  taking a gamble with this case.

16      Q.   Is that a threat?

17      A.   That's not a threat.

18      Q.   Okay.  What do you mean I'm gambling

19  with you?

20           MS. GOODWIN:  He answered the

21      question.

22           THE WITNESS:  Go ahead.

23  BY MR. SWITKES:

24      Q.   What do you mean "I'm gambling with

25  you"?

Page 97

```
 1      A.   I've been falsely arrested, man.  I
 2  was falsely arrested, it's that simple.
 3      Q.   Every time you say that --
 4      A.   It's that simple.
 5      Q.   -- it's irrelevant to the question
 6  I'm asking.  I'm going to ask the Judge to
 7  grant us additional time because you're
 8  refusing to answer the questions and/or
 9  sanctions.
10      A.   I'm answering your questions.
11      Q.   Okay.
12      A.   I'm telling you I'm not going to give
13  you any names and you're not going to make me
14  give you any names.
15      Q.   I can't make you do anything.
16      A.   I know you can't.
17      Q.   The Judge might able to do that, but
18  I can't.
19           How much were you gambling a week?
20      A.   No -- no specific amount.  It was a
21  period of four years, so.
22      Q.   Okay.
23      A.   A period of four years, who knows.
24  Honestly, man, I can't even recall this
25  stuff, man.  I may have had -- I may have had
```

Page 98

1    gambling debts that I probably didn't even

2    occur.

3         Q.    You probably had gambling debts --

4         A.    That I didn't even occur.

5         Q.    -- that didn't occur.

6         A.    If someone --

7         Q.    Can you explain that one to me?

8         A.    If someone come to me and say, Man,

9    you know you owe me this.  You know -- you

10   know we betted on this, we bet on that.

11        Q.    Well, let's specifically talk --

12        A.    I don't know.

13        Q.    -- about your eligibility for

14   Section 8 housing with the Hialeah Housing

15   Authority?

16        A.    Yes.

17        Q.    You got a $19,000.00 settlement.

18        A.    Yes.

19        Q.    Was your portion of it from your

20   Workman's Comp claim with -- with the C&S

21   Wholesale, correct?

22        A.    Yes.

23        Q.    Okay.  You then have to explain how

24   you're entitled to housing.  What did you

25   tell them happened to the $19,000.00 plus

Page 99

1    settlement you got from C&S?

2        A.   Exactly what you see on this paper.

3        Q.   What did you tell them?  You're

4    under oath, sir, you want to answer the

5    question?

6        A.   Exactly what's on that paper.

7        Q.   Answer the question.

8             Are you refusing?

9             MS. GOODWIN:  Just answer the

10        question that's asked.  If you can

11        remember, answer.

12             THE WITNESS:  I told them some of

13        the moneys went to assisting with -- let

14        me be sure.

15             Repeat the question.

16             MR. SWITKES:  Can you read it back,

17        please?

18             THE WITNESS:  It's a waste of time.

19             THE COURT REPORTER:  "What did you

20        tell them?  You're under oath, sir, you

21        want to answer the question?"

22             That's not the question, I

23        apologize.

24             Question:  You have to explain how

25        you're entitled to housing.  What did you

Page 100

1       tell them today happened the $19,000.00

2       plus settlement you got from C&S?

3              THE WITNESS:  Well, I told them that

4       some of the moneys was -- was spent on a

5       gambling debt and that was told.

6   BY MR. SWITKES:

7       Q.   How much of the money was spent on a

8   gambling debt?

9       A.   I can't give you a particular amount.

10  It's in excess of a thousand.  It could have

11  been 18,000, 17,000, 15,000 but whatever I

12  said was said.

13      Q.   Okay.

14      A.   If this was -- if this is what I said

15  and this was -- and this is what they had, if

16  I didn't qualify for housing after this, all

17  they had to do was tell me and the case would

18  have been closed.  I would have went, I would

19  have said, Wow, I messed up.

20      Q.   Okay.  Let's listen to my questions

21  and answer my questions.  So all of the money

22  that you got -- that you got from your

23  settlement, almost $19,000.00, the vast

24  majority of it you claim went to pay off

25  gambling debts; isn't that correct?

Page 101

1      A.   Gambling debts, man.  There was times

2  I went to the casino, gambling loss, it

3  was -- it was just like I said.

4      Q.   What casino?

5      A.   Different casinos.

6      Q.   What casino?

7      A.   I've been to almost every casino here

8  in Miami --

9      Q.   What casinos?

10      A.   -- during the four year period.

11      Q.   What casinos?

12      A.   Let's see, Magic City.  Every casino.

13      Q.   Sir, you got to tell me what

14  casino --

15      A.   You gotta give me a moment.

16      Q.   You said Magic Casino, that's one.

17      A.   You gotta -- yeah, give me a minute,

18  man, I see --

19      Q.   Take your time.

20      A.   I see you have no -- no regards for

21  disabled people.

22          I -- I actually want it -- I want

23  that to get put out there.  You got no regard

24  to disabled people.

25          MS. GOODWIN:  Just listen to the

Page 102

1       question, think about it, and answer it.

2    BY MR. SWITKES:

3       Q.   What other casinos?

4       A.   Magic city.  Every casino here in

5    Miami.  I can't recall all the names.

6       Q.   Give me the ones --

7       A.   I can't recall all the names.

8       Q.   Give me the ones you can recall.

9       A.   I'm telling you.

10      Q.   Miccosukees?

11      A.   Miccosukee.

12      Q.   Okay.

13      A.   If you call them out and I recall

14   them, I'll tell you yes or no.

15      Q.   Okay.  And you had a line of credit

16   at these casinos?

17      A.   No. Just when they were --

18      Q.   How do you owe gambling debts at a

19   casino if you don't have a line of credit?

20      A.   You go in there and you lose.

21      Q.   Well, if you go in there and lose

22   you don't have to pay anybody back because

23   you just lost the money, right?

24      A.   That's some of the money.

25      Q.   Okay.  But that's not what you told

Page 103

1    them happened to the $19,000.00, right?

2           You told them you took the moneys

3    and paid off the financial gambling debts

4    that I owed.

5        A.   That's how -- that's how --

6        Q.   Who did you owe gambling debts to?

7        A.   When you gambling -- when you gamble

8    and you lose, you owe somebody, it's paid.

9        Q.   Okay.  But if you do it at a Magic

10   City Casino or the Miccosukees or any other

11   casino, there's a record of your owing money

12   and then we could check --

13       A.   I consider that all the money.

14       Q.   Excuse me, I'm not done with my

15   question.  You can answer it after I'm done.

16          We can check with the casinos to see

17   when you got a line of credit --

18       A.   I never got a line of credit.

19       Q.   -- how much you got a line of credit

20   for, and how much you paid back.

21       A.   I never got a line of credit.  That's

22   probably -- that's the way I phrase it.

23   We're two different people.  You may phrase

24   things differently.  I'm not you, you're not

25   me.  I phrase things, I say things a certain

Page 104

1    way, I write things a certain way, that's the

2    way -- that's the way I perceive it. If you

3    -- if somebody -- if you -- if somebody, you

4    know what I'm saying, beat you out of

5    something you got to give it to them, you owe

6    them that.  I owed that, it's paid, they got

7    it.

8         Q.   Who's they?

9         A.   The casinos.

10        Q.   Well, are you telling me someone

11   from the casinos threatened you?

12        A.   I'm not saying that.

13        Q.   Well, didn't you say that in

14   writing?

15        A.   Let me ask you, where is this gon'

16   lead?

17        Q.   Excuse me.

18        MS. GOODWIN:  Just answer the

19        question.

20   BY MR. SWITKES:

21        Q.   Did you say that in writing?

22        A.   Yes.

23        Q.   Okay.  So if someone was threatening

24   you and you were in danger was it one of the

25   casinos?

Page 105

1      A.    No.

2      Q.    Who was it?

3      A.    Maybe it was in my head.  During that

4   time I was dealing with my psychological

5   stuff, it probably was in my head at that

6   time.  I may have felt like --

7      Q.    Well, let's read number two.

8      A.    Oh, you don't want to hear that.

9      Q.    Let's read number two.

10     A.    It probably was in my head.  You say

11  a lot of stuff was in my head.

12     Q.    "Took the moneys and paid off the

13  financial gambling debts that I owed.  If not

14  I felt like my life would have have in

15  danger."

16     A.    That's what I said.

17     Q.    "Unfortunately, I misplaced the

18  receipt and don't know what I did with it."

19          So if you felt your life was in

20  danger, and this is in Defendant's No. 2, who

21  was threatening your life?

22     A.    That's the thing and that's what I'm

23  trying to figure out.  I feel like my life is

24  in danger right now.

25     Q.    So this document you submitted to

Page 106

1    the housing authority signed by notary public

2    was a lie?

3              MS. GOODWIN:  Object to the form.

4              THE WITNESS:  No, no.  I answered

5        your question.

6    BY MR. SWITKES:

7         Q.   So who would have put your life in

8    danger if you didn't pay back a gambling debt

9    is the question I've been trying to ask you

10   and you still haven't answered it.

11        A.   I'm answering it.

12        Q.   And the answer is?

13        A.   Anybody I feel like I owed.

14        Q.   And who did you owe?

15        A.   I owed a lot of people.

16        Q.   And give me the names of a lot of

17   people who you owed money to?

18        A.   You know what, maybe, maybe it was in

19   my head.  Maybe I -- maybe there aren't --

20   there aren't any -- any people in particular.

21   Maybe, maybe there's nobody specific.

22        Q.   And maybe you didn't pay anybody

23   back and that's why the housing authority

24   said you have to produce proof of the fact

25   that you claim you got rid of $19,000.00 just

Page 107

1    before you applied for Section 8 housing.  Do

2    you understand why they would ask that

3    question?

4         A.    Whatever the housing authority asked

5    me for I presented it to them.  None of it --

6         Q.    You presented No. 2?

7         A.    -- constituted to me being arrested.

8         Q.    You present3ed No. 2 which says --

9         A.    That's what they got.

10        Q.    -- you felt like your life would

11   have been in danger and today you're saying

12   maybe it was only in my head.

13        A.    You got a problem with that?  That's

14   what I'm saying.

15        Q.    Okay.  So if the housing authority

16   said, Where's the 19,000?

17              And you said, I paid off a debt in

18   gambling because I thought my life was in

19   danger.

20              But today under oath you're saying

21   maybe it was only in my head, that means you

22   still have the 19,000?

23              MS. GOODWIN:  Object to the form.

24              THE WITNESS:  After four years I

25         still got 19,000?

Page 108

1   BY MR. SWITKES:

2       Q.   Well, where did it go?

3       A.   You tell me.

4       Q.   No, see this is what questions are

5   going to be asked by a housing agency that

6   wants to know --

7       A.   They should have asked -- they should

8   have asked before they arrested me.

9       Q.   Excuse me?

10      A.   They should have asked these

11  questions before they arrested me.

12      Q.   That's incredibly interesting 'cause

13  isn't that exactly what Maria De la Cruz met

14  with you on multiple occasions and said to

15  you specifically, You've put down in writing

16  that I gave the money away to some people --

17      A.   This the first time --

18      Q.   Excuse me, you're interrupting --

19      A.   That's the first -- that's the

20  first --

21      Q.   You're interrupting me.

22      A.   That's the first time she asked me

23  that.

24      Q.   You're interrupting me.

25      A.   I know.

Page 109

1            That's the first time she asked me

2    that.

3        Q.    You can't interrupt me 'cause the

4    question is not there yet.  When I'm done you

5    can answer.

6        A.    Man.

7        Q.    Didn't Maria De la Cruz ask you

8    specifically --

9        A.    Break time.

10       Q.    -- for proof --

11            MS. GOODWIN:  Hold on.

12   BY MR. SWITKES:

13       Q.    For proof --

14       A.    Break time.

15       Q.    -- that you allegedly --

16       A.    Break time.

17       Q.    -- gave away $19,000.00?

18       A.    Break time.

19       Q.    So after you answer the question.

20            MS. GOODWIN:  You have to answer the

21        question and then we can take a break.

22   BY MR. SWITKES:

23       Q.    You heard your attorney.  Are you

24   just going to dis --

25            MS. GOODWIN:  Please answer the

Page 110

1      question.

2   BY MR. SWITKES:

3      Q.    -- disregard both of us?

4      A.    What's the question?

5            THE VIDEOGRAPHER:  Could you put

6      your microphone, please?

7            MS. GOODWIN:  You have to put your

8      microphone back on.

9            THE WITNESS:  My hips, my hips, my

10     hips.

11           MS. GOODWIN:  That's fine you can

12     stand and do what you're doing now and

13     still -- and we can still continue but if

14     you need a break, please answer the

15     question and then we can take a break.

16           THE WITNESS:  Go ahead.  What's the

17     question?

18           MR. SWITKES:  Can you read it back

19     please?  I apologize, madam court

20     reporter.

21           THE WITNESS:  I feel like Allen

22     Iverson, we talking about practice?

23           MS. GOODWIN:  Just don't.

24           THE COURT REPORTER:  "Question:

25     Didn't Maria De la Cruz ask you

1      specifically --

2           Answer:  Break time.

3           Question: -- for proof --

4           Ms. Goodwin:  Hold on.

5           Question:  For prior --

6           Answer:  Break time.

7           Question:  -- that you alledgedly

8      gave away $19,000.00?

9           Answer:  $19,000.00.

10          After you answer the question."

11          THE WITNESS:  On 4/28/2016, yeah,

12      that's the first and only time she asked

13      me about that.

14  BY MR. SWITKES:

15      Q.   And when you said you paid back a

16  gambling debt, didn't she say, I need proof

17  whether you claim you gave it away gambling,

18  buying drugs, or anything else?

19      A.   No, that's not true.  Nobody

20  mentioned anything about drugs.

21      Q.   Well, you did, didn't you?

22      A.   When?

23      Q.   When she asked you for proof of your

24  finances didn't you say to her, If I rob a

25  bank or if I sell dope what is it your

Page 112

1    business?  That's the way I make a living.

2          MS. GOODWIN:  Object to the form.

3    BY MR. SWITKES:

4       Q.   Didn't you tell her that?

5       A.   No, I didn't.  I don't know where

6    you're getting that from.

7       Q.   From Ms. De La Cruz's records.

8       A.   Oh, De la Cruz said it, okay.

9       Q.   So she's not telling the truth?

10      A.   Oh, no.  She's known not to tell the

11   truth.

12      Q.   So you didn't say that to her?

13      A.   No, I didn't.

14      Q.   You didn't say, I don't have to

15   prove to you how I earn income?

16      A.   No, I didn't.  But she's known not to

17   tell the truth, that's documented.

18      Q.   How is it, sir, that you are able to

19   pay on time your car payments if you didn't

20   have any income and all of your money went to

21   pay off gambling debts?

22      A.   Man, I been so good to people in my

23   lifetime, plenty of people to help me out.

24   Even to this day they still help me out.

25   Five years later I haven't worked and I'm

Page 113

1    doing well.

2        Q.   What does that have to do with the

3    question I just asked you?

4        A.   It means --

5        Q.   It means nothing.

6        A.   Yeah, it does.

7        Q.   Tell me how you were paying $399.00

8    a month --

9        A.   Financial assistance.

10       Q.   -- when you weren't --

11       A.   Financial assistance.

12       Q.   -- earning any money?

13       A.   Financial assistance.

14       Q.   From whom?

15       A.   I'm not telling you.  From numerous

16   people.

17       Q.   Okay.  See that's where --

18       A.   I know.

19       Q.   -- you think you can tell me what

20   you're going to answer and what you're not

21   going to answer and that's the same thing

22   that happened at the housing authority.

23           If you're telling me you had

24   other --

25       A.   Nothing of this constitutes to me

Page 114

1    being arrested.

2         Q.   You're interrupting me again.

3              If you're telling me you had other

4    sources of income that we're helping you pay

5    your monthly bill for 19 -- 2016 Hyundai

6    Elantra, you got to tell me who it was?

7         A.   It was the Work Comp checks.

8         Q.   No, it can't be the Workman's Comp

9    checks because --

10        A.   It could be the Work Comp checks.

11        Q.   Excuse me.  Excuse me, sir.

12        A.   How you going to tell me it wasn't

13   the Work Comp checks?

14        Q.   Because you've already testified in

15   a notarized statement to the housing

16   authority that every dime of the moneys you

17   received from Workman's Comp went to pay off

18   gambling debts and in fact you owed more in

19   gambling debts than you paid off, but by

20   giving them 17,000 or 14 or 17,000 they wiped

21   out more money than that in debts and that

22   wiped you out so you had no income.

23        A.   What does that have to do with

24   anything?

25        Q.   So now you're telling us for the

Page 115

1    first time --

2         A.    I'ma good saver.

3         Q.    How much do you have saved?

4         A.    Back then I saved.  I'm not saving

5    anything now.

6         Q.    How much did you have saved?

7         A.    How much did I have saved back then?

8         Q.    Yes, ma'am -- sir.

9         A.    From my Work Comp checks.  Like I

10   said, you loan money to people, you need it

11   back, they give it back to you.

12        Q.    Sir, you just told me --

13        A.    I never be broke.

14        Q.    -- you're a good saver.

15        A.    I never be broke.

16        Q.    How much money did you have saved?

17        A.    I personally didn't have anything

18   saved.  When I give somebody something and I

19   get it back --

20        Q.    How could you be a good saver if you

21   don't have any money?

22        A.    Huh?

23        Q.    That's -- I should -- I should say

24   what you said.

25        A.    How am I surviving if I don't have

Page 116

1    any money?

2        Q.   That's what you're supposed to

3    answer under oath.  How are you paying car

4    bills, phone bills, insurance bills, and a

5    current when you're claiming under oath you

6    have no income and no money and you just

7    admitted, despite the fact that you're a

8    great saver, you have no savings?

9        A.   I'ma great saver, I'ma great

10   survivor, it's life.  When -- whenever you

11   can walk in a black man's shoes, you'll know

12   it.  You survive, it's called surviving.

13       Q.   Okay.  What does that have to do

14   with savings?  You can give all those

15   statements you want and you're wasting our

16   time.  You've said it about 12 times.  When I

17   ask you a specific question --

18       A.   I think you're the one wasting time,

19   man.

20       Q.   -- I expect specific answers.

21       A.   We've been stuck on this -- we've

22   been stuck on this for about 30 minutes, man.

23            MS. GOODWIN:  Elgin, if you talk

24       when he talks you're ticking her off.

25       She can't --

Page 117

1            THE WITNESS:  Oh, all right.

2            MS. GOODWIN:  She can't -- she can't

3       type --

4            THE WITNESS:  She -- she neutral.

5       She innocent, I don't want to tick her

6       off.

7            MS. GOODWIN:  No, she's going to

8       yell at you.

9            THE WITNESS:  I apologize.

10           MS. GOODWIN:  Thank you.

11           MR. SWITKES:  And that's the court

12      reporter we're talking about.

13           MS. GOODWIN:  Yes, that's exactly

14      who.

15           THE WITNESS:  I apolo -- I Apologize

16      to you.  Thanks for bringing that to my

17      attention.

18           MS. GOODWIN:  Yes.

19  BY MR. SWITKES:

20      Q.   And now that you brought it to her

21  attention, can you answer the question?

22  Where were you getting money from since you

23  had no savings to keep your bills current?

24      A.   Different family members, different

25  friends, just people, man.

Page 118

1      Q.    Who?  Who?  What family members?

2      A.    My mother, I got a mother, I got a

3   brother, I got a son, I got a kid's mother, I

4   got cousins, aunts.

5      Q.    And how much were they giving you on

6   a monthly basis?

7      A.    However much I need.  There's no --

8   no particular amount.  If I got 20 -- 20

9   people I can go to I can get at least $25,

10  $50 a piece from them so it all depend.

11  However much I need to survive.  I go to

12  somebody and say, Man, I'm in a hold.

13     Q.    And then you owe money, right?

14     A.    Huh?

15     Q.    Then you owe them money, correct?

16     A.    Yeah.  It's some -- some of them I

17  owed money back, some -- some I didn't have

18  to pay back.  So I just did -- like I said,

19  that money -- that money, man, that money

20  came and went so fast, man.

21     Q.    What does that mean?

22     A.    Meaning the money was spent before I

23  even got it so that's not no money that I had

24  just sitting.  Just sitting trying to --

25  trying to or hide anything like that, man.

Page 119

1    Q.   So you still haven't answered the

2    question.

3    A.   I done worked for three years.

4    Q.   How are you paying --

5    A.   I just told -- I just answered your

6    question.

7    Q.   No, you said, When I want to I can

8    get $25.00 from this person --

9    A.   No, I didn't.

10    Q.   -- and that person.

11    A.   I told you from family and friends.

12   I specifically told you my mother --

13    Q.   Okay.  Let's start with your mother.

14    A.   No, I answered your question.

15    Q.   What's your mother's name?

16    A.   Laverne.

17    Q.   Laverne what?

18    A.   Hilliard.

19    Q.   And where does Ms. Hilliard live?

20    A.   I don't know.  I don't.

21    Q.   How do you get money from her if you

22   don't know where she lives?

23    A.   She comes to me.

24    Q.   Okay.  And how often did she come to

25   you back at the time you applied for Section

Page 120

1    8 housing with H.H.A.?

2         A.   She was coming -- she was coming

3    every two weeks here and there, every month.

4         Q.   And what does your mother do -- did

5    she do for a living back then?

6         A.   She's a retired teacher.  I'm trying

7    to see -- she probably was still working at

8    the time.  She probably was still teaching at

9    the time.

10        Q.   And she would come to you every

11   month and give you money?

12        A.   Of course.

13        Q.   How much?

14        A.   She come to me every month and give

15   me money now.

16        Q.   How much was she giving you when you

17   applied for housing at H.H.A.?

18        A.   It all depends.  She give me like,

19   you know what I'm saying, $200.00, $150.00 --

20        Q.   A month?

21        A.   -- $100.00.

22             Yeah.

23        Q.   And you told the H.H.A. that she was

24   supporting you with 150 t0 $200.00 a month,

25   correct?

Page 121

1          MS. GOODWIN:  Object to the form.

2          THE WITNESS:  I told -- no.  I told

3     H.H.A. she was supporting me with $150.00

4     a month.

5     BY MR. SWITKES:

6     Q.   Okay.  And then --

7     A.   You want to pull that document out?

8     Q.   And your brother, what's your

9     brother's name?

10    A.   Go ahead.

11    Q.   What's your brothers name?  What's

12    your brothers name?

13    A.   I'm not answering that question.  My

14    mothers the only person --

15         MR. SWITKES:  Counsel, I've had it.

16    You're going to have to instruct him to

17    answer the questions.

18         MS. GOODWIN:  I -- I -- listen to

19    the questions that are asked, answer the

20    questions.  If there's a question that I

21    -- that you should not answer, I will

22    tell you not to answer.  Otherwise,

23    please answer the questions.

24         Now listen to --

25    BY MR. SWITKES:

Page 122

1      Q.   For the fourth time, what's your

2  brother's name?

3      A.   I don't understand why I'm being

4  drilled like this.  Why Gutierrez ain't been

5  here?

6           MS. GOODWIN:  You're not special.

7      This happens to everybody who's deposed.

8      Please answer the question.

9           THE WITNESS:  He ain't been asked a

10     question yet since he falsely arrested

11     me.

12  BY MR. SWITKES:

13     Q.   You've wasted at least an hour of my

14  time and I have seven hours.  I'm going to

15  ask for additional time.

16          For the fifth time, what's your

17  brother's name?

18     A.   Vice versa.

19     Q.   What's your brothers name?

20          MS. GOODWIN:  Elgin.

21          THE WITNESS:  For what reason you

22     want to know?

23          MS. GOODWIN:  Elgin, you have to

24     answer the question.

25          THE WITNESS:  I don't have to.

1          MS. GOODWIN:  Nobody can force you

2       to answer the question, but the Judge can

3       issue sanctions if you don't, he's right

4       about that.

5          I'm instructing you to answer his

6       questions unless I tell you to not answer

7       them which I haven't heard anything yet

8       that I would do that with.

9          THE WITNESS:  Okay.  His name is

10      Dante.

11  BY MR.  SWITKES:

12      Q.   Dante what?

13      A.   Same last name.

14      Q.   And where does he live?

15      A.   I don't know that.

16      Q.   What's his phone number?

17      A.   I don't know his number by heart.  I

18  get a hold of it, I'll get back to you with

19  it, but I don't know.  I don't it off the top

20  of my head right now.

21      Q.   How much was Dante, your brother,

22  paying you when you applied at H.H.A. for

23  public housing?

24      A.   He wasn't paying me -- he wasn't

25  paying me anything.   If I need -- if I

1    needed anything from him, I could go get it.

2        Q.    How much was he paying you a month

3    while he --

4        A.    He wasn't paying you anything.

5        Q.    He wasn't supporting you at all?

6        A.    If I needed support from him I can go

7    to him --

8        Q.    Okay.

9        A.    -- I was able to go to him and get

10   it.  He wasn't paying me anything though.  I

11   wasn't working for him.

12       Q.    Okay.  So --

13       A.    I don't working for him.

14       Q.    The only ones that you were

15   receiving any compensation for --

16       A.    Consistently.

17       Q.    -- at the time you applied for

18   public housing, Section 8 housing with H.H.A.

19   was your mom's $150.00, correct?

20       A.    Yes.

21       Q.    And you're aware of the fact that

22   your mom sent a letter saying she stopped

23   giving you the $150.00, remember?

24       A.    When?

25       Q.    You don't remember that?

Page 125

1      A.   No.

2      Q.   Okay.  And Dante --

3      A.   I still get money from my mom to this

4   day.

5      Q.   Okay.

6      A.   Did she send you a letter for that?

7      Q.   How much are you getting currently

8   from your mother?

9      A.   There's no specific amount, man.  If

10  I need something, I ask for it, I get it.

11     Q.   Okay.  Do you still have a car?

12     A.   Yeah, I have a car.

13     Q.   Do you pay off the car?

14     A.   Yeah, I don't owe anything on the car

15  that I have now.

16     Q.   So you paid it off?

17     A.   It has nothing to do -- do I still

18  have the Elantra?

19     Q.   Yeah.

20     A.   No, I don't have that Elantra.

21     Q.   When did you sell the Elantra?

22     A.   I never sold it, it got repoed.

23     Q.   When did it get repoed?

24     A.   2017.  I'm trying to think, it was

25  the end of 2016 probably, I can't remember.

Page 126

1   I think it was the end of 2016 or the

2   beginning of 2017 so I didn't have it -- I

3   didn't have it that -- that long.

4        Q.   Did you still have a cell phone?

5        A.   Do I still have a cell phone?

6        Q.   Yes, sir.

7        A.   I've always kept a cell phone.

8        Q.   What's your --

9        A.   If somebody paid the bill for it.

10       Q.   What's your -- somebody?

11       A.   Yeah.

12       Q.   Who's somebody?

13       A.   Anybody.

14       Q.   Who's anybody?

15       A.   Anybody, man.  You act like it's hard

16   for peop -- for people to give people money.

17            MS. GOODWIN:  He's asking you the

18       question, just answer it.

19            THE WITNESS:  There's times I stand

20       on the corner and panhandle.

21   BY MR. SWITKES:

22       Q.   Where do you panhandle?

23       A.   Different places, man.

24       Q.   Where?

25       A.   Nowhere specific.

1      Q.   What do you mean nowhere specific?

2      A.   I don't have a particular corner.  I

3    don't have a particular area.

4      Q.   Where are all the places that you've

5    panhandled?

6      A.   Any store that I went to.  If I want

7    to panhandle, I'll panhandle.

8      Q.   Where are the places you panhandle?

9    It's a specific question.

10      A.   You asked me --

11      Q.   I want an address.

12      A.   I can't answer it.  You asking me to

13    remember something that -- it's something I'm

14    having issues remembering things.  That's why

15    I write a lot of stuff down right now.

16      Q.   So you can't remember any place that

17    you panhandled?

18      A.   I can't remember too many places.

19      Q.   When was the last time you

20    panhandled?

21      A.   Today.

22      Q.   Where?

23      A.   Just come -- coming here, I

24    stopped --

25      Q.   Where'd you panhandle?

Page 128

1      A.   -- and panhandled and asked somebody

2    for money and they gave it to me.

3      Q.   Where?

4           MS. GOODWIN:  You have to answer the

5      question.

6           THE WITNESS:  At the store I stopped

7      to, man.  God darn.

8    BY MR. SWITKES:

9      Q.   What store?

10     A.   Man.

11     Q.   What store?

12     A.   The gas station I stopped -- stopped

13   to, man.

14     Q.   Where?

15     A.   I don't -- on 17th Avenue and -- and

16   28 Street.

17     Q.   And how much did you get?

18     A.   I got $20.00.

19     Q.   From one person?

20     A.   Yeah.

21     Q.   How'd you get here today?

22     A.   I drove.

23     Q.   What kind of car did you drive?

24     A.   I drove my car, a Pontiac Grand --

25   Grand Prix.

Page 129

1      Q.   And when did you get that?

2      A.   I got that car --I've had it for like

3  two years now.  I've had it for about two

4  years now.

5      Q.   And when -- who did you buy it from?

6      A.   I bought it from -- I don't know.  I

7  can't remember the name of the car

8  dealership, but it's on 27th Avenue and got

9  to be in between 65th and 75th Street.

10     Q.   How much you pay for it?

11     A.   The car was, it was $3,000.

12          Let me ask you, what does that have

13  to do with this case?

14          MS. GOODWIN:  He's allowed to ask.

15  BY MR. SWITKES:

16     Q.   And how much money did you put down

17  on the car?

18     A.   Let me see.  Me and my mom -- my mom

19  put down, she put down -- let me see.

20          It was half, it was half that was

21  put down.

22     Q.   1,500?

23     A.   Yep.

24     Q.   Where did you get the $1,500 from?

25     A.   My mom.  She put it down.

Page 130

1      Q.    And the rest is financed?

2      A.    Yeah.

3      Q.    And who filled out the financial

4  documents?

5      A.    I think I did.  I think I filled

6  everything out.

7      Q.    And what did you put down as a

8  source of income?

9      A.    I can't recall.

10     Q.    Well, they didn't give you a car

11  loan without providing financial sources of

12  income.  What did you put down?

13     A.    How much you want to bet?

14     Q.    So they just gave you the car for

15  $1,500 and said, Pay it back when you can?

16     A.    Yes.

17     Q.    That's very nice.

18           Is he related to you this person?

19     A.    No, I don't know him.

20     Q.    And you don't know the name of the

21  dealer?

22     A.    I can't, man, I can't recall.  I

23  think it was -- it's called Shed's Auto.

24  Shed's Auto.  Shed's Auto.

25     Q.    Can you spell that?

Page 131

1        A.    I be guessing, man.  S-H-E-D-S,

2     Shed's Auto.

3        Q.    And is that the first automobile you

4     purchased since the Hyundai?

5        A.    No, it's not.

6        Q.    What other cars did you purchase

7     since then?

8        A.    I think my kid's mother she -- she

9     helped me get a -- I can't remember the name

10    of that car.  A little black car, I can't

11    remember the name of it.

12       Q.    Where did you buy that car?

13       A.    Bought that from a car dealership on

14    -- it's hard to remember, man.  I was working

15    at -- I got -- I gotta recall.  I was working

16    at Mac Town Inc. at the time 27th Avenue and

17    20th Street.  I can't remember.

18       Q.    What was the name of the place?

19       A.    I can't remember.

20       Q.    And did somebody buy that with you?

21       A.    Yeah, my kid's mother.

22       Q.    Ms. Richardson?

23       A.    Yeah.

24       Q.    And what kind of car was it?

25       A.    I just told you I can't remember the

Page 132

1    name of it.

2        Q.   You don't know whether it was a

3    Chevrolet or a Dodge?

4        A.   I can't.  I'm telling you I can't

5    remember, man.

6        Q.   But the name -- the title was in

7    your name?

8        A.   It probably was.  I -- I don't doubt

9    that it wasn't.

10       Q.   And how much was that car?

11       A.   That car, man, that car was like

12   $1,000.00.

13       Q.   And how much --

14       A.   1,500.

15       Q.   -- did you pay?

16       A.   How much did I personally pay?

17       Q.   Yeah.

18       A.   I can't recall.  I don't think I paid

19   anything.  If I'm not mistaken, she paid down

20   for it.  I was working at Mac Town at that

21   time and this was 2012.  This was two

22   thousand --

23       Q.   The question was did you own any

24   cars between the Hyundai Elantra and a

25   Pontiac Grand Prix.  Now you're telling me

Page 133

1   this was 2012?

2       A.   If I'm not mistaken.

3       Q.   That's not between those two dates,

4   is it?

5       A.   Let me think.

6            You see this is what I'm dealing

7   with.  I know you're real insensitive so I'm

8   used to it.

9            MS. GOODWIN:  Just answer the

10          question as asked.

11          THE WITNESS:  I got to think.  And

12          believe me, I'm trying to be as

13          truthfully honest -- honest as possible

14          because why would I be giving information

15          if -- no, actually I'm wrong.  That was

16          before -- no, I -- I'm wrong, I didn't.

17          The Grand Prix, the Grand Prix was the

18          only car I got after that so that was

19          even before that.  That was before that,

20          that was before that.  I'm all -- my head

21          all messed up.

22   BY MR. SWITKES:

23       Q.   That was before what?

24       A.   That was before the Elantra so, yeah,

25   dis -- disregard that.

Page 134

1      Q.    Do you have a car presently?

2      A.    Yeah.

3      Q.    What kind of car?

4      A.    The Grand Prix.  The one I just told

5  you.

6      Q.    You said you bought that before the

7  Elantra?

8      A.    No, I bought it after the Elantra.

9            Did I say I bought it before the

10 Elantra?

11     Q.    You just said that.

12           MS. GOODWIN:  The black car he meant

13     is before the Elantra, that's the way I

14     interpret that.

15           THE WITNESS:  No, I --

16           MS. GOODWIN:  I'm not trying to

17     testify, I'm just helping out.

18           MR. SWITKES:  Raise your left hand.

19           MS. GOODWIN:  Exactly.

20           THE WITNESS:  No, I stand corrected.

21     I'm standing corrected.

22 BY MR. SWITKES:

23     Q.    Okay.  So do you still have the

24 Pontiac Grand Prix?

25     A.    Yeah.

Page 135

1      Q.    Who pays for the insurance?

2      A.    My son's paying for it now.

3      Q.    Okay.  That's Elgin Jr.?

4      A.    Yes.

5      Q.    And where does he live currently?

6      A.    Right now he's back home with us.  I

7  don't know -- honestly I don't know because

8  he leave -- he leaves once a week so I don't

9  know.  He probably still live in Quad City, I

10 don't know.  He's home -- he's home --

11     Q.    When you say he's back with us, you

12 mean yourself and Ms. Richardson?

13     A.    Yeah.

14     Q.    And so it's your son, your daughter,

15 your ex-wife, and yourself all living at the

16 same address, correct?

17     A.    Yes.

18     Q.    Did you ever say that --

19     A.    Beautiful, isn't it?

20     Q.    -- Ms. -- a different woman owned

21 that house other than your ex-wife?

22     A.    That's the impression I was under.

23     Q.    What does -- what do you mean that's

24 the impression you're under?

25     A.    I didn't think that that was solely

Page 136

```
1    her house.  I didn't think that was solely

2    Tiandria's house.

3        Q.   Who did you think it was?

4        A.   Her sister because her sister was

5    staying there at that time.

6        Q.   And what's her sister's name?

7        A.   Her sister's name is Natalie.

8        Q.   Natalie?

9        A.   What?

10       Q.   What's her last name?

11       A.   I don't -- I can't recall her last

12   name.

13       Q.   Casen?

14       A.   No, that don't ring a bell.

15            Keep going.

16       Q.   Huh?

17       A.   That doesn't ring a bell.  Casen

18   doesn't ring a bell.

19       Q.   Okay.  And you thought the sister

20   owned the house --

21       A.   Yeah.

22       Q.   -- at 1861?

23       A.   Actually, I thought it was both of

24   they house.  I -- I thought it was both of

25   they house.  I don't know.
```

Page 137

1      Q.    Does Ms. Richardson's sister live

2  there?

3      A.    She doesn't live there anymore.

4      Q.    When did she last live there?

5      A.    It was about a couple of -- a couple

6  of weeks after -- after I went through the

7  process with this housing.  She got her own

8  place after that.

9      Q.    After a couple weeks of what?

10     A.    That I was going through the process

11  with this housing.

12     Q.    So she was living with you there?

13  Because you said --

14     A.    She wasn't living with me.

15     Q.    -- you were living there in 2010 to

16  2016.

17     A.    She wasn't -- she wasn't -- she

18  wasn't living with me, that's not my house.

19     Q.    Was she living in the house at the

20  same time you were from 2010 to 2016

21     A.    Was she stay -- was she staying in

22  that house?

23     Q.    Do you understand my question not

24  yours?

25     A.    I'm trying my best.

Page 138

1        Q.   Well, you're not doing very good.

2        A.   I know you got -- I know you got a

3    problem with that, but that's not my problem.

4        Q.   My problem is you're not answering

5    the question.

6        A.   That's not my problem.

7        Q.   You said you lived there --

8        A.   I'm trying to best.

9        Q.   -- from 2010 to 2016.  Was Ms.

10   Richardson's sister, Natalie, living there at

11   the same time?

12       A.   No, she wasn't.

13       Q.   Okay.  Do you think that the housing

14   authority had a right to ask you to document

15   your income?

16       A.   Of course they had a right to.

17       Q.   Do you think they had a right to ask

18   you if you paid all of your Workman's Comp

19   moneys to a gambling debt who that was?

20       A.   I'm not sure about that one.

21       Q.   Well, everybody can come and say I

22   won the lottery and I had $100,000.00 but I

23   gave it away so now I'm entitled to public

24   housing.  Wouldn't they have the right to ask

25   that person where did you give the money if

Page 139

1    you won $100,000.00?

2           MS. GOODWIN:  Object to the form.

3    BY MR. SWITKES:

4       Q.   Wouldn't that be a fair question to

5    ask somebody?

6       A.   I'm not sure, man.

7       Q.   Well wouldn't everybody be eligible

8    for Section 8 housing if they just said, I

9    make $100,000.00 but I gave it all away?

10          MS. GOODWIN:  Object to the form.

11          THE WITNESS:  They been doing it for

12      they people.

13   BY MR. SWITKES:

14      Q.   So you're doing what everybody else

15   is doing?

16          MS. GOODWIN:  Object to the form.

17          THE WITNESS:  No, I'm doing what I'm

18      doing.

19   BY MR. SWITKES:

20      Q.   Which is you're saying that, I don't

21   have to tell you where I get my money from.

22          Didn't you tell Ms. De la Cruz that?

23          MS. GOODWIN:  Object.

24          THE WITNESS:  I never told her that.

25      What I told her is right here on this

Page 140

1        form.

2    BY MR. SWITKES:

3        Q.    And you also put it on this form.

4    Is that the one that says you gave it away

5    because your life was in danger?

6        A.    Yes, it is.

7        Q.    Ah.  And from a --

8        A.    I'm still living.

9        Q.    -- mysterious person.

10            Who is this person that put your

11   life in danger?

12       A.    I just told you I can't really recall

13   that, man.

14       Q.    So someone --

15       A.    If I said this at that time, that's

16   what I said.

17       Q.    You owe so much money to someone

18   that you're afraid your life was in danger,

19   but you can't remember the name?

20            MS. GOODWIN:  Object to the form.

21   BY MR. SWITKES:

22       Q.    Does that sound logical?

23            MS. GOODWIN:  Objection.

24            THE WITNESS:  Man, that's -- that's

25       three years ago, man.  I can't -- I can't

Page 141

1        really think that -- that good.

2   BY MR. SWITKES:

3        Q.   Well, you filed a lawsuit about

4   that.

5        A.   Oh, yes, I know about the rest.

6        Q.   How do you not know --

7        A.   I know that clearly.

8        Q.   -- about the person you owed money

9   to if you remember everything else?

10            MS. GOODWIN:  Object to the form.

11   BY MR. SWITKES:

12        Q.   That's something you wipe from your

13   memory?

14        A.   I don't know.  I don't know if I --

15   if I wiped it from my memory.  Honestly, I --

16   I don't know, man.  I really don't know but

17   if it's there, it's there.

18        Q.   But it's not there and I asked you

19   to identify the person and you said you

20   refuse.

21        A.   And we wasting -- go ahead.

22        Q.   Excuse me?

23        A.   Go ahead.

24        Q.   You're still refusing?

25        A.   Refusing what?

Page 142

1       Q.    To give me the name of the person

2    you alledgedly paid all these gambling debts

3    to?

4       A.    I told you, man, it was numerous

5    people, man.

6       Q.    No, you never told me.

7            Give me the names of all the people

8    or one of the persons, let's start there.

9            Can't do that?

10           MS. GOODWIN:  Elgin, if you remember

11       you have to -- to tell him or you'll be

12       ordered to.

13           THE WITNESS:  I'm trying my best

14       to -- I'm trying my best to remember.

15   BY MR. SWITKES:

16       Q.    You would think if you owed

17   $19,000.00 to someone you might remember who

18   that was.

19           MS. GOODWIN:  Object to the form if

20       that's a question.

21   BY MR. SWITKES:

22       Q.    Wouldn't you think that would be the

23   case?

24       A.    Why?

25       Q.    If you owed $19,000.00 all the money

Page 143

1    you got from Workman's Comp case

2    settlement --

3        A.   Over a period of four years.

4        Q.   -- you might remember who that

5    person was that you owned the money to or

6    persons?

7            MS. GOODWIN:  Object to the form.

8            THE WITNESS:  Over -- over the

9        period of four years, man, without

10       working, without earning a substantial

11       gain -- gainful income, man, you

12       accumulate all kinds of debts.  Everybody

13       don't have the luxury of you and other

14       people.

15   BY MR. SWITKES:

16       Q.   We're not talking about all kinds of

17   debts.  We're only talking about one kind of

18   debt, your claim that it was a gambling debt.

19       A.   So we're focussed on a gambling debt

20   which --

21       Q.   Yeah, that's the one you said all

22   the money went to.

23       A.   Which had -- which has nothing to do

24   do with nothing.  It has nothing to do with

25   my housing.

Page 144

1        MS. GOODWIN:  Just --

2        THE WITNESS:  It has nothing to do

3    with me being arrested.

4    BY MR. SWITKES:

5    Q.   It has a lot to do with your

6    eligibility for Section 8 housing which is

7    why I'm asking these questions.  Otherwise

8    your attorney would have instructed you not

9    to answer.

10   A.   So why -- so why this my first time

11   hearing about it after my false arrest?

12   Q.   So you never heard about this at

13   your appeal at the housing authority?

14   A.   I don't recall hearing about anything

15   that would -- that prevented me from getting

16   my housing.  That's why I was placed back on

17   the list.

18   Q.   Who was -- who was your --

19   A.   So why was I placed back on the list?

20   Q.   Who was your caseworker at the

21   housing authority?

22   A.   Who was my caseworker?

23   Q.   Yeah.

24   A.   I assumed De la Cruz.

25   Q.   And she never asked you about who

Page 145

1    you paid your debt to?

2        A.    This -- this is the reason why I

3    wrote the statement.

4        Q.    Did she ask you who you paid this

5    $19,000.00 debt to?

6        A.    She asked me all that stuff.

7        Q.    And you never told her, did you?

8        A.    And I still got placed back on the

9    list.

10       Q.    And you never told her, did you?

11       A.    Hmm?

12       Q.    You never told her who you paid,

13   correct?

14       A.    Hmm?

15            MS. GOODWIN:  If you answer -- if

16       you understand the question and -- then

17       you need to answer it.

18            THE WITNESS:  Whatever I told her is

19       right there on that paper.

20   BY MR. SWITKES:

21       Q.    And she asked you who that was and

22   you refused to tell her and you're refusing

23   to tell me under oath; is that correct?

24       A.    I don't recall that.

25            MS. GOODWIN:  Object to the form.

Page 146

1          THE WITNESS:  I don't recall that.

2     BY MR. SWITKES:

3          Q.   You don't recall her asking?

4          A.   All I know is what -- is what I told

5     her.  I know what happened when I got taken

6     off the list, you know what I'm saying, and I

7     know I fought to get back on it and I was

8     placed back on it.  That's all I know.

9          Q.   And so when you were placed back on

10    it did you go --

11         A.   I know she lied too.

12         Q.   When you were placed back on it did

13    you go and ask what your status was?

14         A.   Did I go where and ask?

15              You trying to get me arrested again?

16         Q.   The Hialeah Housing Authority.

17         A.   Oh, no.  Heck, no, I didn't go back

18    there.

19         Q.   Why not?

20         A.   I was afraid for my life.  I wasn't

21    going back to that place.  I didn't even want

22    to go back.

23         Q.   So you --

24         A.   Took a beating to fight to get back

25    on the list.

Page 147

1      Q.   But you did?

2      A.   Because I was told I had to.

3      Q.   And you won, correct?

4      A.   I was told that I would -- I would be

5   safe.

6      Q.   And you won, correct?

7      A.   And I still was threatened while I

8   was there.

9      Q.   So you didn't go back 'cause you

10   felt threatened?

11      A.   After that of course.

12      Q.   Okay.

13      A.   I really -- I wasn't going back to

14   that place, man.

15      Q.   Okay.

16      A.   I didn't feel comfortable going back

17   there.

18      Q.   Okay.

19      A.   I don't feel --

20           MS. GOODWIN:  Elgin --

21           THE WITNESS:  Man.

22           MS. GOODWIN:  There's no question.

23      You don't have to fill in the dead space.

24   BY MR. SWITKES:

25      Q.   When you first applied to the

Page 148

1    housing authority you applied with one of

2    your children; isn't that correct?

3        A.    Yes.

4        Q.    And that was your daughter?

5        A.    Yes.

6        Q.    And why were you applying with your

7    daughter?

8        A.    Because at the time her mother she --

9    even though she was trying to help me out,

10   she was still dealing with her own personal

11   issues.  So we talked about it if I was able

12   to get my own place then my daughter probably

13   can live with me for a certain amount of time

14   and she can come back and live with her for a

15   certain amount of time.

16       Q.    But then you withdrew your

17   daughter's name before your application was

18   processed, correct?

19       A.    I don't know if it was before the

20   application was processed or it was after or

21   during, but I was allowed to withdraw the

22   name.

23       Q.    And why did you withdraw it?

24       A.    Because we decided that that wasn't

25   going to be a good idea anymore.

Page 149

```
 1     Q.    Okay.  So you were only --

 2     A.    I decided --

 3     Q.    -- applying for yourself, correct?

 4     A.    Yeah, after that.

 5           That was smooth there.

 6     Q.    Excuse me?

 7     A.    I said now that was smooth.

 8           MS. GOODWIN:  Elgin, there's no

 9     question.  You don't have to -- don't

10     talk when there's not a question.

11           MR. SWITKES:  I'll take a

12     compliment, that's quite okay.

13           That's the first thing you're

14     attorney --

15           MS. GOODWIN:  Not trying to take

16     your compliment away.

17           MR. SWITKES:  That's the first thing

18     your attorney didn't have to caution you

19     about.

20           THE WITNESS:  You couldn't debate

21     that one there.

22           MR. SWITKES:  We're going to have to

23     change the tape, we're going to take a

24     five minute break.

25           MS. GOODWIN:  Okay, all right.
```

Page 150

1          THE VIDEOGRAPHER:  We'll go off the

2     record at 4:02.

3       (A brief recess was taken at 4:02 p.m.)

4          THE VIDEOGRAPHER:  And we're back on

5     the record. Here begins DVD No. 2 at

6     4:21.

7  BY MR. SWITKES:

8     Q.   Do you remember telling the folks at

9  Dr. Meli's office that you were going to harm

10 yourself or others?

11    A.   No.

12    Q.   When the caseworker from Restore

13 Rehabilitation called you, did you tell her

14 that you were at your mom's house and when

15 she asked for the address you stated that she

16 was harassing you and being prejudice towards

17 you?

18    A.   Not true.

19    Q.   And didn't she tell you she had to

20 explain to you that she took your threats

21 seriously and she wanted to make sure that

22 you were taken care of?

23    A.   Nope, not true.

24    Q.   Did you tell them that you were in a

25 terrible mental state due to your physical

Page 151

1    condition long before you applied for housing

2    with H.H.A.?

3        A.   Can you repea -- can you repeat the

4    question?

5        Q.   Did you tell them at Workman's Comp

6    that you were in a terrible mental state,

7    that the quote they used that you told them,

8    due to your condition and your post-accident

9    physical condition?

10       A.   Did I tell Workman's Comp that?

11       Q.   Did you tell the Restore

12   Rehabilitation Medical case manager?

13       A.   You said "they."

14       Q.   Excuse me?

15       A.   You said "they."  Did I tell them?

16   You talking about one person or two people?

17       Q.   At the Restore Rehabilitation

18   Medical case manager for your Workman's Comp

19   case, did you tell Teddy, who I'm assuming is

20   a woman, but maybe it's a man, did you tell

21   somebody that?

22       A.   I don't get into assumptions.  I go

23   off of facts.

24       Q.   Did you tell somebody that?

25       A.   No.

1      Q.    That's not an assumption, it's a

2   quote.

3      A.    So, you said assumption.

4      Q.    This is -- this is a quote from you

5   in quotes.  You didn't tell them that?

6      A.    No, I didn't tell them nothing of

7   what you're saying.

8      Q.    Did you ask for a referral to a

9   psychiatrist while you were being treated?

10     A.    Yes.

11     Q.    And why did you tell them you wanted

12   to see a psychiatrist?

13     A.    First of all I told the orth -- the

14   orthopedic doctor that, I told him that.

15   He's the one that put the referral in for me,

16   he's the one that got it approved.  I chose

17   not to go through with it, that's my right.

18     Q.    Okay.  And who is he?

19     A.    You mentioned his name earlier.

20     Q.    Mr. Meli?

21     A.    Yeah.

22           No, no, not Dr. Meli.  The one that

23   did -- the one that did my ankle surgery.

24     Q.    Okay.  And did you also say you

25   would like to be referred to a psychiatrist

1   because you feel like you are a threat to

2   yourself and others, and parenthesis, this is

3   the direct quote from you.

4        A.   No, I didn't say that.

5        Q.   In fact, you've seen -- been seen at

6   New Horizons and at Jackson and Dr. Poitier,

7   correct?

8        A.   New Horizons is Dr. Poitier.

9        Q.   Okay.

10       A.   That's the treating doctor.  That's

11  the treating doctor.

12       Q.   And what did you tell them was the

13  cause of what you believe are your mental

14  problems?

15       A.   Just like I told, you the pain that

16  I'm dealing with physically mainly from my

17  hips.  Basically, yeah, basically, that -- it

18  really -- it really was just the pain.

19       Q.   Okay.

20       A.   Took me a while to figure it out.

21       Q.   Now, during the time you were being

22  treated for Workman's Comp, you were working

23  as an assistant football coach, correct?

24       A.   No.

25       Q.   You weren't working --

Page 154

1      A.   No.

2      Q.   -- with kids?

3      A.   No.

4      Q.   Well, didn't you go on Facebook and

5  tell everybody that you're working as

6  football coach back in 2014, sir?

7      A.   Yes.

8      Q.   Okay.  Were you lying to everybody?

9      A.   Yeah.

10      Q.   Huh?

11      A.   Yeah.  People lie on Facebook, they

12  exaggerate.

13      Q.   So you were a football coach or you

14  weren't?

15      A.   My brother-in-law, he got a -- he got

16  a coaching job.

17      Q.   Yeah.

18      A.   He asked me to come out.  I came out

19  there one day.

20      Q.   Just one day?

21      A.   Just one day.  I volunteered my

22  services that day to those young men.

23      Q.   What is the name of that coach?

24      A.   His name is Tommy Richardson.

25      Q.   And where was he coaching at the

Page 155

1   time?

2       A.   The university that he was coaching

3   at?

4       Q.   I don't know if it was a university

5   or it just says he was coaching?

6       A.   Yeah, it was -- it's a junior college

7   that they brought here -- they just -- that

8   was going to be the inaugural football --

9   football season.  I can't remember the name

10  of the university.

11      Q.   Here in Miami?

12      A.   Yeah, here in Miami.  Yeah, he got a

13  head coaching job there.  He asked me to come

14  out there, I came out there that day.

15  After -- after that day, I enjoyed the

16  experience, but my body.  My body won't let

17  me do it anymore.

18      Q.   And you were the one throwing

19  passes, right?

20      A.   No, I wasn't throwing any passes.  I

21  was -- I was just doing the instructive's,

22  that's all.  My body was in so much pain

23  after that I couldn't go back.  He asked me

24  to come back.

25      Q.   Did he say "You were catching

Page 156

1    passes, coach."  And the subject replied,

2    "Yeah, man.  Hey, I couldn't run all the

3    routes full speed, but, yeah.  He hand my

4    hands stinging."

5         A.   No, that -- that wasn't that.  That

6    wasn't that.

7         Q.   That wasn't on your --

8         A.   That wasn't related to that.

9         Q.   What do you mean it wasn't relating

10   to that?

11        A.   That don't sound like --

12        Q.   It's talking about on 9/20/14 your

13   conversation with Rick.

14        A.   I was talking about my son.

15             No, that wasn't related to that.  I

16   didn't catch any passes that day.

17             Yeah, he can throw it, man, he can

18   throw it.

19        Q.   And you felt you're being

20   discriminated against the TSA, right?

21        A.   No, I was.

22        Q.   And then you felt you're being

23   discriminated against --

24        A.   It was proven.

25        Q.   -- at C&S?

Page 157

1      A.   No, I didn't say that.  I didn't -- I

2   didn't feel that way about C&S.  I just got

3   injured.

4      Q.   So when you made the statement, I

5   asked what he did and said nothing.  He just

6   stood around. He called out on two, seven.   I

7   asked why he would call out if they told him

8   not to come to work.

9           Employee states that he's -- he

10  feels he's being discriminated against and

11  treated unfairly.

12     A.   I don't follow.  I don't have --

13     Q.   That's what you told Workman's Comp.

14  You don't remember that?

15     A.   I don't -- you got to repeat that.

16  Sound like slang to me.

17     Q.   Sounds like what?

18     A.   Slang.  I didn't really understand

19  what you were saying.

20     Q.   I asked why he would call out if

21  they told him not to come to work.

22           Employee stated that he feels he is

23  being discriminated against and treated

24  unfairly.  I asked for a specific example and

25  he states they're trying to force him to

Page 158

1   quit.  I asked how he replied, just standing

2   around is torture.

3        A.   I don't recall any of that.  I don't

4   -- at -- at -- none of that even says

5   anything I said.  I don't have a clue what

6   that is.  I don't have a clue.

7        Q.   How is it that all the records that

8   quote you directly you say you never said it?

9        A.   That --

10            MS. GOODWIN:  Object to the form.

11            THE WITNESS:  That doesn't quote me

12       directly.

13   BY MR. SWITKES:

14       Q.   Yes, it does.

15       A.   I didn't hear that.

16       Q.   When you -- when Dr. Meli said you

17   could return to work with a zero percent

18   disability why didn't you?

19       A.   Because there was another doctor that

20   started to treat me there and even though Dr.

21   Meli is the head doctor there she overruled

22   him, that's why.  Dr. Abion.

23       Q.   But you retired from --

24       A.   C&S?

25       Q.   -- C&S.

Page 159

1       A.   Eventually, yeah.

2       Q.   Okay.

3       A.   And that's --

4       Q.   Why didn't you just go to work with

5    the accommodations the doctor said you could

6    work with?  Which is lifting below a certain

7    level.

8       A.   At C&S?

9       Q.   Yeah.

10      A.   I couldn't do it, man.  And that's --

11      Q.   What couldn't you do?

12      A.   I couldn't go back and do that type

13   of work and that's one of the documentations

14   from my disability case.  I can't go back and

15   do any of that work that I did before.

16      Q.   You didn't have a disability case

17   arising out of C&S, you had a Workman's Comp

18   claim that was settled, right?

19      A.   Yeah, when we settled the Workman's

20   Comp --

21      Q.   And it wasn't on a total disability.

22      A.   That's neither here nor there.

23      Q.   Well, no, it's very important.

24      A.   I'ma ask you --

25      Q.   If you were on total disability then

Page 160

1    you can't go back to work.  If you have --

2         A.   Okay.

3         Q.   -- no disability, but they're

4    allowed to allow you to come back in the

5    workplace with certain work accommodations.

6         A.   Okay.

7         Q.   The question is why with that didn't

8    you go back?

9         A.   Because part of my settlement with

10   the Work Comp case was that I retired.

11        Q.   'Cause you decided you wanted to

12   retire?

13        A.   No, that's what -- actually, that's

14   what they presented to me.

15             Honestly, I was -- I didn't mind

16   going back, but that was part of the

17   settlement.  They told me that I would have

18   to retire from them.

19        Q.   So if the records say you directly

20   told Dr. Meli you do not want to return to

21   work, the records are wrong?

22        A.   No, Dr. Meli was one of the first

23   orthopedic doctors I saw at the beginning of

24   my Work Comp injury.  I saw doctors almost

25   two years after -- almost a year and a half

Page 161

1   after him.  He probably just doing his job,

2   trying to clear somebody just to go back to

3   work regardless -- what?  He didn't care.

4        Q.   Well, if he's saying you can go back

5   to work, but lifting would be restricted to

6   ten pounds why wouldn't you be able to do

7   that?

8        A.   Why did another doctor say

9   differently?

10       Q.   You -- so you're telling me right

11  now that you can physically lift ten pounds?

12       A.   I can lift ten pounds now.

13       Q.   Okay.  So if you could lift ten

14  pounds and the doctor would give you a

15  prescription saying the employer had to take

16  you back with that restriction, why were you

17  so intent of not going back to work?

18       A.   Dr. Meli didn't probably -- he didn't

19  -- he didn't properly assess me.  When I

20  first saw Dr. Meli he assessed me with

21  scoliosis, he assessed me with herniated disc

22  in my lumbar, he wanted me to get injections.

23            At the time I didn't -- I didn't

24  feel comfortable getting injections from the

25  doctor that was -- that was going to be

Page 162

1    administering them, that's why Dr. Meli

2    cleared me and I went to that office almost

3    seven months later.  I -- I continued getting

4    treatment --

5        Q.   You're allowed to get another

6    Workman's Comp doctor if you choose to,

7    you're aware of that?

8        A.   I never did that.

9        Q.   You had an attorney, didn't you --

10       A.   I never did that.

11       Q.   -- in the Workman's Comp claim?

12       A.   Yeah, eventually I got an attorney

13   towards the end.

14       Q.   Yeah.

15       A.   I got an attorney towards the end of

16   my case.  I didn't have an attorney during

17   that time.

18       Q.   You know, I just went back on my

19   records the name of Natalie Orr, O-R-R.  You

20   remember her?

21       A.   I told you Natalie --

22       Q.   That's -- that's Ms. Richardson's

23   sister?

24       A.   Yes.

25       Q.   And when you filled out a document

Page 163

1    to the H.H.A. saying that you were renting

2    from Natalie Orr that was not true, correct?

3         A.    Eventually I found out that, no, she

4    doesn't, she doesn't own -- it's not her

5    house and that got corrected.

6         Q.    And wasn't it true that your ex-wife

7    told H.H.A. that because you quit and were

8    not working she wasn't going to charge you

9    any rent, correct?

10        A.    No, she didn't say anything about

11   quitting because I didn't quit anywhere.  So

12   I doubt she said that --

13        Q.    Your ex-wife --

14        A.    -- that I quit.

15        Q.    -- told the H.H.A. that because you

16   quit and weren't working, she's going to stop

17   paying you any rent.  You're saying that's

18   not true?

19            MS. GOODWIN:  Object to the form.

20        If you know the answer you can answer.

21            THE WITNESS:  If she was to pay me

22        rent I'll take it.  If she wasn't paying

23        -- if she wanted to pay me rent?

24   BY MR. SWITKES:

25        Q.    Why would she pay you rent for you

Page 164

1    living for free at her house?  Does that make

2    any sense?

3         A.   What you're saying doesn't make any

4    sense.

5         Q.   Well, let me say it one more time.

6         A.   Go ahead.

7         Q.   Your ex-wife told the H.H.A. that

8    she would not charge you any rent because you

9    quit and were not working.  Are you aware of

10   that?

11        A.   No, I'm not.

12        Q.   Okay.

13        A.   That would be a false statement

14   because I didn't quit.

15        Q.   Have you ever rented any other room,

16   apartment, house, since your application at

17   H.H.A.?

18        A.   No.

19        Q.   So you're constantly living at your

20   wife -- ex-wife's?

21        A.   Little here and there.

22        Q.   And --

23        A.   Little here and there.

24        Q.   -- what does that mean?  Where else

25   have you lived?

Page 165

1      A.   I stayed in my car numerous times.

2      Q.   Okay.

3      A.   Numerous times.

4      Q.   But you haven't rented any other

5  housing other than living with your ex-wife,

6  correct?

7      A.   I haven't.

8      Q.   Okay.  Now, I have here that your

9  auto payments were $399.00, your car

10  insurance was $188.00, health insurance was

11  $64.00, and your phone payments average

12  $80.00.

13      A.   Beautiful.

14      Q.   How could you tell the people at

15  H.H.A. you were current on your bills with no

16  income?

17          MS. GOODWIN:  Object to the form.

18          THE WITNESS:  How could I tell them?

19      When -- when did I tell them that?

20  BY MR. SWITKES:

21      Q.   When you applied.

22      A.   Where's that at?

23      Q.   In your application they checked to

24  see all of the bills you had and all of your

25  bills were current when you said you had no

1    income.

2         A.    That's what --

3         Q.    How did you do that?  Is that when

4    you were borrowing 20, $25.00 from everybody?

5         A.    I never told them that, but if they

6    checked then that's what they came up with.

7         Q.    Yup.  Then how were those bills

8    current if weren't have any money and --

9         A.    Like I told you.

10        Q.    You borrowing from everybody?

11        A.    Yes, and I'm still doing it to the

12   day -- to this day.

13        Q.    And no one has threatened your life

14   since the gambling debt?

15        A.    (Witness nods.)

16        Q.    They just keep giving you money

17   because?

18        A.    I've been blessed.  I've been

19   blessed.

20        Q.    Isn't it true that you never updated

21   your personal declaration which you were

22   advised to do by your caseworker while your

23   application was pending?

24        A.    I don't recall any -- any of that.

25   Anything like that.

Page 167

1       Q.   You don't remember ever updating

2   your personal declarations page; isn't that

3   true?

4       A.   First of all, I don't even know what

5   the personal declarations page is.

6       Q.   That's where you put all your income

7   and tell them how much you're earning and how

8   you're paying all of your expenses.

9       A.   I -- you know what, I do recall us

10  adjusting that.  De la Cruz and I, we

11  adjusted something.  And if I'm not mistaken,

12  I adjusted it twice.  One time --

13      Q.   In writing?

14      A.   It's on -- it's on the applications.

15  They on the applications.  From my knowledge,

16  there are two applications that I was allowed

17  to -- so there's two applications.

18      Q.   And how did you amend it?

19      A.   How did I amend them?

20      Q.   Yes, what did you change?

21      A.   Like I said, if I'm not mistaken, De

22  la Cruz brought it to my attention.  One of

23  them at the time I had stopped earning

24  income, I wasn't having income.  The other

25  time my mother was giving me $150.00 a month.

Page 168

```
 1      Q.   Okay.  Other than that did you ever
 2  document any of the financial requests that
 3  Ms. De la Cruz had made to you?
 4      A.   Not to my knowledge.
 5      Q.   Okay.
 6      A.   I don't recall that.
 7      Q.   Now, would you admit that the
 8  records indicate that you feel worthless,
 9  angry, depressed, irritable, and it's
10  difficult to get along with your coworkers
11  in almost every job you've ever had?
12      A.   Say it again.
13      Q.   That you get angry, you were
14  depressed, you're irritable, and difficult to
15  get along with with your coworkers.
16      A.   That's funny.
17      Q.   And you've admitted that to all of
18  the psychological caregivers that you've
19  treated with?
20      A.   No, that's a false statement.  That's
21  not true at all.
22      Q.   Okay.  Now, when you went down and
23  met Ms. De la Cruz on the date you were
24  arrested, did you make any personal comments
25  to her?
```

Page 169

1       A.    Any personal comments to her?

2       Q.    Yes.

3       A.    No.

4       Q.    Did you ever say anything about her

5  being very pretty?

6       A.    No.

7       Q.    Did you ever say anything to her

8  about not being married?

9       A.    No.

10      Q.    Did you ever say anything to her

11 about why is she living alone?

12      A.    No.

13            How do I know she living alone?

14      Q.    Did you ask?

15      A.    I don't recall none of this stuff you

16 saying, man.

17      Q.    You don't under -- remember any of

18 that stuff?

19      A.    How would I know she's living alone?

20      Q.    I asked you.  Did you ask her?

21      A.    No.

22      Q.    Did you ask her any personal

23 questions?

24      A.    No, I didn't -- I didn't ask any

25 personal questions.

1      Q.    What is Ms. De la Cruz background if

2    you know?

3      A.    What's her background?

4      Q.    Yeah.

5      A.    I don't know.

6      Q.    Do you know what race she is?

7      A.    I don't -- she told -- she told me

8    she was Cuban, that's all I know.  Now, what

9    she told me, I could tell you what she told

10   me.

11     Q.    Tell me what she told you.

12     A.    She told me -- she told me she was

13   Cuban.

14     Q.    What else did she tell you?

15     A.    Right now that's all I can recall,

16   but I wouldn't know if she was living alone.

17     Q.    Well, do you think it would be

18   inappropriate to ask your caseworker a

19   personal question about whether she's single,

20   whether she lives alone, whether she has a

21   boyfriend?  Do you think those questions

22   would be inappropriate?

23     A.    I didn't ask -- I didn't indulge in

24   anything like that, but I wouldn't see what

25   -- what would be wrong with that.

Page 171

1      Q.   You don't see what's wrong with

2  asking someone who is going through your

3  application for Section 8 housing coming on

4  to her, you don't think that's wrong?

5           MS. GOODWIN:  Objection.

6           THE WITNESS:  I never came on to

7      her.

8  BY MR. SWITKES:

9      Q.   Okay.  But if you -- someone did,

10  would you believe that's inappropriate?

11     A.   The question you just asked me --

12     Q.   Yeah.

13     A.   -- if that was a normal conversation

14  with two people?

15           I don't see a crime in any of that

16  what you just said.

17     Q.   I didn't say a crime --

18     A.   I don't see anything wrong with it.

19     Q.   -- I said appropriate.

20     A.   I don't see anything inappropriate

21  about it.

22     Q.   Okay.  Did Ms. De la Cruz tell you

23  that she felt uncomfortable with your

24  questions and to start talking about the

25  questions she wanted answered about your

Page 172

1    finances?

2        A.    Never.  But we never had an

3    inappropriate conversation like that.

4        Q.    What race is Ms. De la Cruz?

5        A.    Like I said, I recall her just having

6    a conversation with me telling her she was

7    Cuban.

8        Q.    Uh-huh.

9        A.    She was day -- daydreaming.  I'm

10   like, why you -- what you thinking about?

11            Oh, just thinking about my hometown

12   in Cuba.

13       Q.    Did she tell you where in Cuba?

14       A.    I can't -- honestly, I don't recall.

15   She had -- she had numerous conversations

16   with me which I found flirtatious, but I

17   don't recall.  I can't recall.

18       Q.    Well, tell me one thing she said

19   that you considered flirtatious?

20       A.    One thing that she said?

21       Q.    Yeah.

22       A.    One thing she said and that's one of

23   the reasons why I brought up my kid's mother

24   in the last meeting that I had with her

25   before the arrest.  She was -- she was

Page 173

1    concerned -- she was concerned whether or not

2    we were still together.  I thought that was

3    -- I thought that was personal.  And it seems

4    as if her whole demeanor changed after that

5    day, but before that there was no problem.

6         Q.   You said flirtatious.  What does --

7    what in the way -- what did she say that you

8    consider flirtatious?

9         A.   I like how -- I like how beautiful

10   your dreads are.  You know my -- I had my

11   dreadlocks back then.

12        Q.   Okay.  What else?

13        A.   That's what I can recall right now.

14        Q.   Okay.  Do you know you even have the

15   country wrong?

16        A.   I don't know.

17        Q.   Well, you just said she talked to

18   you numerous times about where she came from

19   when she came from Cuba.

20        A.   That's all I can recall.

21        Q.   Do you know that you even got what

22   country she came from wrong?

23        A.   I wouldn't be surprised if I -- if I

24   did.

25        Q.   Why is that?

Page 174

1      A.   It's probably 'cause of my disability

2    right now.  I stand to be corrected on that

3    one.

4      Q.   So every time when you say something

5    that's untrue, you then revert back to say

6    that's it's because of your disability?

7             MS. GOODWIN:  Object to the form.

8             THE WITNESS:  All I know is Cuba,

9        that's all I know.  If I'm right -- if

10       I'm -- if I'm -- if I'm technically right

11       or wrong, I don't know, man.

12   BY MR. SWITKES:

13     Q.   Well, if you're technically wrong,

14   you're wrong.  Does that mean that you're not

15   telling the truth about your conversations or

16   is that just you make up stuff?

17            MS. GOODWIN:  Object to the form.

18            THE WITNESS:  No, I don't make up

19       stuff.  I'm telling you the facts.

20   BY MR. SWITKES:

21     Q.   And the facts are she numerous times

22   told you about where she was from in Cuba?

23     A.   No, she didn't numerous times told

24   me.  She told me that -- that one

25   conversation, I told you.

Page 175

1     Q.   One conversation?

2     A.   I told you one conversation she was

3  just sitting there --

4     Q.   And when you say --

5     A.   Daydreaming in space.  Why we suppose

6  to been taking care of business.  And I'm

7  like -- I'm like, De la Cruz everything all

8  right?

9          No, I'm just -- I'm just

10 daydreaming.

11         I'm like, Daydreaming about what?

12         I found that kind of odd.  I'm like

13 what the hell you daydreaming about?

14         No, I'm just daydreaming about being

15 back in my hometown in Cuba.

16         And honestly, I don't recall what

17 else, you know what I'm saying, took place

18 with the conversation, but I just wanted to

19 take care of business, man.  I don't want to

20 know where nobody from, I'm not there for

21 that.

22    Q.   So if she considered your statements

23 to her sexually harassing and abusive, you

24 don't remember anything you said that could

25 have been construed that way?

Page 176

1      A.   I know I didn't say anything for a

2   fact because if so she -- she probably would

3   have said something.

4      Q.   Well, in fact, she did.  She went

5   back and called for the investigator for the

6   H.H.A.?

7      A.   Not that day.  I ain't talking about

8   the day y'all got me arrested.

9      Q.   Well, I'm talking about the day that

10   the police officer for the H.H.A. --

11      A.   That was probably planned out.

12      Q.   Let me finish my question.

13      A.   Go ahead.

14      Q.   The reason why the officer showed up

15   is because you made inappropriate comments to

16   her and she was afraid of you; are you aware

17   of that?

18      A.   No, that's my first time hearing

19   that.

20      Q.   Okay.

21      A.   I thought this -- I thought it was

22   because of letting it happen.

23      Q.   And when she asked you for financial

24   information you began intimidating her.

25      A.   Not true.  Not my style.

Page 177

1       Q.    And when she asked you to come back

2   with proof of how you're meeting all the

3   bills and your credit -- your credit was good

4   and current on all your bills while you're

5   claiming you have no income and you spent all

6   your money from your Workman's Comp

7   settlement to pay off gambling debts, you

8   came back on the 17th of May at about 4:45;

9   isn't that true?

10      A.    That's not true.  That's not --

11      Q.    What time did you arrive?

12      A.    That's not how it went.

13      Q.    What time did you arrive?

14            I didn't ask you how it went, I said

15   what time did you arrive?

16      A.    On the day of my arrest?

17      Q.    Yes, sir.

18      A.    I can't recall because I don't think

19   it was that late.

20      Q.    But wasn't it close to closing time

21   and virtually no one was there?

22      A.    I don't know what time they close so

23   I couldn't tell you.

24      Q.    Well, let's say if they close at

25   5:00 like most businesses.  Wasn't it close

1    in time to that?

2        A.   I don't know.  I came the time she

3    asked me to come.  She called me on the spot

4    and told me that, you know what I'm saying,

5    she need me to bring some paperwork in.

6        Q.   And did you bring any paperwork?

7        A.   I came in that day --

8        Q.   Did you bring any paperwork was the

9    question.

10       A.   I'm trying to recall.  You going to

11   give me a moment or you gonna keep --

12       Q.   No, I want you to answer that

13   question before you go into some other

14   subject.

15       A.   I'm trying to remember exactly when

16   she told me to come in.  I'm trying to -- did

17   I bring in paperwork?

18            I did bring the paperwork that day.

19       Q.   What did you bring?

20       A.   I -- if I'm not mistaken, that's the

21   day I brought this -- this notarized letter.

22       Q.   And what's the date of that?

23       A.   No, it's not.

24            It's 4/28.

25       Q.   Yeah, so it wasn't that.

1              So did you bring any financial data

2    on the date of the arrest?

3        A.    I'm trying to think that -- why --

4    what did I bring in there.  I know that she

5    called me and told me that she needed me to

6    come, but other than that I didn't just show

7    up just to show up.

8        Q.    So what did you bring?

9        A.    What did I bring in that day?

10             I can't really -- I can't really

11   recall what I brought in, but I know she

12   called me and told me that she needed me to

13   come in.

14       Q.    What is Pearl Aroma International?

15       A.    That's an old business.  The

16   International -- yeah, that's an old

17   business.

18       Q.    When did you open that?

19       A.    Back in got -- got to be like back in

20   '08.

21       Q.    What was your position with Pearl

22   Aroma International?

23       A.    I was the President, CEO.

24       Q.    What was the business of Pearl Aroma

25   Internation?

Page 180

1     A.   It was a air freshener business.

2     Q.   What happened to that business?

3     A.   No, it just failed.  It didn't

4  succeed.

5     Q.   Where was the business located?

6     A.   I ran it from my -- I ran it from my

7  vehicle.  It was located also at a storage

8  area.  I had a storage area it was assigned

9  to.

10    Q.   Where?

11    A.   79th and -- 79 Street and 119.

12         I'm sorry 119 and 27th Avenue.

13    Q.   Because on the secretary of state

14  you can't list your car as the place of

15  business, right, so you listed the warehouse?

16    A.   I'm not sure.  I don't know -- I

17  don't know, you know what I'm saying, all the

18  -- I don't know all that stuff.

19    Q.   What was G.U.M.P. and Slogan?

20    A.   What was that?

21         That's something that my son and his

22  old teammate came up with.

23    Q.   What is it?

24    A.   It just an acronym for Great Under

25  Major Pressure.  That's something that --

Page 181

1    that they came up with.

2         Q.   Great Under?

3         A.   Major Pressure.

4         Q.   And what was your position with that

5    company?

6         A.   No, that wasn't a company.

7         Q.   Okay.  What did it -- what did it

8    do?

9         A.   I just told you.  That's just an

10   acronym at the time.

11        Q.   I understand the acronym, I want to

12   know --

13        A.   You won't even let me.

14        Q.   -- what that business did.

15        A.   I'm trying to answer your question.

16        Q.   Well, go ahead.

17        A.   You keep interrupting me.

18        Q.   I think I was asking you what the

19   business did.  I know what you said --

20        A.   I just told you it wasn't a business.

21   You want to make it a business?

22        Q.   So it was just a Great Under Major

23   Pressure acronym that was --

24        A.   Yeah, that's what -- that what those

25   young men -- that's what they -- that's what

Page 182

1   they wanted to do at the time.  They did

2   well.

3        Q.   When you say "wanted to do," what

4   were they doing besides making a name?

5        A.   That's all it was.  It was just a

6   motivational thing.  It was an inner-city

7   black -- black quarterback thing.

8        Q.   A motivational?

9        A.   Motivational thing.

10       Q.   Okay.

11       A.   Teddy Bridgewater and my son, E.J.

12   Hilliard the two quarterbacks at Miami

13   Northwestern at the time, that's something

14   they came up with.  They inspired, you know

15   what I'm saying, other -- other people,

16   inner-city kids in particular --

17       Q.   What is --

18       A.   -- family members.

19       Q.   What is Hilliard's Solutions Inc.?

20       A.   What was it or what is it?

21       Q.   Both.

22       A.   It's nothing now.

23       Q.   What was it?

24       A.   It was a business established -- it

25   was a credit restoration business.

Page 183

1            Go ahead.  I'm answering your

2    question.  You got a problem with my answers?

3    That too good to be true?

4        Q.   No.

5             Credit restoration business?

6        A.   Yeah.

7        Q.   Okay.  When did you form that?

8        A.   That was formed -- let's see.  You

9    taken me back.  You taken me back some good

10   memories.  I helped a lot of people out with

11   that.  That probably would have been like

12   '06.  It was sometime around that time, '06,

13   '07.

14       Q.   And what was the nature of the

15   business?  Credit restoration?

16       A.   I already just told you, yeah.

17       Q.   And how many employees did it have?

18       A.   It actually didn't have -- I was the

19   only -- I was the only person that was

20   employed.  It was just a corporation.

21       Q.   So you were the President and CEO of

22   that one too?

23       A.   I probably was.

24       Q.   And what experience did you have in

25   credit restoration?

Page 184

1          A.    Whatever experience I had.

2          Q.    Which was?

3          A.    Meaning I don't have to have

4    experience to start a business.  I felt like

5    starting a business so I started it.  That's

6    what I did.

7          Q.    And how long did that business last?

8          A.    It lasted for -- it lasted for about

9    a year about -- about the amount of time it

10   lasted.

11         Q.    Did you make any money?

12         A.    I didn't really make money, but I

13   learned a lot about -- about credit.  My

14   credit got good enough to get a job with TSA.

15   Not bad for somebody with no experience.

16         Q.    But you didn't make any money?

17         A.    I didn't really make money of it --

18   of it.  I probably should have turned it into

19   a non for profit.  For me it was -- it was

20   just from -- from a knowledge standpoint.

21   Just -- just trying to find something

22   positive.  I just needed to grab something

23   positive just like those young men that came

24   up with the G.U.M.P. acronym.

25         Q.    Okay.

Page 185

1      A.   If you don't go through it, you won't

2   never understand it.

3      Q.   How many times did you claim your

4   employers were discriminating against you?

5      A.   That one time with TSA?

6      Q.   Well, that's one of them.   And

7   then --

8      A.   I never said they was --

9      Q.   -- with C&S and with H.H.A., right?

10          THE COURT REPORTER:   I'm sorry, I

11     didn't hear you.

12   BY MR. SWITKES:

13     Q.   With C&S and H.H.A?

14     A.   I never said that C&S was

15   discriminating against me.

16     Q.   I just read a passage from --

17     A.   I got work --

18     Q.   I just read the passage from the

19   Workman's Comp file.   That's exactly what you

20   said.   You're saying --

21     A.   You keep talking about a Workman's

22   Comp.

23     Q.   Yeah.

24     A.   You talking about he, she?

25     Q.   I'm talking about your caseworker

Page 186

1    documenting and quoting you exactly and

2    writing down the quotes in quotation marks.

3         A.   He didn't quote me.  Nobody quoted me

4    on that.

5         Q.   Yes, that's exactly what that is.

6    You're saying it never happened?

7         A.   I never said them things.

8         Q.   Okay.

9         A.   And that's the thing.  Anything

10   anybody else says it stands, whatever Elgin

11   says it doesn't.  I didn't say that.  My word

12   means something too.  I'm somebody too.  I'ma

13   human being too.  I have rights too.  My

14   voice counts too.

15        Q.   When you've treated with

16   psychologist, psychiatrist did you say that

17   you felt worthless because every job you had

18   either you quit or were terminated --

19        A.   No.

20        Q.   -- and you couldn't help support

21   your family.

22        A.   No.

23        Q.   You didn't say that?

24        A.   I've never said I felt worthless,

25   never, never, never.  You can't find nobody

Page 187

1    to quote that.

2         Q.   Well, it happens to be in the

3    records --

4         A.   That's not what I said.

5         Q.   -- from New Horizons and Jackson.

6         A.   No.

7         Q.   You never said that either so the

8    doctors that quoted you are incorrect?

9         A.   That's not in there.

10        Q.   Okay.

11        A.   Being depressed --

12        Q.   You had 12 different jobs that you

13   either quit or terminated from in about a ten

14   year period, right?

15             MS. GOODWIN:  Object to the form.

16             THE WITNESS:  Who knows.  Who know.

17   BY MR. SWITKES:

18        Q.   You would know because you worked

19   there.

20        A.   We trying to -- we trying to -- we

21   trying to figure this out.  I'm still trying

22   to figure that out to this day with my

23   disability process.

24        Q.   Well, let's go backwards.  We went

25   through a lot of those jobs.  Each one of

Page 188

1    them you either quit or were terminated.

2    That was about 12 of them in a ten year

3    period; do you remember that?

4       A.   If that's the case I'm cool with it.

5    I tried, I'm working.  I wasn't out there

6    doing nothing illegal.

7       Q.   Why would you be cool with the fact

8    that you went through 12 jobs and quit or

9    terminated from each one?

10      A.   Because I --

11      Q.   What's cool about that?

12      A.   I'm trying.  And I'm going to keep

13   trying.

14      Q.   How were you trying if you quit?

15      A.   First if of all you keep saying I

16   quit, I got terminated.  You -- you said I

17   got terminated.  Which one did I do?  Did I

18   quit or did I get terminated?

19      Q.   There's about half and half.

20      A.   No, that's false.

21      Q.   Okay.  So tell me how many you were

22   terminated from and how many -- what word do

23   you like to use instead of quit?  What do you

24   say?  Resigned?

25      A.   If I resign from a place --

Page 189

1      Q.    Okay.  Let's use resigned.

2            So if of the 12 jobs in ten years --

3      A.    Two different things.

4      Q.    -- you resigned or were terminated,

5   what's cool about that?

6      A.    The fact that I tried.  Under --

7   under that verse that I --

8      Q.    How were you trying by -- by

9   resigning?

10     A.    First of all if I resigned -- that

11  first resignation I made from TSA that just

12  came with the reversal.

13     Q.    No, you were terminated from TSA --

14     A.    Yeah.

15     Q.    And then you eventually --

16     A.    I was discriminated against.

17     Q.    -- agreed to --

18     A.    I was targeted and I was

19  discriminated against and I proved it.  And

20  then the resignation was the outcome.

21     Q.    They agreed to allow you to resign

22  and leave as a means of your appeal of the

23  termination, right?

24     A.    Yeah, instead of being terminated.

25     Q.    Okay.  And that looked better on

Page 190

1    your resume?

2        A.   I don't know about all that, but I

3    wasn't terminated.  That didn't stick.  I

4    proved that.

5        Q.   You proved what?

6        A.   I proved that I was discriminated

7    against racially.

8        Q.   What are you appealing at the SSI?

9    Your appeal was denied.  What is still

10   pending?  Is there --

11       A.   You gotta ask my lawyers that.

12       Q.   Who's your lawyer?

13       A.   Right now it's Pierre Pierre.

14            Everything I say you act like it's

15   funny or you got a problem with it.  You

16   don't like the name Pierre Pierre either?

17       Q.   I know the firm which is why I'm

18   smiling.

19       A.   Oh, I'm -- I'ma catch on to it.

20       Q.   Good, keep up with me.

21            Now, after on May 17th when --

22       A.   What year?

23       Q.   -- Ms. De la Cruz went inside and

24   summoned Rene Guiterrez, did you then have a

25   discussion with Ms. Halphen?

Page 191

1      A.   First of all, I wasn't aware that De

2   la Cruz was the one that summoned her.

3      Q.   Okay.  Did you have --

4      A.   From my knowledge Ms. Halphen.

5      Q.   -- a discussion with Ms. Halphen?

6      A.   Ms. Halphen is the one.  She sent for

7   him.

8      Q.   Okay.  What was the discussion you

9   had with Ms. Halphen?

10     A.   We gotta start over because it -- it

11  didn't -- it didn't begin right and you

12  confusing me.

13          Can you repeat the question?

14     Q.   What are you -- what are you

15  confused about?

16     A.   First of all you said De la Cruz

17  summoned.

18     Q.   What did you say to Ms. Halphen and

19  what did she say to you?

20          Is that simple enough?

21     A.   Yeah.

22     Q.   Okay.  So why don't we do that.

23     A.   I recall Ms. Halphen saying something

24  to the sort of, The T.V. was turned off

25  because -- because of lightening.

Page 192

1      Q.   Okay.  So let's -- let's go back to

2  the genesis of this.  You were there talking

3  to Ms. Cruz and then she went into the back

4  room, correct?

5      A.   And then who went into the back room?

6      Q.   Ms. De la Cruz.

7      A.   Okay.

8      Q.   Yes?

9      A.   Yes.

10     Q.   Okay.  And then you were in the

11 waiting room and you walked outside, correct?

12     A.   Correct.

13     Q.   When you left to walk outside was

14 there anybody else in the waiting room beside

15 you?

16     A.   When I left -- when I -- when I was

17 in there and I got up to leave, nobody was in

18 there from what I recall.

19     Q.   Okay.

20     A.   I could be mistaken.

21     Q.   And the television was on --

22     A.   Yes.

23     Q.   -- before you walked out briefly,

24 correct?

25     A.   Yes, yes.

Page 193

1      Q.   And then you came back in, correct?

2      A.   Yes.

3      Q.   And when you came back in the

4  television was off?

5      A.   Yes.

6      Q.   And what did you say to Ms. Halphen?

7      A.   First of all, I didn't say anything

8  specifically to Ms. Halphen.  They was --

9  there was three total employees there, Ms.

10 Halphen and two other employees.  Ms. Halphen

11 was actually way on the end so walking in the

12 door I have access to the other two employees

13 before her so I didn't say anything to her.

14 I just asked what happened to the T.V.

15     Q.   And who did you ask that?

16     A.   I just asked it out loud.  I say,

17 What happened to the T.V.?

18     Q.   And who responded?

19     A.   Ms. Halphen.  She's the one that

20 responded.

21     Q.   And what did she say?

22     A.   She said, Oh, lightening.  Lightening

23 shut it off.

24     Q.   And what did you say?

25     A.   I said, Lightening?

Page 194

1           And I looked outside.

2           I said, Well, it's not raining.

3      Q.   And what did she say?

4      A.   She didn't say anything.  She just

5  look like "hmm."

6      Q.   And then what happened next?

7      A.   So I walked over to the T.V. at the

8  time I had my cane so I walked over and I

9  found out where the power button was.  I

10 turned it on, it came on.

11     Q.   And what happened next?

12     A.   She just blurted out, Wow, you're a

13 genius.  You're not as dumb as you look.

14     Q.   Okay.  Have you written and

15 testified about what Ms. Halphen said?

16     A.   Yeah.

17     Q.   Did you testify anywhere that Ms.

18 Halphen said "you're not as dumb as you

19 look"?

20     A.   I recall her saying, Wow you're a

21 genius.

22     Q.   Okay.  But you added something else

23 on that and you just made it up today 'cause

24 you've never testified to that and never

25 written that in any sworn answer, correct?

1            MS. GOODWIN:  Object to the form.

2    BY MR. SWITKES:

3        Q.    Correct?

4        A.    Incorrect.

5        Q.    So you testified at the appeal

6    hearing that she said, "Wow you're a genius.

7    You're not as dumb as you look"?

8            MS. GOODWIN:  Object to the form.

9            THE WITNESS:  What do you mean when

10       you say object to the form?

11   BY MR. SWITKES:

12       Q.    That's for the judge.  You can just

13   answer my questions.

14       A.    I recall Ms. Halphen saying, Wow

15   you're a genius.

16       Q.    Okay.  But then you added another

17   quote that you've never said before until

18   today.  Which is you said --

19       A.    So now we gon' focus on that.

20       Q.    -- you're not as dumb as I thought?

21       A.    She didn't say that.  She said, Wow

22   you're a genius.

23       Q.    Okay.  So you just made up the

24   second quote today?

25           MS. GOODWIN:  Object to the form.

Page 196

1        THE WITNESS:  Can we -- can we move

2    forward and get to -- to -- to the point?

3  BY MR. SWITKES:

4      Q.   No, you're going to answer my

5  questions.  Not when you pass over it when I

6  catch you making something up.

7           You never testified and she never

8  said, "You're not as dumb as you look,"

9  right?

10     A.   Maybe I testified and maybe I didn't.

11     Q.   Okay.

12     A.   That's what I recall here.

13     Q.   Well, you're saying you now recall

14  she said "you're not as dumb as you look" or

15  you're just now agreeing that she never said

16  that?

17     A.   She didn't say it.

18     Q.   Okay.

19     A.   Let's move forward.

20     Q.   Okay.  And then after she said what

21  she said, what did you reply?

22     A.   Let me think exactly what I replied.

23           I think my reply was, You know what,

24  I may be a genius.  I think I am a genius.

25     Q.   And she said?

Page 197

1      A.   God, what did she say?

2           I'm going to be honest with you, I

3    don't recall exactly what she said after

4    that.  But I recall it just being a

5    uncomfortable feeling.

6      Q.   So you left?

7      A.   No, I didn't go anywhere.  I -- I sat

8    down and watched T.V. I turn the T.V.

9      Q.   So --

10     A.   I accomplished what I wanted.  I got

11   the T.V. back on.

12     Q.   And then what happened next?

13     A.   And no lightening turned it off.  No

14   lightening shut it off.

15     Q.   And what happened next?

16     A.   I'm trying to recall exactly what she

17   said.

18          Okay, I got it.  I recall her saying

19   something to the sort, Did you know that this

20   is not a hotel.  This -- this -- this is not

21   a hotel.

22     Q.   And you testified to that at your

23   appeal hearing too?

24     A.   I'm telling you -- I'm telling you

25   what I recall her saying.

Page 198

1       Q.    Okay.  Listen to my --

2       A.    I'm tell -- I'm telling --

3       Q.    Listen to my question.

4       A.    Go ahead.

5       Q.    I don't want you to now tell me you

6   recall what you said.  I want you to answer

7   my question which was when you went to appeal

8   your lack of approval for H.H.A., during that

9   appeal did you just testify to --

10      A.    I'm not exactly.

11      Q.    -- the same thing as you testified

12  that day?

13      A.    I'm not exactly sure if that's

14  exactly what I said or how I said it, but to

15  get to the point, there was no threats.  I

16  didn't threatened her.  I never threatened

17  her.

18      Q.    So then Ms. Halphen has quoted you

19  as saying "I know you have a few hours left

20  and I know people who know what to do when

21  you leave here."

22            Did you say that --

23      A.    No, I didn't.

24      Q.    -- yes or no?

25            You didn't say that?

Page 199

```
 1      A.   No, I didn't, no.  For what reason
 2   would I say that?
 3      Q.   To intimidate her.
 4      A.   For what reason though?
 5      Q.   'Cause you're angry.
 6      A.   For what reason?
 7      Q.   'Cause you're angry.
 8      A.   Why would I be angry?  I got the
 9   T.V. --
10      Q.   Because she --
11      A.   I turned the T.V. back on.  The T.V.
12   was on.
13      Q.   -- was trying to lighten the mood by
14   making a statement that you're a genius --
15      A.   No, man.
16      Q.   -- and you took offense to it.  So
17   you felt you were being discriminated against
18   and you told her "I know you have a few hours
19   left and I know people who know what to do
20   when you leave here."
21      A.   First of all --
22      Q.   You didn't say that?
23      A.   Of course I didn't.  I don't know
24   what time she -- she get off.  I don't know
25   how many hours she got left.  I don't know
```

Page 200

1    nobody to do nothing with her.  Isn't that

2    the same thing that De la Cruz attested to

3    hearing and then it -- it came -- it came to

4    light that -- that she wasn't even present at

5    that time?

6        Q.   Did you say it yes or no?

7        A.   No, I didn't say that.

8        Q.   Okay.

9        A.   That's not even a threat and I didn't

10   say that.

11       Q.   It's not a threat?

12       A.   I didn't say that.

13       Q.   What do you mean it's not a threat?

14       A.   What I'm hearing you say right now, I

15   know what time you get off and I know

16   people -- what -- what else you said?

17       Q.   "I know you have a few hours left

18   and I know people who know what to do when

19   you leave here."

20            You didn't think that's a threat?

21       A.   That don't sound like a threat to me.

22   That's not what I said though.  That -- I

23   didn't say anything like that.

24       Q.   That's not a threat is what you're

25   saying?

Page 201

```
1      A.   I didn't -- that -- I don't hear that

2    threatening someone.  I don't hear that as

3    coming off as somebody saying what they're

4    going to do --

5      Q.   Well, let me interpret it for you

6    the way I think --

7      A.   Go ahead.

8      Q.   -- the average person would

9    interpret that is when you leave I know

10   people that can take care of you.

11     A.   Yeah, I'm going to say that in

12   Hialeah.

13     Q.   Yeah.

14     A.   Yeah.  I'ma be right in the middle of

15   Hialeah and say something like that.

16     Q.   Are you discriminating against

17   Hialeah?

18     A.   Hey.

19     Q.   Hey what?

20     A.   Hialeah's Hialeah.

21     Q.   What does that mean?

22     A.   It show -- it show --

23     Q.   What does that mean?

24     A.   It show on my arrest.

25     Q.   What does that mean?
```

Page 202

1    A.   I was arrested with no regards.  No

2    regards to nothing I had to say.

3    Q.   Okay.  So now we have an officer

4    show up, correct, shortly thereafter?

5    A.   You got something -- something show

6    up.  I don't know who he is or what he was,

7    but he showed up.

8    Q.   That's interesting.  Was he wearing

9    any clothing that might have given you a clue

10   as to what he might be in terms of a

11   profession?

12   A.   What I saw -- what I can recall him

13   having on is like a T-shirt.

14   Q.   Did it have a badge on it?

15   A.   I'm going to be honest with you, I

16   don't recall --

17   Q.   Did he have a gun belt on?

18   A.   Are you gonna let me answer the

19   question?

20   Q.   I thought you were finished

21   answering.  Excuse me if I interrupted you.

22   Please complete your answer.

23   A.   I forgot what I was going to say,

24   man.

25   Q.   You sure?  I want to make sure you

Page 203

1    can get out anything you want to say.

2        A.    Yeah.   I recall -- I recall Gutierrez

3    showing up after -- after I told Ms. Halphen

4    I want to file a complaint against him.

5             I sat down, I actually told Ms.

6    Halphen, I say, You know what, I feel like

7    I'm being discriminated against by you.   I

8    say I want to file a complaint against you.

9             She say, Oh, here's the form --

10       Q.    Okay.

11       A.    -- and this is the person you address

12   it to --

13       Q.    Okay.

14       A.    -- they're not going to do anything.

15       Q.    Okay.   Now you're telling -- now

16   you're telling a story.

17       A.    I sat down, I started filling out my

18   form, and yeah, Gutierrez came.

19       Q.    Okay, okay.   And I asked you was he

20   wearing a uniform?

21       A.    I can't recall what he was wearing.

22       Q.    And then I asked you was he wearing

23   a gun belt and then you gave a story.

24       A.    I don't recall.

25       Q.    Was he wearing a gun belt is the

Page 204

1   question.

2       A.   I noticed he had on a belt once we

3   got outside.

4       Q.   Okay.  And what was on the gun belt?

5       A.   I can't -- honestly I can't tell you

6   exactly what was on the gun belt.

7       Q.   But it's no question it looked like

8   a police officer's gun belt, right?

9       A.   Possibly.

10      Q.   Yeah.

11           And -- and when someone has a shirt

12   with a badge on it that says "Hialeah Police

13   Department," that usually means they're a

14   police officer, right?

15           MS. GOODWIN:  Object to the form.

16           THE WITNESS:  Ah, it could be.

17   BY MR. SWITKES:

18      Q.   So you thought it was an

19   impersonator?

20      A.   Yeah, he is an impersonator.  He

21   could have been impersonating so he could

22   have been an impersonator too.

23      Q.   Okay.  So when you then started

24   filling out, you said --

25      A.   The complaint form.

Page 205

1      Q.    Who gave you the complaint form?

2      A.    Halphen gave it to me.

3      Q.    So when you said you're being

4   discriminated against, she said, Here's a

5   form --

6      A.    Yeah.

7      Q.    -- you can fill it out, correct?

8      A.    And this is who you address it to.

9      Q.    And she gave you who to address it

10  to?

11     A.    And nothing is going to be done about

12  it.

13     Q.    Okay.  That's -- you're saying

14  Halphen said that?

15     A.    Exactly.  That's exactly what she

16  said.

17     Q.    Did she say it in front of anybody

18  else?

19     A.    She said it in front of everybody

20  that was there.  The two -- the two other

21  employees and there was another gentleman in

22  the lobby as well.

23     Q.    Yeah, there was.  And you know he

24  filled out a statement saying they were

25  absolutely professional and polite to you;

Page 206

1    you're aware of that?

2         A.   To me?

3         Q.   Yes, sir.

4         A.   No, I don't recall that.

5         Q.   Oh.  Well.

6         A.   I saw -- I saw some scribble scrabble

7    he wrote, but that wasn't addressed to me.  I

8    thought he was talking about himself.

9         Q.   Okay.  So this other gentleman is

10   sitting there and you're claiming you're

11   filling out the form and then comes Officer

12   Gutierrez.  He's wearing a gun belt, he's

13   wearing a shirt with a badge, he might have

14   been in full uniform, you don't remember?

15        A.   I really don't recall.

16        Q.   And he tells you, Sir, can you

17   please leave, correct?

18        A.   No.

19        Q.   Well, what did he say to you?

20        A.   He said, I need you to step outside.

21        Q.   Okay.  And you said?

22        A.   I said, Give me a moment.

23        Q.   And he said?

24        A.   No, now.

25        Q.   And when you were given an order by

Page 207

1   a police officer in uniform to step outside,

2   what did you say?

3       A.   I got up.

4       Q.   Okay.  And you did what?

5       A.   We proceeded outside the door.

6       Q.   He said it one time and you

7   immediately got up and went out the door?

8       A.   He said, I need you to step outside.

9            I had the form in my hand, I was

10  finishing up.  I said, Give me a moment.

11           He said, No, come -- he says, Now.

12           I said, Okay.  It must be urgent.

13           Honestly, I didn't know what he was

14  there for.  I didn't really know.  I hadn't

15  done anything wrong so.

16      Q.   Okay.  So let's go -- break down a

17  little bit of what you said.

18      A.   Go ahead.

19      Q.   He said, Step outside?

20      A.   Yes.

21      Q.   You said, Let me finish this?

22      A.   No, I didn't.  I said, Give me --

23  give me one moment.

24           I was about the put the paper away

25  and put the pen in my pocket.  I guess that

Page 208

1    wasn't fast enough.

2           He said, No, now.

3           I just took it how I had it and I

4    had to gather my cane too so I was trying to

5    conform all this stuff "bap" at -- at one

6    time, at one time.

7    Q.   You just made the court reporter

8    jump.  I'm not sure why you screamed, but

9    try --

10   A.   I was trying --

11   Q.   Try to contain yourself because

12   nobody in this room deserves that.

13   A.   I was trying to gather all my stuff

14   at one time while having a cane in one hand.

15   Q.   And so you gathered your cane?

16   A.   Yeah.

17   Q.   And you walked outside, correct?

18   A.   Yes.

19   Q.   And you walked outside with Officer

20   Gutierrez?

21   A.   Yes.

22   Q.   And he told you, You are now being

23   given a trespass warning, correct?

24   A.   No.

25   Q.   What did he tell you?

Page 209

1      A.   We just stood there.

2      Q.   He just stood there?

3      A.   I was about this distance and he was

4   about where you --

5      Q.   When you --

6      A.   I said we just stood there.

7      Q.   Okay.  But stop.

8      A.   Go ahead.

9      Q.   At the very beginning I told you,

10   don't say "this distance" or point.  The

11   court reporter can't take that down.

12      A.   Okay.

13      Q.   So for the best of your ability when

14   you say "this distance," give me some

15   measurements so when the court reporter types

16   this up --

17      A.   About three feet apart.

18      Q.   -- we can read it and make some

19   sense of that.

20      A.   We were standing about three feet

21   apart.

22      Q.   Okay.

23      A.   I said, What?  What am I out here

24   for?

25      Q.   What are you what?

Page 210

1      A.   Why am I out here?

2           I didn't -- I didn't really know

3   what he -- what he was asking me to step

4   outside for.  He asked me to step outside, I

5   went out.  I said -- I said, What?

6      Q.   And he said?

7      A.   He just looked.  A couple of seconds

8   later, he said, I feel threatened with that

9   cane in your hand.

10          I said, Okay, no problem.

11          I took the cane, I put it against

12  the side of the building structure.  The

13  paperwork I had in my hand, I just put it

14  down.  Eventually it flew away.

15     Q.   So you didn't leave the paperwork

16  inside H.H.A.?

17     A.   No, I had it in my hand with me.

18     Q.   Okay.  And then what happened?

19     A.   And then I put my hands behind my

20  back in a non-threatening manner.  And I just

21  said, Now what?  I'm like, What?  What am I

22  here for?  Why -- why you ask me to come

23  outside?

24     Q.   Okay.  Did he tell you because --

25     A.   He never said it.

Page 211

1      Q.   -- Ms. De la Cruz and Ms. Halphen

2  felt threatened by the comments you made

3  inside?

4      A.   Never.

5      Q.   Did he tell you you're giving a

6  trespass warning and you're no longer allowed

7  at H.H.A. Facilities?

8      A.   Never.

9      Q.   Okay.  So you're standing there and

10  you're saying now what?

11      A.   I'm saying, What?  Why am I here?

12  What do you want from me?  What do you want

13  from me?

14          At the time there was a lady in the

15  car, I say about four feet in the park -- in

16  the parking -- in the parking space right

17  there.  He turned his attention to her.  He

18  said, Ma'am, is he with you?

19          I said, Now look at you.  I said,

20  Now you're harassing her.

21          And that's when he reached --

22      Q.   What --

23      A.   He reached -- he said, you know what,

24  you're under arrest.

25      Q.   Excuse me.

Page 212

1      A.    And that's how that happen.

2      Q.    When he said, "are you there with

3   him" --

4      A.    Yep.

5      Q.    -- what is harassing about that to

6   her?

7      A.    First of all, that lady she minding

8   her business.

9      Q.    What is harassing about asking her

10  if she's with you?

11     A.    Because first of all I felt like I

12  was being harassed.  I was harassed already.

13     Q.    Okay.

14     A.    Once -- once --

15     Q.    Let me ask you for the third time,

16  what when Rene Gutierrez, the uniform police

17  officer, asked a woman were -- was she with

18  you, how is that harassing towards her?

19     A.    First of all, what would give him the

20  impression that we're together because we

21  both are black?

22     Q.    Because you're only persons there

23  and there's only one person waiting.

24     A.    We weren't the only people there. It

25  was -- there was somebody else in there.

Page 213

1    There was a -- there was a gentleman in there

2    as well.  He didn't ask him.

3        Q.   The gentleman that said everybody

4    was treating you very --

5        A.   That gentleman didn't attest to

6    nothing about me.

7        Q.   Oh, really, okay.

8        A.   He should've attest to the threat if

9    that was the case.

10       Q.   But he didn't.

11       A.   'Cause he didn't -- 'cause he didn't

12   hear.

13       Q.   He said everybody acted pleasantly

14   towards you.  So let's go back to where we

15   are.  Nothing in what Rene said to this women

16   was intimidating.  He asked the question "are

17   you with him?" and then what happened?

18       A.   And like I said.

19       Q.   Yeah.

20       A.   I said, Now, look at you.  I said,

21   Now, you're harassing this lady here.

22            'Cause first of all, I was being

23   harassed when we stepped outside.  He said he

24   felt threatened with my cane in my hand.  I'm

25   just an ole-have-it-up person walking with a

Page 214

1   cane.

2       Q.   You're not old.  How old are you?

3       A.   That's how I described it.

4       Q.   How -- how old are you?

5       A.   I'm 45 years old now.

6       Q.   And you consider that old?

7       A.   Not O-L-D.  O-L-E, I'm just an "ole"

8   that's a slang term.  I'm just an

9   ole-have-it-up person.

10      Q.   Okay.  But you're in your mid 40s.

11      A.   I just said --

12      Q.   At the time you were 44 years old?

13      A.   I didn't attest -- I didn't attest to

14  O-L-D.  I attest to O-L-E.

15      Q.   Okay.

16      A.   Can we move from that?

17      Q.   And you still haven't -- and you

18  still haven't said what was intimidating

19  about what he said to the woman, but now you

20  say to him --

21      A.   Just him -- just him diverting his

22  attention to her now after me.  My thing

23  was --

24      Q.   So that was disrespectful to you --

25      A.   To me I just felt --

Page 215

1      Q.    -- by asking the questions of her?

2      A.    To me I felt like first of all me

3  being out there it was never brought to my

4  attention why -- why was I asked to come

5  outside.

6      Q.    Well, if I now explain to you that

7  Ms. De la Cruz  --

8      A.    It's too late now.  I've been

9  arrested already.

10      Q.    Now, you're interrupting me and let

11  the court reporter try to get us both down.

12      A.    Okay.

13      Q.    If Ms. De la Cruz said she felt

14  threatened by you and the personal comments

15  you made and then Ms. Halphen said to Rene

16  Gutierrez that you threatened that when she

17  leaves work you're going to have people take

18  care of her.  Do you now understand why Rene

19  Gutierrez asked you to step outside?

20          MS. GOODWIN:  Object to the form.

21          THE WITNESS:  You know what?

22  BY MR. SWITKES:

23      Q.    Yeah.

24      A.    I -- I thought about that and I say

25  You know what, I said maybe Gutierrez just

Page 216

1    went off of what he was told.  I said maybe

2    that guy didn't even know anything.

3         Q.   And if -- and if --

4         A.   If he -- if he found out what they

5    said were lies.

6         Q.   And if Ms. De la Cruz and Ms.

7    Halphen both said they felt threatened and

8    intimidated by you, now you understand for

9    the first time why he was there and he asked

10   you to step outside?

11        A.   Yeah.

12        Q.   Okay.

13        A.   And hon -- I know for a fact it

14   wasn't true what they said because we found

15   that out in the meeting we had with Ms. Bates

16   to get back on the list.  De la -- De la Cruz

17   attested to something that she -- she -- she

18   wasn't even there --

19        Q.   Okay.  So --

20        A.   -- and she said she heard that.

21        Q.   -- now we're outside and now for the

22   first time you understand why Rene was called

23   and why he asked you to step outside?

24        A.   I said I -- I understand.

25        Q.   And now you step outside and now

Page 217

1    you're outside and Rene tells you you're

2    being given a trespass warrant?

3        A.    He never told me that.

4        Q.    Okay.

5        A.    You keep saying he did.

6        Q.    Did he ask you to leave?

7        A.    He never did.

8        Q.    So you're standing there and you're

9    having a conversation with him and you're

10   saying now what?

11       A.    After I put my cane down, after he

12   told me he felt threatened with me having my

13   cane in my hand, I said no problem.  I took

14   it and put it on the bill -- the building

15   structure.

16       Q.    Why didn't you leave?

17       A.    Hmm?

18       Q.    Why didn't you leave?

19       A.    Because I was try -- I was trying to

20   respect Gutierrez.  Like I said, I notice he

21   had on something.  I'm trying to find out

22   what is it and first of all I wasn't finished

23   with my business inside.  I was never told

24   that I was finished with my business inside.

25       Q.    When he told you to step outside was

Page 218

1    that an indication that you --

2        A.   No, I can't assume anything.

3        Q.   Excuse me, you're interrupting me

4    again.

5        A.   Okay, go ahead.

6        Q.   When he told you to step outside was

7    that an indication to you that your business

8    at the H.H.A. that day was done?

9        A.   Oh, no.

10       Q.   You didn -- that didn't enter your

11   mind?

12       A.   No.

13       Q.   That you had this exchange with Ms.

14   De la Cruz, you had this exchange with Ms.

15   Halphen --

16       A.   I didn't have an exchange with either

17   one of them.

18       Q.   -- and then a police officer asks

19   you to step outside.  You thought that you're

20   going to go back in and conduct more business

21   that day?

22           MS. GOODWIN:  Object to the form.

23           THE WITNESS:  Because tho -- those

24       exchanges that they claim, like I said,

25       it came to find out that they was -- they

Page 219

1        was lies, they weren't true.

2    BY MR. SWITKES:

3        Q.    Okay.

4        A.    So there was nothing for me to be

5    concerned about because I didn't -- I didn't

6    need none of those things.

7        Q.    That's your opinion.

8        A.    That's a fact.

9        Q.    They have a different opinion.

10       A.    Okay.

11       Q.    Now, as you're outside and he's

12   telling you, Okay --

13       A.    He never told me anything.  He never

14   told he me that.

15       Q.    -- it's time to leave.  So you say

16   to him he felt threatened by your cane?

17       A.    That's the only thing he told me.

18       Q.    Okay.  Wouldn't that be an

19   indication that it's time to leave?

20       A.    No, of course not.  Why was that?

21       Q.    Because you're now going to confront

22   the police officer as to why he feels

23   threatened after Ms. De la Cruz felt

24   threatened and Ms. Halphen felt threatened,

25   but you didn't say anything to anybody that's

Page 220

1    threatening, correct?

2         MS. GOODWIN:  Object to the form.

3         THE WITNESS:  So just because

4       anybody say that they felt threatened by

5       me that means it sticks.  That's why I

6       don't walk with my cane to this day and I

7       -- honestly, I probably never will walk

8       with a cane again because of that

9       incident.

10   BY MR. SWITKES:

11        Q.   Okay.

12        A.   It's going to stay in the back of my

13   head.

14        Q.   So -- so I gave you the setting.

15        A.   I gave you the setting.

16        Q.   We now have two people that said

17   they feel threatened that's why they called

18   the officer.  Now, for the first time you

19   recognize, you're outside and you're -- put

20   the cane down 'cause he said he's feeling

21   threatened, but you don't think that's a

22   hint, I want to deescalate this?  It's time

23   for me to leave?

24        A.   Of course not.

25        Q.   You want to confront him?

Page 221

1          MS. GOODWIN:  Object to the form.

2          THE WITNESS:  I didn't confront him.

3   BY MR. SWITKES:

4      Q.   What do you mean?

5      A.   He confronted me.  He confronted

6   me --

7      Q.   Well, he said --

8      A.   -- to step outside.  I stepped

9   outside.

10     Q.   And then he felt threatened by your

11  cane and that's where we're at.

12     A.   So okay --

13     Q.   And then --

14     A.   -- he tell me --

15     Q.   And you put the cane down and say?

16     A.   -- he failed -- I'm trying to

17  understand what was I supposed to do when he

18  said he felt threatened by my cane.

19     Q.   Uh, a good idea would be to say,

20  Okay, I'm leaving.

21     A.    For what?  I was there to take care

22  of business.  I wasn't finished taking care

23  of business.

24     Q.   Okay.  But the business is done.

25  You've been asked to step --

Page 222

1      A.   No, no, no.

2      Q.   -- outside by a police officer.

3      A.   The business wasn't done.

4      Q.   So you're not going home?

5      A.   The business still was --

6      Q.   You're going to insist on going back

7   in there after they called the police on you?

8           MS. GOODWIN:  Object to the form.

9           THE WITNESS:  Honestly, when he

10      asked me to step outside I didn't know

11      what he was going to say.  I was -- I was

12      still waiting to hear what he sad to say

13      to me.  The only thing I heard him saying

14      to me afterwards was, Put your hands on

15      the wall, you're under arrest.

16   BY MR. SWITKES:

17      Q.   Okay.  You left out a part.  Didn't

18   he take out his TASER?

19      A.   He didn't take it out.  He reached

20   for it.  He reached for it.

21      Q.   Why did he reach for it?

22      A.   That's when he divert his attention

23   to the lady that was parked.  It's like once

24   he saw her, he thought twice about it.

25      Q.   Olay.  So you're saying -- the

Page 223

1    officer said he did take out his TASER --

2         A.   I don't recall him having his TASER.

3         Q.   -- because you were swinging your

4    cane.  Are you now saying that he didn't take

5    out his TASER?

6         A.   He didn't.

7         Q.   He didn't?

8         A.   He didn't take his TASER out.

9         Q.   He did not?

10        A.   So I'm swinging my cane while he got

11   a TASER in his hand?

12        Q.   Well, it's before he took the TASER.

13   He says --

14        A.   So he put it back in?

15        Q.   -- you swung your cane, he then took

16   out his TASER.

17        A.   He said I swung my cane?  At who?

18        Q.   Yes, he did.

19        A.   At him?

20        Q.   Yes, sir.

21        A.   While he had his TASER out or he

22   didn't have it out at the time?

23        Q.   He didn't have it out.

24        A.   So I swung my cane and then he pulled

25   the TASER out?

Page 224

1      Q.   You were yelling angrily and you

2   swung your cane.  He took out his TASER and

3   then he called for the police to come; are

4   you aware of that?

5           MS. GOODWIN:  Object to the form.

6           THE WITNESS:  Listen to what you're

7       saying, man.

8   BY MR. SWITKES:

9      Q.   You were standing right near him.

10      A.   It don't make sense --

11      Q.   You didn't hear him call the police

12   department?

13      A.   It don't make sense what you're

14   saying.

15      Q.   You were standing within feet of

16   him --

17      A.   Especially at that time.

18      Q.   -- did you --

19           Stop.  Listen to my question.

20           You're standing within feet of an

21   officer who's got a radio who when he takes

22   out his TASER 'cause he says you're

23   threatening him and getting in a fighting

24   stand, he's calling for police back up; did

25   you hear that?

Page 225

1      A.   That didn't happen like that.

2      Q.   Well, how did -- you said in your

3   answers to interrogatories about seven or

4   eight different police officers showed up.

5      A.   When they showed up?

6      Q.   They showed up because he called for

7   them right in front of you.

8      A.   He never -- no, he didn't.   He

9   never -- he never, he never called the police

10  out there.   Evidently he had already called

11  them before we stepped outside.

12     Q.   Okay.   So you're outside, he's got

13  his TASER out, but you say he never pulled it

14  out?

15     A.   He never pulled it out.

16     Q.   Okay.

17     A.   'Cause he would have pulled it out,

18  he would have used it.

19     Q.   You put -- you put your cane down

20  and what happens next?

21     A.   After he told me he felt threatened

22  with me with my cane in my hand, I just took

23  it put on the buil -- on the side of the

24  building structure and I put my hands behind

25  my back.   He said, I feel threatened by you.

Page 226

1           I took the cane and put it on my --

2    I put it on the side and I put my hand behind

3    my back.  He said, Oh, now you squaring off

4    against me?

5       Q.   So you're saying Officer Rene

6    Gutierrez told you he felt threatened by you

7    swinging the cane --

8       A.   He never said he felt threatened --

9       Q.   -- you put your ca -- well, why

10   would you put your cane --

11      A.   -- swinging the cane.

12      Q.   -- why would you put your cane down?

13      A.   He said I feel threatened --

14      Q.   Okay.  So you put the cane down --

15      A.   -- with you having that cane in your

16   hand.

17      Q.   So you put the cane down, he never

18   drew his TASER?

19      A.   I don't recall him draw -- drawing

20   his TASER --

21      Q.   Okay.

22      A.   -- he had no reason to.

23      Q.   And then what happened?

24      A.   Once he said that he felt threatened

25   with me having my cane in my hand --

Page 227

1      Q.   Yeah.

2      A.   I took the cane --

3      Q.   We're passed that.  You put the cane

4  down.  What happened next?

5      A.   I put my hands behind my back.

6      Q.   Why'd you do that?

7      A.   Because I wanted to just be in a

8  non-threatening stance and it was the total

9  opposite to him.

10     Q.   Okay.  And then he -- well, he

11 didn't take out his TASER, he didn't take out

12 a gun, he didn't take out handcuffs, he

13 didn't take out any weapons, correct?

14     A.   Once I put my hands behind my back,

15 he said, Oh, now you squaring off against me?

16          And that's when he went to reach and

17 that's when he divert his attention to the

18 lady.  He said, Oh -- he said, Is he with

19 you?

20          I said, Now look at you.  Now you're

21 harassing this lady here.

22          And that's when he said, Put your

23 hands on the wall.  You're under arrest.  You

24 hear those police sirens, boy, you're going

25 to jail.

Page 228

1       Q.    Okay.  And by saying, "Is he with

2    you" he was harassing her?  What was --

3       A.    That's how I -- that's how I felt.

4    That's how I interpret it.

5       Q.    Okay.  Who was that lady?

6       A.    That's the mystery.

7       Q.    What was -- give me a description of

8    that lady.

9       A.    I just recall seeing a black -- a

10   black female just sitting in the car.

11      Q.    What was her age?

12      A.    She could have been like in her late

13   30s, early 40s.

14      Q.    And she was waiting for somebody?

15      A.    I don't know if she was waiting for

16   someone or she just was broke down there or

17   whatnot.  But she was parked in that parking

18   space, she was there when the police showed

19   up.

20      Q.    And she didn't leave, correct?

21      A.    She never -- she didn't leave.

22      Q.    So he threatened her in your

23   opinion --

24      A.    I say he harassed her.

25      Q.    -- but she never left?

Page 229

1       A.   He harassed her.

2       Q.   Why would she stay if she felt

3   threatened?

4       A.   I said I felt like he was harassing

5   her.

6       Q.   Well --

7       A.   'Cause she was just sitting there

8   minding her business.  She had nothing to do

9   with why he asked me to come outside.

10      Q.   Okay.  And then the police showed

11  up, what happened?

12      A.   After Gutierrez -- Gutierrez detained

13  me, put me in handcuffs for no reason, put my

14  hands -- put me on the wall, the police was

15  showing up, I never seen them call anybody.

16  Evidently, he had already called them.

17      Q.   Well, evidently, he might have

18  called them right in front of you --

19      A.   No, he didn't.

20      Q.   -- but you don't remember that?

21      A.   He didn't call them.  There wasn't no

22  time.

23      Q.   Okay.  What do you mean it wasn't no

24  time?  How much time does --

25      A.   Everything --

Page 230

1      Q.    -- it go on the radio and ask for

2   back up?

3      A.    Everything happened so fast.

4      Q.    How fast?

5      A.    We were in dialogue with each other.

6      Q.    How fast?

7      A.    That -- that incident took -- I give

8   it like, man, two minutes.

9      Q.    Okay.  So in the two minutes you're

10   saying the police department is located where

11   in relation to the H.H.A.?

12      A.    I don't know -- I don't where they

13   have the police department.

14      Q.    Do you know it's across the street?

15      A.    I don't know.

16      Q.    You don't know that?

17      A.    I don't know.

18      Q.    It's almost directly across the

19   street?

20      A.    I don't know and I don't care,

21   honestly.

22      Q.    Okay.  So it took two minutes,

23   police officer showed up and then what

24   happened?

25      A.    I was in handcuffs when they showed

Page 231

1    up.  Two, four, six, eight, I say there was

2    about three cars -- three or four cars.

3        Q.   Okay.

4        A.   One officer came to me all the other

5    officers they went on the side of the

6    building.

7        Q.   Did any of them go inside?

8        A.   Honestly, I don't recall anybody

9    going inside, but I heard -- I found out that

10   somebody did talk to Halphen and somebody did

11   -- they talk -- they talked to Gutierrez.

12   Nobody talked to me, nobody talked to the

13   lady that was parked in the car 'cause I was

14   able to see her the whole time and I never

15   understood that.  I remember saying to

16   myself, Why don't they just go to that lady?

17   She saw everything.

18       Q.   Do you remember Officer Gutierrez

19   asking you to calm down multiple times?

20       A.   To calm down?

21       Q.   Yes.

22       A.   No, there was no reason for him to

23   ask me to calm down.  I never -- never got

24   ups -- I never got irate, I never got angry,

25   I was just curious as to why -- why he wanted

Page 232

1    me outside.

2        Q.    Well, and now for the first time

3    you're saying you understand?

4        A.    I understand why -- because I was

5    curious to know, like, why would he just show

6    up 'cause I was -- there was nothing that I

7    had done, there was nothing to that I was

8    doing to warrant an officer to come approach

9    me.

10        Q.    But now you know that two of the

11    employees felt threatened by your comments

12    even though you claim they weren't intended

13    that way, right?

14        A.    First of all that I didn't happen.  I

15    didn't threaten either one of them.  They're

16    females, that's not my style, that didn't

17    happen.  I can -- I can understand why

18    Gutierrez may have showed up --

19        Q.    Okay.

20        A.    -- with the demeanor that he had.  It

21    still didn't warrant me being arrested, but.

22        Q.    If someone threatens to bring people

23    to take care of them --

24        A.    I never say said that.

25        Q.    -- do you think -- let's assume for

Page 233

1   a second that someone heard you say that or

2   heard someone say that.

3       A.   I'm not going to assume anything.   If

4   I said it, someone would've heard me.

5       Q.   You interrupted me.  You can't do

6   that --

7       A.   Go ahead.

8       Q.   -- because you answer a question

9   that wasn't asked.

10      A.   Go ahead.  Go ahead.

11      Q.   If somebody said "when you leave

12  work I'm going to have someone take care of

13  you."  You know that's an arrestable offense,

14  don't you?

15      A.   I don't know, but I didn't say that.

16      Q.   Okay.  If you did or someone said

17  that you understand that being an aggravated

18  assault?

19          MS. GOODWIN:  Object to the form.

20          THE WITNESS: I don't know, I'm not

21      sure.  I don't know the law that way.

22  BY MR. SWITKES:

23      Q.   Well, but you know if you threatened

24  someone that you're going to kill them,

25  that's a threat?

Page 234

1        A.   Of course.

2        Q.   Okay.

3        A.   I didn't say that.  I didn't threaten

4   to kill anyone.  It was two workers there,

5   they didn't hear it?  Nobody else heard that

6   but Haplhen 'cause it never was said, none of

7   it.

8        Q.   Did you say that you felt

9   discriminated against while you were inside?

10       A.   Yes.

11       Q.   And you said that to who?

12       A.   I told that to Halphen and -- I told

13   that to Halphen and De la Cruz.

14       Q.   And what was the statement that you

15   think Ms. De la Cruz said that warranted your

16   allegation that she was discriminating

17   against you?

18       A.   First of all --

19       Q.   Answer that and then you can give me

20   some other explanation as to it.  What is the

21   statement that she meant?

22       A.   First -- first of all I'm going to

23   answer my questions the way I feel like

24   answering it.  That's what I feel like

25   saying.

Page 235

1        Q.   No, see but that's the problem --

2             MS. GOODWIN:  You have to answer --

3   BY MR. SWITKES:

4        Q.   -- it's not your question, it's

5   mine.

6        A.   I'm going to say first of all --

7   first of all --

8        Q.   No, answer my question and if you

9   have to explain it you can.

10       A.   First of all --

11       Q.   What did you say to Ms. De la Cruz

12  that she -- that you necessitated you saying

13  "you're discriminating against me"?

14       A.   What I said to her was --

15       Q.   It's what she said to you, not what

16  you said to her.

17       A.   I said -- I said this to her first

18  then she said -- said something to me.

19            I told her, I said I wrote on paper

20  what I got from Work Comp.

21            She told me, No, that's not true.

22  They said they gave you 25,000.

23            I said, I'm telling you how much I

24  got.  I said, Now I feel like I'm being

25  singled out and discriminated against by you.

Page 236

1    I said, Because I'm telling you exactly what

2    happened, how it happened.

3        Q.   Okay.  How is that discriminating?

4        A.   What you think?  Because I'm giving

5    her -- I'm giving her my written statement.

6        Q.   What does that have to do with

7    discrimination?

8        A.   I just felt --

9        Q.   Do you know what the word means?

10       A.   I may don't, but I just feel like the

11   stuff I went through, the stuff I was going

12   through there, I didn't deserve to be going

13   through it.

14       Q.   So when you said "I make my money

15   gambling" or I said "I used all my money to

16   pay off gambling," you think that that's the

17   end of what a caseworker can ask you?

18       A.   I don't know.

19       Q.   And anything else she asks you is

20   discriminating against you?

21       A.   Whatever --

22            MS. GOODWIN:  Object to the form.

23            THE WITNESS:  Whatever I said, she

24       had.  All she had to do was take it back

25       there and do her job, but I said what I

Page 237

1        said.

2    BY MR. SWITKES:

3        Q.    Do you know what her job is?

4        A.    I don't know what her job is.

5        Q.    So why would you say all she has to

6    do is take it back there and do her job?

7        A.    Because I gave her --

8        Q.    She's -- her job as a caseworker is

9    to determine whether or not the applicant

10   meets the financial requirements for

11   receiving Section 8 housing.  And someone

12   saying I gave all my money away gambling --

13       A.    So what did she come up with?

14       Q.    -- doesn't satisfy that requirement

15   so she asked you for further documents.

16       A.    So what was the outcome then?  All

17   she had to do was tell me, You don't qualify,

18   Elgin, I'm sorry.

19       Q.    She didn't get there because --

20       A.    That's why I said all she had to do

21   was go back and do her -- finish her job off.

22   That's what I told you.

23       Q.    Now, see, now you're telling her

24   what her job is --

25       A.    I didn't tell her that.

Page 238

1    Q.    -- and I have a feeling that you

2    don't know --

3    A.    I'm saying that now.

4    Q.    -- what her responsibility is.

5    A.    I didn't -- I didn't tell her that.

6    Q.    But that's your attitude.

7    A.    That's what I thought she was gonna

8    do.

9    Q.    I gave you enough answers so go back

10   and do your job.

11   A.    Exactly.  What more she needed?

12   Q.    She needed proof that you have

13   disposed of all of the Workman's Comp moneys

14   which would justify your being considered for

15   Section 8 housing and all you did is give her

16   statements that had paid off gambling debts.

17   A.    So she should have drew a conclusion

18   after that.

19   Q.    Well, she had pretty much drawn a

20   conclusion.

21   A.    Not arrest -- not having me arrested.

22   Q.    Well, she called the police because

23   she felt threatened by you.

24   A.    No one threatened her.

25   Q.    You can feel that you didn't

Page 239

1    threaten anybody --

2         A.   No one threatened her.

3         Q.   -- but you have two workers that

4    felt threatened.

5         A.   I didn't say or do anything to

6    threaten De la Cruz nor Halphen and you had

7    -- you had three people there.

8         Q.   They disagree.

9         A.   You had three people there, no one

10   person attested to it, but De la Cruz.

11        Q.   How -- how many people testified at

12   your appeal hearing?

13        A.   If I'm not mistaken, just one person

14   De la Cruz.

15        Q.   Ah, so the other people that were

16   present didn't testify so there was no way --

17        A.   Who?

18             Halphen -- was Halphen, De la Cruz,

19   and myself.

20        Q.   And how about the other women that

21   were at the desk, did they testify?

22        A.   Of course not.  I didn't hear

23   anything --

24        Q.   What do you mean of course not?

25        A.   Because I don't see their names

Page 240

1    anywhere.

2        Q.   Did you -- did you call them as

3    witnesses?

4        A.   Huh?

5        Q.   Did you call the other workers as

6    witnesses?

7        A.   I didn't need to call them as

8    witnesses.

9        Q.   Because everybody would have to

10   believe you?

11       A.   Because nothing that De la Cruz claim

12   that I said was said and I proved that.  De

13   la Cruz tried to -- she tried to help -- help

14   her with that claim, but we found out that

15   she -- she got -- had got caught in a lie and

16   Halphen, Halphen said herself.  My lawyer

17   asked Halphen, Who was all present at the

18   time you and Mr. Hilliard had a conversation?

19          She said it was other workers and

20   another gentleman in the lobby.

21          She said, Was De la Cruz present?

22          She said, No.

23          I don't know what else to say, man,

24   but I told her that De la Cruz wasn't even

25   there.  She wasn't even present with me and

Page 241

```
1    Halphen were talking.  There was no threats,

2    I never threaten.

3        Q.   Okay.  So did Ms. De la Cruz say

4    anything to you that you felt she was giving

5    you an attitude?

6        A.   No, not an attitude just the back and

7    forth.

8        Q.   But that's not what your complaint

9    says.

10       A.   After I --

11       Q.   Let me -- let me read.  Before you

12   say anything else --

13       A.   Go ahead.

14       Q.   -- let me read your complaint which

15   states the exact opposite of what you just

16   said.

17       A.   Go ahead.

18       Q.   "At that time Hilliard informed Ms.

19   De la Cruz that her recent questions and

20   attitude towards him we're making him feel

21   uncomfortable.  And that he felt she was --

22   had been giving him a harder time ever since

23   he reported to her that he was disabled and

24   that his income was limited.  Ms. De la Cruz

25   then went back into her office alone to
```

Page 242

1    review his letter and left Mr. Hilliard

2    sitting in the lobby."

3        A.    That's the discrimination I'm talking

4    about.

5        Q.    Okay.

6        A.    That's --

7        Q.    You use the word "discrimination"

8    you've used it multiple times today.  I'm

9    having a hard time, maybe it's me --

10       A.    No, maybe it's me.

11       Q.    Excuse me.  Listen to my question.

12             -- understanding what you mean by

13   discrimination.

14       A.    You're not asking the question.  You

15   just made a statement.

16       Q.    I asked you did what you just say

17   disagree with page -- Paragraph 22 of your

18   complaint on Page 4 of your first amended

19   complaint you filed in federal court.  What

20   -- her questions, what about her attitude was

21   making you feel uncomfortable?

22       A.    First of all, you keep saying

23   attitude.  I don't look at it -- it's not an

24   attitude to me, it's just a thing that.

25       Q.    See and that's my problem.  This is

Page 243

1    your words in your complaint.

2        A.    We're not --

3        Q.    I'm not saying the word, you did.

4    I just read it to you.

5        A.    This the --

6        Q.    "Her recent question and attitude

7    towards you."  That's what you wrote in your

8    complaint.

9        A.    Somebody else said that.

10       Q.    You said that.

11       A.    Somebody else said that.  You say her

12   recent attitude and credit towards you.

13       Q.    I'm reading it from your complaint.

14   This is what Mr. Hilliard is alleging.

15       A.    I didn't write that.

16       Q.    So these allegations --

17       A.    Somebody -- somebody --

18       Q.    -- are untrue?

19       A.    Whoever wrote that, they probably

20   worded it differently, but most of that stuff

21   you said in there, yeah, I felt like I was

22   being singled out by them.

23       Q.    So when you wrote in paragraph --

24       A.    Is that my handwriting?  It's not my

25   handwriting.

Page 244

1      Q.   Sir, this is your first amended

2   complaint that was filed by your attorney,

3   April Goodwin, who's sitting in the room.

4      A.   That's how Ms. Goodwin phrased it.

5      Q.   So you're claiming Ms. Goodwin

6   misrepresented?

7      A.   No, I'm not.

8      Q.   Okay.  Because I thought that's what

9   you just said.  This is not your words and

10   someone else said it.

11         Well, Ms. Goodwin on your behalf

12   said it in the complaint in federal court.

13   That's your attorney, she's speaking for you.

14      A.   And she's -- and she's on point, but

15   the attitude part, I don't want to -- I don't

16   want to focus on attitude 'cause is neither

17   here nor there, but I'm just going off the

18   facts.  I felt like I was being singled out

19   and discriminated against by them.

20      Q.   Okay.  So you wrote in Paragraph 16

21   on our about April 25, 2016, "Hilliard

22   attended a meeting with Margarita De la Cruz,

23   the H.H.A. intake worker assigned to his

24   application.  In order to provide Ms. De la

25   Cruz with documents she had requested."

Page 245

1              Isn't that true?

2        A.    True.

3        Q.    And then you write in Paragraph 17,

4   "during this meeting, despite being presented

5   with ample evidence of Mr. Hilliard's

6   disabilities, Ms. De la Cruz accused Hilliard

7   of lying about his disability stating that he

8   was not -- not disabled in her eyes."

9        A.    That's true

10       Q.    Is that true?

11       A.    Exactly true.

12       Q.    She said that to you on April 25,

13  2016?

14       A.    Yes, she did.

15             You're not disabled in my eyes.

16       Q.    And you said "despite being

17  presented with ample evidence of your

18  disabilities."

19             What evidence of your disabilities

20  did you give to Ms. De la Cruz on or about or

21  before April 25, 2016?

22       A.    Well, at that time it was just my

23  Work Comp -- it was my Work Comp information.

24       Q.    Okay.  You didn't give her any

25  documents from Workman's Comp, did you?

Page 246

1      A.   'Cause -- yeah, she had documents.

2      Q.   Okay.

3      A.   Short-term disability.

4      Q.   Okay.  Did you give her any

5  documents --

6      A.   I didn't make --

7      Q.   -- from Workman's Comp?

8      A.   Huh?

9      Q.   Did you give her any documents --

10      A.   Yeah, she had my Work Comp documents.

11      Q.   I asked you a simple question.  You

12  seem not to be able to answer it.

13      A.   Go ahead.

14      Q.   Did you give her any Workman's Comp

15  documents on or before April 25, 2016, yes or

16  no?

17      A.   Yes, of course.

18      Q.   You gave her your entire Workman's

19  Comp file?

20          MS. GOODWIN:  Object to the form.

21          THE WITNESS:  She had.

22  BY MR. SWITKES:

23      Q.   You keep saying she had.  The

24  question is you gave her --

25      A.   I didn't have access to my whole file

Page 247

1   so I don't -- I couldn't say I gave her my

2   whole file.

3       Q.   So if you didn't have access to your

4   own file, you obviously didn't give it to

5   her?

6       A.   I said my whole file.  I didn't have

7   access to my whole file.

8       Q.   Okay, yeah.  So you didn't --

9       A.   I gave her what I had.

10      Q.   What'd you give her?

11      A.   I gave her the check stubs from --

12  from my weekly work -- my weekly work comp --

13  compensation.

14      Q.   Yeah.

15      A.   That's basically all I had to bring

16  in to her.

17      Q.   Okay.  So that's nothing to do with

18  disability, correct?

19      A.   Yeah, it is.

20      Q.   What do you mean?

21      A.   It's called short-term disability.

22      Q.   Your work stubs are short-term

23  disability?

24      A.   That's what I'm receiving.

25      Q.   Your work stubs show that you're

Page 248

1    being paid during your injury --

2         A.    That's what I consider disability.

3         Q.    -- on the basis of Workman's Comp.

4    What does that have to do with proving your

5    disability?

6              MS. GOODWIN:  Object to the form.

7              THE WITNESS:  That's going through

8         the disability process.  But you know

9         what I brought --

10   BY MR. SWITKES:

11        Q.    That's the Workman's Comp process.

12        A.    Okay.

13        Q.    That's not a disability process.

14        A.    That's the Work Comp process.  I also

15   brought her in my disability information.

16        Q.    From whom?

17        A.    Huh?

18        Q.    From whom?

19        A.    From disability.  I applied.

20        Q.    What do you mean from disability?

21        A.    Just -- just the process of going

22   through the disability.

23        Q.    What is disability?

24        A.    My written -- my written statements.

25        Q.    What is -- you said you brought a

1   documents from your disability.  What is from

2   disability?  There's no agency I'm aware of

3   that's just disability?

4            MS. GOODWIN:  Object to the form.

5   BY MR. SWITKES:

6       Q.   Are you talking about Social

7   Security?

8       A.   No, she had me --

9       Q.   Are you talking about --

10      A.   She had my -- she had my information

11  from Poitier, she had my information from my

12  psychiatrist.

13      Q.   You gave her that?

14      A.   Yeah.

15      Q.   When did you give her that?

16      A.   I don't know.  I don't recall exactly

17  what date.

18      Q.   You gave her your psychiatric

19  records?

20      A.   Yeah.

21            MS. GOODWIN:  Object to the form.

22  BY MR. SWITKES:

23      Q.   So you realize we have a file at

24  H.H.A. with all the documents you provided.

25  You're saying all the Dr. Poitier's records

Page 250

1    are in your H.H.A. file?

2              MS. GOODWIN:  Object.

3              THE WITNESS:  Not all of them.

4    BY MR. SWITKES:

5        Q.    Which ones did you give her?

6        A.    At that time I just had started

7    seeing him Dr. Poitier.  I started seeing him

8    December.

9        Q.    When?

10       A.    December 2000 -- 2015.  This arrest

11   happened, what, six months later.

12       Q.    And so --

13       A.    Five months later.

14       Q.    And so you gave all the records from

15   Dr. Poitier --

16       A.    You keep saying all.

17       Q.    -- up until that time?

18       A.    I gave her --

19       Q.    Sorry, didn't mean to --

20       A.    Whatever --

21       Q.    I accidentally knocked down your

22   glasses.

23       A.    Me too.

24       Q.    You in purpose knocked down my file.

25       A.    Nah I --

Page 251

1      Q.   And the good thing is we're on

2  video.  What the purpose of that is, I

3  haven't the slightest idea.

4      A.   That probably was an accident.  You

5  probably flung it over.

6      Q.   Yeah.

7      A.   You're the only one that can make --

8  make a mistake, not me.

9      Q.   Like I said, there's a video.

10     A.   Yeah, and it's clear cut.

11     Q.   Did you ever mention to Dr. Poitier

12  that anything that occurred to H.H.A. was the

13  cause of any of your mental illness problems

14  that you claim you had?

15     A.   Yeah, I -- I mentioned to him about

16  the arrest about the incident about

17  everything that occurred.

18     Q.   Isn't is true that --

19     A.   That's his decision.

20     Q.   -- all the records of Dr. Poitier

21  regarding your depression, regarding any

22  treatment was about your inability to hold

23  jobs and being terminated throughout your

24  career?

25     A.   I'm not --

Page 252

1      Q.   Page after page?

2      A.   -- I'm not exactly sure.  Whatever

3   assessment he made that's on him.  I'm not --

4   I'm not the expert.  I'm not the

5   professional.

6      Q.   Did you tell Dr. Poitier that you

7   have a gambling problem?

8      A.   I don't have a gambling problem.  Who

9   said I had a gambling problem?

10     Q.   I seem to remember -- I'm trying to

11   recall earlier in this deposition --

12     A.   Uh-huh.

13     Q.   -- you claim that your life was

14   threatened because you owed about $17,000.00

15   dollars to --

16     A.   Who said that's a gambling problem?

17          MS. GOODWIN:  Object to the form.

18   BY MR. SWITKES:

19     Q.   So you're saying that's not a

20   gambling problem?

21     A.   Who says it?

22     Q.   Well, I would think that --

23     A.   Who -- who left you in charge and

24   said that?

25     Q.   Excuse me.  I -- I would think that

Page 253

1  you would admit --

2      A.   No, I won't admit none of that.

3      Q.   -- that if you're gambling debts

4  resulted in a death to your life and you have

5  to pay $17,000.00 --

6      A.   I could have been overreacting, who

7  knows.

8      Q.   Well, you couldn't overreact by

9  overpaying, did you?

10     A.   Hey, you never know.  Better be safe

11  than sorry.

12     Q.   How much were you earning a year?

13     A.   I'm still here.

14     Q.   How much were you earning a year at

15  the time --

16     A.   I'm still here.

17     Q.   How much were you earning a year

18  when you incurred $17,000.00 in debt?

19     A.   I haven't finished the year up.

20     Q.   $20,000.00 a year?

21     A.   I haven't finished the year.

22     Q.   If you're earning $500.00 a week --

23     A.   I didn't finish it up.

24     Q.   Okay.  If you're earning $500.00 a

25  week, what is your yearly salary?

Page 254

1      A.   Can't -- you can't assume that 'cause
2   I didn't get there.
3      Q.   You worked for C&S more than a year,
4   didn't you?
5      A.   No, I didn't.
6      Q.   How long did you work for them?
7   While you're on Workman's Comp you're still
8   working for them you realize?
9      A.   I started 2014.
10      Q.   And you left in 2016, right?
11      A.   Yeah.
12      Q.   Okay.  So that's more than a year?
13      A.   That's not a salary.  Work Comp isn't
14   a salary.
15      Q.   Oh, Workman's Comp is a proportion
16   of your salary.
17      A.   Proportion?
18      Q.   So you said your salary was $500.00
19   a week?
20      A.   With C&S.
21      Q.   Okay.  So if you were losing more
22   money gambling than virtually all of your
23   take home pay, you don't consider that a
24   problem?
25      A.   Who said I lef -- I lost my money

Page 255

1    gambling that --

2        Q.   What's $17,000.00 compared to what

3    you're earning?

4        A.   During a four year period.

5        Q.   So it --

6        A.   That's $5,000.00 a year.  Less than

7    $5,000.00 a year.

8        Q.   That's nothing?

9        A.   No, it's not -- I'm not saying it's

10   nothing, but it is what it is.

11       Q.   And it reached the point where

12   someone was threatening your life.

13            MS. GOODWIN:  Object to the form.

14   BY MR. SWITKES:

15       Q.   Would you consider that nothing?

16       A.   No, we -- we own -- that less than

17   $5,000.00 a year.

18       Q.   Okay.  So when Dr. Poitier asked you

19   do you go to casinos, do you know what your

20   answer was?

21       A.   I don't recall.

22       Q.   I'll give you the answer.

23            No.

24       A.   Okay.  That's --

25       Q.   That's a lie, right?

Page 256

1          MS. GOODWIN:  Object to the form.

2          THE WITNESS:  If that's what he

3     said.

4  BY MR. SWITKES:

5     Q.   Yeah, that's what he said.  That's

6  what he filled out.  That your response to

7  questions posed to you.

8     A.   The disability judge didn't even --

9  didn't even hold his -- his statements any

10  weight.  So I don't know what it say.

11     Q.   And you went to him before your

12  arrest in Hialeah because of your depression,

13  correct?

14     A.   Because of my Work Comp.  Because of

15  my --

16     Q.   Because of your depression and

17  anxiety, correct?

18     A.   First of all, I didn't go to him for

19  nothing.  I went to him to be assessed so I

20  don't know -- I didn't know what I had when I

21  went to him.  That's his -- that's his, you

22  know what I'm saying, determination.  I just

23  went 'cause I was looking for help.

24     Q.   And those determinations were made

25  back in 2015 before your arrest at Hialeah

Page 257

1   Housing Authority, correct?

2        A.   Depression?

3        Q.   Yeah.

4        A.   He led -- he -- he labeled me with

5   depression.

6        Q.   And that's what you're still

7   claiming is your disability, isn't it?

8        A.   No.

9        Q.   Now you're just claiming your hips?

10       A.   It's anxiety.  And I just found

11  out --

12       Q.   And that's what he diagnosed?

13       A.   Who Poitier?

14       Q.   Yeah.

15       A.   That's old man.  I've seen -- I've --

16       Q.   That's old?

17       A.   That's old.  That's -- that -- that

18  -- that's from an old disability case.  That

19  that's still being fought in court right now.

20  That's old there.

21       Q.   What do you mean it's being fought

22  and caught?  What's being fought and caught?

23       A.   My -- my initial disability is still

24  going on.  Poitier, I haven't seen Poitier --

25       Q.   You keep saying your initial

Page 258

1    disability.  I want you to put this in terms

2    of --

3         A.   Go ahead.

4         Q.   -- some legal agency.  There's SSI,

5    Social Security Administration.  You can

6    apply for Social Security Disability.

7         A.   Okay.

8         Q.   Is that what you're talking about?

9         A.   Like I told you, man.

10        Q.   Don't tell me, man.  Tell what

11   you're talking to?

12        A.   I got lawyers -- I got -- I got a

13   lawyer that's handling both of my disability

14   cases.  I have two open disability cases

15   right now.

16        Q.   Okay.  And with what agencies do you

17   have two -- you have one with SSI --

18        A.   I don't know all that stuff.  SSI,

19   SSDI.

20        Q.   Social Security --

21        A.   I work so mines SSDI.

22        Q.   What do you mean you work?  You

23   don't work?

24        A.   At the time, my initial disability

25   case that's based on SSDI if I'm not

Page 259

1    mistaken.  It's not SSI.

2         Q.   SSDI.

3         A.   Uh-huh.

4         Q.   And Georges Pierre that law firm

5    that -- you said Pierre Pierre.  I believe

6    the firm is Georges Pierre.

7         A.   No, it's not Georges Pierre.

8         Q.   It's not Georges Pierre?

9         A.   Another assumption.

10             It's Pierre Pierre.

11        Q.   Okay.  May be a different firm that

12   I wasn't aware of.

13             And they're handling both of your

14   disability claims?

15        A.   Yes.

16        Q.   One is SSDI and the other one is?

17        A.   Actually, they both SSDI because my

18   credits are good up to 2020 so it's all the

19   same.  My work credits.

20        Q.   So you have two SSDI claims?

21        A.   From what I know.

22        Q.   And you feel when you spoke to the

23   doctor that all of your employers were

24   discriminating against you?

25        A.   What doctor?

Page 260

1        Q.    Poitier.

2        A.    That's not -- that's not what I told

3    him.  What I told him, what I recall telling

4    him was I feel like the majority of my issues

5    started once I got that job with TSA

6    between 2006 six and 2008.  And I said I just

7    felt like I've been unfairly targeted by them

8    ever since that, ever since I left that job.

9    Because every job that I've had after that

10   there seems to be issue after issue after

11   issue.

12       Q.    So it was the TSA that caused all of

13   your problems?

14       A.    I'm not --

15             MS. GOODWIN:  Object to the form.

16             THE WITNESS:  I'm not sure, man.

17   BY MR. SWITKES:

18       Q.    WELL, that's what said.

19       A.    I'm just saying --

20       Q.    Okay.

21       A.    It may be a coincidence.

22       Q.    Okay.

23       A.    Maybe it's a coincidence dealing with

24   the federal government, I don't know.

25       Q.    Yeah.

Page 261

1      A.    I never -- I never been through that

2  before.

3      Q.    And when you went to New Horizons

4  you said your family size was three.  What --

5      A.    Mmm-hmm.

6      Q.    What constitutes your family's size?

7      A.    My daughter and my kid's mother,

8  that's what I consider my family at the time.

9      Q.    Okay. And --

10      A.    My son was in college.

11      Q.    And your family income you listed as

12  $13,608.00.

13      A.    Hey, I can't recall --

14      Q.    I'm just reading it to you.

15      A.    -- specifically.

16      Q.    So your gambling debt is pretty

17  significant portion of your income, wouldn't

18  you say?

19          MS. GOODWIN:  Object to the form.

20          THE WITNESS:  It may be, but one

21      thing I learned about those medications

22      they cause issues like that, gambling

23      issues.  So I don't know, at that time --

24      at that time I'm really not -- I'm not

25      really sure honestly.  All I know that I

Page 262

```
1       was just, know what I'm saying, going

2       through a -- thought a thing at that

3       point in my life something I never had

4       experienced at all until that time.

5   BY MR. SWITKES:

6       Q.   When -- when were you at Jackson in

7   their crisis intervention?

8       A.   That -- if I'm not mistaken, that was

9   the end of 2017.  The end of two thousand 17

10  if I'm not mistaken.  I don't think it was

11  the end of 2016, but it was towards the end

12  of the year because it was like in -- it was

13  like in November.

14      Q.   Now, you said that you only treated

15  with Dr. Poitier because it was relating to

16  C&S?

17      A.   I never say said that.

18      Q.   Well, what were you -- why did you

19  start treating with him?

20      A.   Because I felt like I needed -- I

21  needed to find out.

22      Q.   So it was your doctor not C&S's

23  doctor right,

24      A.   I can't talk.

25           I feel like I just want to find out
```

Page 263

1    what I was deal -- what I was going through

2    in life, what was going on with me.

3         Q.   So his diagnosis wasn't as a result

4    of Workman's Comp, it was your decision to go

5    to him, right?

6         A.   Yeah, that was my individual

7    decision.

8         Q.   And you were seeing him '15, 2015?

9         A.   I started seeing December two

10   thousand --

11        Q.   You were seeing him in 2016?

12        A.   Yeah.

13        Q.   And you were seeing him in 2017?

14        A.   Yes, and 2018.

15        Q.   How about 2019, are you still seeing

16   him?

17        A.   Nah, no, I stopped seeing him maybe

18   2018.  From that time -- from the beginning

19   to that time things started improving a

20   little bit so I didn't really need to see him

21   anymore so I had stopped seeing him, but I

22   started seeing someone else.

23        Q.   Who did you start seeing?

24        A.   I started seeing Carol Delaney.

25        Q.   And when did you start seeing her?

Page 264

```
1        A.    I started seeing her shortly after --
2   after I stopped seeing him so I think it was
3   the end of September, like around the end of
4   September.
5        Q.    Of what year?
6        A.    2018 if I'm not mistaken.
7        Q.    So when you answered these
8   Interrogtories you gave us the name Carol
9   Delaney?
10       A.    Of those?
11             I wasn't seeing her when I -- when I
12  first started that process.  Poitier --
13  Poitier he probably was the only psychiatrist
14  I was seeing.
15       Q.    And Carol Delaney --
16       A.    But I'm currently seeing her right
17  now.
18       Q.    -- she's a psychiatrist?
19       A.    She -- she's a psychologist.
20       Q.    Psychologist.
21       A.    She's a psychologist, she's a
22  registered nurse.  She just had most of
23  everything I needed.
24       Q.    And who is paying for her treatment?
25       A.    Medicaid.
```

1      Q.    When did you get Medicaid?

2      A.    I started receiving Medicaid -- when

3   did I start receiving Medicaid?

4          I don't know if it was the beginning

5   -- the beginning of 2018.  I think it was the

6   beginning of 2018 if I'm not mistaken.  It

7   was the beginning of 2018, yeah, had to be

8   the beginning of 2018.

9      Q.    Now, didn't Ms. Halphen tell you she

10  was going to be calling the police after you

11  threatened her?

12     A.    No.

13     Q.    She never told you she was going to

14  call the police?

15     A.    What she -- what I recall her saying

16  was, Do you want me to call the police?

17          And I recall saying, Call the police

18  for what?  I haven't done anything.

19     Q.    Did she tell you she was calling the

20  police?

21     A.    She never came out and said, I'm

22  going to call the police on you.

23     Q.    So in your complaint, Paragraph 28

24  "Ms. Halphen then informed Hilliard she was

25  going to call the police at which time

Page 266

1    Gutierrez who was on duty at H.H.A.

2    approached Hilliard and instructed him to

3    step outside."

4         So is it true that she told you that

5    or is it true what you testified to?

6         A.   I recall her saying, Do you want me

7    to call the police.

8         Q.   The complaint says she told you, you

9    -- she was calling the police.

10        A.   All right.  Well, whether she said it

11   or not, there was no reason to call the

12   police.  She can't -- people can't just go

13   through life saying, I'm going to call the

14   police on you.

15        Who cares.

16        Q.   If they feel threatened they

17   certainly can.

18        A.   She was never threatened.  I never

19   threatened her.

20        Q.   Well, that's your opinion.  If she

21   feels you threatened her --

22        A.   It wound up being a fact, it came out

23   on tape.  When they asked her, Why didn't you

24   just turn the T.V. back on, Ms. Halphen?

25        She said, I don't know.

Page 267

1                It wasn't about no threats.  If that
2    was the case, she would have stuck to that.
3    Well, he threatened me and that's the only
4    thing I know.
5                It was never none of that.  It was
6    just like, Well, why did you start the
7    situation with the T.V.?
8                That was it.
9                I don't know.
10               It wasn't about no threats.  I never
11   threatened her.  I never threatened Ms.
12   Halphen.  That's not my -- that's not my
13   style.  I don't go around threatening people,
14   I don't go around threatening woman in
15   particular.
16       Q.    Do you remember anything else that
17   was said outside by --
18       A.    Gutierrez?
19       Q.    Yeah.
20       A.    That's all I recall.  I recall going
21   out there asking him what is it?  I recall
22   him saying I feel threatened by you with that
23   cane in your hand.
24               I put the cane down, put my hands
25   behind my back.  He said, Oh, now you

Page 268

1      squaring off against me?

2              That's -- it was that -- it was

3      really just that simple.  It wasn't really

4      nothing like, you know what, people in here

5      have said you're threatening them, I'm going

6      the to ask you to leave.

7              I never heard anything like that.

8      Q.    Okay.  Now, when you went to Jackson

9      you're saying you went in there voluntarily?

10     It wasn't a Baker Act?

11     A.    Nah, no Baker Act.

12     Q.    And it wasn't done by your ex-wife?

13     A.    No, I volunteered myself.

14     Q.    And it wasn't because you said you

15     were going to take your life by slashing your

16     throat?

17     A.    Nah.

18     Q.    So if that's in the hospital

19     records, that's wrong?

20     A.    I know what the hospital records say.

21     Q.    What --

22     A.    I know exactly what they said.  I

23     remember exactly how it went.

24     Q.    What do they say?

25     A.    They said -- they -- they -- she said

Page 269

1    it.  They said she said that he -- he -- he

2    say he was going to slice his throat with a

3    knife.  That's what he said.

4        Q.   That's what Ms. Richardson said?

5        A.   Yeah, that's what got me in the door.

6        Q.   And she said that --

7        A.   And once I got in there --

8        Q.   She lied to get you in there?

9        A.   I don't know -- I don't know -- like

10   I said, I don't know if that's what she

11   recall me ever saying or that's what she

12   felt, but I was there because I felt like I

13   needed help but even if I did, I'm here,

14   that's my right.  It didn't happen.

15       Q.   Even if you did threaten to kill

16   yourself --

17       A.   It didn't happen.

18       Q.   You didn't kill yourself is what

19   you're saying?

20       A.   I didn't.

21       Q.   Okay.  We're happy about that, but

22   the question is --

23       A.   Why?  You're not happy about that.

24       Q.   -- what was said as opposed to

25   what's in the records.

Page 270

```
 1      A.   I'm telling you, the stuff that I was

 2  saying during the intake they were like,

 3  Well, sir, that's nothing for us to feel like

 4  you need to be placed in here.

 5      Q.   Well, see, you just -- well --

 6      A.   And she said --

 7      Q.   So why is your wife making up --

 8  ex-wife making up a story about you

 9  threatening to kill --

10      A.   You gotta ask her.

11      Q.   --  yourself to get you in a

12  psychiatric facility if you didn't need to be

13  there?

14      A.   I'm not saying she did that to get me

15  in there.  Whatever -- when you get a chance

16  to talk to her, you ask her all of that.

17      Q.   Okay.

18      A.   I can't answer that question.

19      Q.   I promise you I will.

20           You said you never threatened women.

21      A.   I don't go around --

22      Q.   But I just read to you previously

23  that you threatened the caseworker of Restore

24  Rehabilitation that you said you're going to

25  do harm to yourself or others; isn't that a
```

Page 271

1    similar threat to -- threat that you made to

2    Ms. Halphen?

3             MS. GOODWIN:  Object to the form.

4             THE WITNESS:  First of all, I never

5        -- I never had a conversation of that

6        sort with the woman from whatever

7        department you're talking about.  And

8        what I heard, there's nothing directly

9        there threatening her as a woman.

10   BY MR. SWITKES:

11       Q.   It's two --

12       A.   I'm trying to find it.

13       Q.   It's right here in the records and

14   she said you did threaten that you're going

15   to harm yourself or others.

16       A.   Or others.

17             Where the women at?

18             MS. GOODWIN:  Object to the form.

19             THE WITNESS:  Where's the female at?

20        Where's she at?

21             MS. GOODWIN:  He hasn't asked you to

22        a question.

23   BY MR. SWITKES:

24       Q.   And you said you would like to be

25   referred to a psychiatrist because in quote

Page 272

1    he feels like he's a threat to himself or

2    others.  This is a direct quote, open

3    parenthesis and closed parenthesis.  You

4    never said that?

5         A.   To her.

6         Q.   Yeah.

7         A.   No.

8         Q.   So how is it that people that

9    interact with you have directly felt that you

10   threatened them when you don't recall these

11   things?

12        A.   First of all, this "her" you keep

13   talking about when you find her, you tell me.

14   I don't even know this "her" you're talking

15   about, but I'ma play along with you.  You

16   keep talking about some "her,"  I don't know

17   who this her is.  I never met this "her."

18        Q.   You talked to her on the phone?

19        A.   That's why -- that's why -- that's

20   first and foremost why I can't really answer

21   your question directly 'cause there is no

22   "her" that I was talking to, saying this

23   stuff to.

24        Q.   Didn't you talk to the people from

25   Workman's Comp while you were receiving

Page 273

1    Workman's Compensation?

2         A.   My lawyers communicated with them.

3    It wasn't much talking for me to do.  Mt Work

4    Comp -- I had no issue with my Work Comp, no

5    issues.  There was no iss -- no reasons for

6    me to have any conversations like that.

7         Q.   Well, there were lots of issues

8    during the course of your Workman's Comp.

9    You were complaining that the doctors weren't

10   treating you right, correct?

11        A.   Initially, Dr. Meli, that's the only

12   issue I had.

13        Q.   And you were complaining they

14   weren't giving you a psychiatric evaluation

15   when you wanted one; isn't that correct?

16             MS. GOODWIN:  Object to the form.

17   BY MR. SWITKES:

18        Q.   It's right in here.

19        A.   No, that's not true at all.

20        Q.   So you didn't ask for psychological

21   treatment?

22        A.   I'm telling -- I'm telling you

23   towards the end of my ankle surgery, the

24   doctor that performed my ankle surgery once

25   he was finished, once I was healed up and he

Page 274

1    already wrote his assessment, I said, You

2    know what, man?  I said, I'm dealing with

3    this pain.  I said, I just feel like I'm not

4    prepared to go back to work.  I say, You know

5    what, I think I need to see a psychologist or

6    a psychiatrist.  I said, Is there a way that

7    you can -- you can set a referral up.

8             He's the one did it, that doctor.

9    These Work Comp people they couldn't -- they

10   couldn't set nothing up.

11        Q.   So you asked for it?

12        A.   I asked the doctor for that.

13        Q.   Okay.

14        A.   Dr. Wind -- Dr. Winddram.  I asked

15   him that in his office, he set it up, it was

16   approved.

17             MS. GOODWIN:  There's not a -- he

18        hasn't asked you a question.

19   BY MR. SWITKES:

20        Q.   And you asked for the psychiatric

21   evaluation because?

22             MS. GOODWIN:  Object to the form.

23             THE WITNESS:  What does that mean?

24             MS. GOODWIN: That's just -- it's

25        just for the Court.

Page 275

```
 1            THE WITNESS:  All right.  Nah,

 2      because --

 3  BY MR. SWITKES:

 4      Q.   Why did you ask for the psychiatric

 5  evaluation --

 6      A.   Because.

 7           Go ahead.

 8      Q.   For your Workman's Comp claim?

 9      A.   Because I had not gotten my hips

10  addressed.  My ankle was addressed.  My lower

11  back, I never got the injections so, you know

12  what I'm saying, I just went up -- I just

13  said I'll just let that go, but my hips, I

14  never had gotten my hips addressed.  So I

15  didn't feel physically com -- comfortable

16  going back -- going back to work and I just

17  wanted to see, you know what I saying, what

18  is it.

19      Q.   Okay.  When did you injure your hips

20  on the job?

21      A.   I felt -- I felt the injury after

22  that, but even though I found out --

23      Q.   Okay.  But timeout.

24      A.   My hips were injured at the job

25  during that incident, but they weren't added
```

Page 276

1    to the case and I didn't -- I didn't expect

2    them to be added to the case, I just felt the

3    pain.

4        Q.   Who told you your hips were injured

5    when you either jumped off the forklift or

6    you were hit by a rolling object; who told

7    you that?

8        A.   Like I told you, once Dr. Meli -- the

9    same office.  Once -- once Dr. Meli decided

10   he was -- he was just going to release me a

11   couple of weeks after I saw him to go back to

12   work, I started seeing another doctor there,

13   she's the one that told me.

14           Like I told you, she took x-rays of

15   my lower back.  This had nothing to do with

16   my Work Comp.  She saw both of my hips, she

17   said, Elgin.  She said, Do you know that your

18   hips are eventually about to go?

19           That just caught me by storm.  I'm

20   like -- I'm like, What are you talking about?

21   I never had heard that before.

22           And that's when the focus went from

23   -- from my -- from my mental health, from my

24   physical health, my focus went on my hips

25   because I --

Page 277

1       Q.    Okay.  But the hips were not part of

2    your claim --

3       A.    No.

4       Q.    -- it was your back and it was --

5       A.    My ankle.

6       Q.    Your ankle?

7       A.    Yeah.

8       Q.    The hips were found to be suffering

9    from degenerative arthritic changes --

10      A.    Can't preform --

11      Q.    -- non-related to your accident.

12   But you wanted Workman's Comp to treat that,

13   correct?

14      A.    No, no, no.

15            MS. GOODWIN:  Object to the form.

16   BY MR. SWITKES:

17      Q.    No?

18      A.    No, Work Comp didn't treat that.

19            I eventually was seen by that same

20   doctor's office, Meli Orthopedics, with my

21   own insurance.

22            You know that?  They treated me.

23   They're the first ones that treated me for my

24   hips, they're the ones that took X-rays,

25   they're the ones that said, You know what,

Page 278

1    you probably need a surgery on this -- this

2    -- this -- this left hip right now.  So

3    that's what I was dealing with.  I was like

4    Wow.

5         So the Work Comp, it was what it

6    was.  I knew eventually my ankle was going to

7    heal up and I was going to get over that, byt

8    my hips, that became many primary focus in

9    life and that's what I focused on after the

10   -- after the -- after the job -- after that

11   job there.

12       Q.   Did Dr. Delaney tell you that you

13   have hostility and irritability?

14       A.   No, I don't recall -- I don't recall

15   her telling me anything.  I just have my

16   sessions with her.  I have my sessions -- I

17   have my sessions with her as a matter of fact

18   I probably have one next week with her,

19   but...

20       Q.   She prescribing any -- has she asked

21   anybody else to prescribe medication to you?

22       A.   Nah, no medication.  That medication

23   old.  No medication, no more medication.

24       Q.   So you said you never took OxyCotin?

25       A.   I never took OxyCotin.

Page 279

```
 1      Q.   But I'm looking right at the records
 2  from Safe Harbor Medical Health Associates --
 3      A.   And what does it say?
 4      Q.   -- that you're receiving OxyCotin.
 5      A.   Nah.
 6      Q.   Yeah.
 7      A.   There's OxyCotin -- I never -- I
 8  never receive OxyCotin.
 9      Q.   You now how many times you've had
10  that prescription authorized by the doctors?
11      A.   I never received a prescription that
12  say OxyCotin.
13      Q.   You ever ask them to keep
14  prescribing them and tell them you're taking
15  it four to five times a day?
16      A.   I never received a prescription
17  prescribed as OxyContin.
18      Q.   Do you have any reason to doubt that
19  it's all over every single page of your
20  medical records?
21      A.   OxyContin?
22      Q.   Yes, sir.
23      A.   Can you spell it for me.
24      Q.   I will maybe try to start, but it's
25  O-X-Y-C-O-N-T-I-N 20 milligrams.
```

Page 280

1      A.   No, I -- I never received OxyCotin.

2      Q.   That was -- every single -- every

3   single prescription?

4      A.   I never received that.

5      Q.   And then it talks about tapering off

6   your meds of OxyCotin?

7      A.   I never receive brand name drugs.

8      Q.   Let's not play games.  What do you

9   mean you never received brand named --

10     A.   I never received OxyCotin.

11     Q.   What were you taking?

12     A.   You tell me.

13     Q.   I told you and you're saying I never

14   took the brand.  Now, you're --

15     A.   I never received OxyCotin.

16     Q.   -- backing off the statement.

17          So what are you taking, sir?

18     A.   What am I taking?

19     Q.   Yeah.

20     A.   I told you what I'm taking.

21     Q.   You told me hypertension and one

22   other medical condition.  What are you taking

23   for your mental health?

24     A.   My mental health?

25     Q.   Yeah.

Page 281

1      A.   Nothing.  That's done with, that's

2    old with.  I don't take any -- any mental

3    health medication anymore.

4      Q.   Were you going to a pain center?

5      A.   Yes.

6      Q.   Which pain center?

7      A.   Dr. Emilio Suarez.

8      Q.   What was he prescribing for you?

9      A.   Initially?

10     Q.   Yeah.

11     A.   When I started out I was getting

12   percocet.  February, that was like a few,

13   months before my arrest.  After my arrest, my

14   pain skyrocketed.

15     Q.   Okay.  So what were you taking was

16   the question.

17     A.   It went from Percocet to Oxycodone.

18   Oxycodone.

19     Q.   Are you playing word games with me?

20     A.   No, I'm telling you.

21     Q.   Okay.

22     A.   It went from percocet to Oxycodone.

23     Q.   So you were taking Oxycodone?

24     A.   Yeah.

25     Q.   You recognize that name?

Page 282

1      A.    Yeah, I recognize Oxycodone.

2      Q.    How many times a day were you taking

3  Oxycodone?

4      A.    After my encounter with the arrest it

5  went from -- let me see.  It went from

6  Percocet to -- within, you know what I'm

7  saying, month after month probably within a

8  six month span, it went from Percocet to 20

9  milligram Oxycodone to eventually 30

10  milligram Oxycodone.

11      Q.    How many times a day?

12      A.    At one time I was taking up to four a

13  day, initially.  My pain was that high.

14      Q.    Isn't that what I asked you

15  previously?

16      A.    Huh?

17      Q.    Isn't that what I asked you

18  previously?

19      A.    No, you asked me had I take OxyCotin,

20  and I didn't.  I never took that.

21      Q.    Ah, so you misunderstood that and

22  you knew it was Oxycodone?

23      A.    No, I never -- I never seen any

24  OxyCotin on any -- on any of my prescription

25      Q.    And you know the difference between

Page 283

1    the two drugs?

2        A.   Do I know the difference?

3        Q.   Yeah.

4        A.   No, I just know what I take.  I never

5    seen a  -- I never seen a prescription of

6    mines say Oxycotin.

7        Q.   So you were taking it like I said

8    four to five times a day, Oxycodone?

9        A.   At one point, yeah.

10       Q.   For how long?

11       A.   It had to been -- Let me see, May,

12   June, July, August.

13           I don't know if I started being

14   prescribed in August, but it was right after

15   my arrest but grad -- even -- gradually my

16   pain just for some reason just never

17   decreased.  The pain I felt in my -- in my --

18   in my hips, my left hip in particular, it

19   hasn't healed up since -- since many I

20   arrest.  Since being in that jail cell, I got

21   down off the cot, I don't know what I did to

22   my hip but it just never been the same so my

23   pain --

24       Q.   You're hip pain started long before

25   your arrest.

Page 284

1     A.   It did.  It did.

2     Q.   Okay.  So --

3     A.   But it got exacerbated after the

4  arrest.

5     Q.   Who told you that?

6     A.   The doctor.

7     Q.   Which doctor?

8     A.   Dr. Suarez.

9     Q.   He said by sleeping on a cot --

10    A.   Not sleeping.

11    Q.   Excuse me.

12    A.   Your excused.

13    Q.   Don't interrupt my question.

14         Dr. Suarez told you that by sleeping

15  on a cot one night in jail --

16    A.   Not sleeping.

17    Q.   -- that exacerbated your hip

18  condition?

19    A.   Not sleeping on it.  He don't know

20  what happened, I told him what happened.  The

21  way I -- the way I came down off the --

22    Q.   So the question was what did Dr.

23  Suarez tell you not what you told Dr. Suarez.

24    A.   Suarez --

25    Q.   Did Dr. Suarez ever tell you that

Page 285

1    that one day on a cot caused your hip

2    problems?

3         A.    What you doing?

4         Q.    I'm answering the phone to get it to

5    stop ringing.

6         A.    Oh.

7         Q.    Okay.

8         A.    That's how you do it?

9         Q.    Did you answer the question?

10        A.    I can't remember.  Can you repeat the

11   question?

12        Q.    Sure.  Did Dr. Suarez ever tell you

13   that the one day on the cot is what

14   exacerbated your hip condition?

15        A.    No, he didn't say it like that.

16        Q.    Okay.

17        A.    He wouldn't have known anything about

18   the indent until I told him about it.  When I

19   had the incident I told him about it.

20        Q.    And after you told him about it did

21   he say it exacerbated your hip condition?

22        A.    I just know my pain --

23        Q.    First answer yes or no.

24        A.    I don't recall that.

25        Q.    Okay.  That's good enough.

Page 286

1       A.    I just know my pain medication went

2    of after my arrest.

3            MS. GOODWIN:  I don't know how much

4        longer you have, but I have -- if we

5        could take a -- like a five minute break.

6            MR. SWITKES:  Of course, counsel.

7            THE VIDEOGRAPHER:  We only have ten

8        minutes left on the tape.  We'll go off

9        the record at 6:12.

10       (A brief recess was taken at 6:12 p.m.)

11           THE VIDEOGRAPHER:  And we're back on

12       the record at 6:26 here begins DVD No. 3.

13    BY MR. SWITKES:

14       Q.   Mr. Hilliard, you went to the Oshodi

15    Foundation for psychological testing; isn't

16    that correct?

17       A.   Yes, I was sent there by V.R.

18       Q.   By?

19       A.   Vocational Rehabilitation work

20    program.

21       Q.   Okay.  And they asked you a number

22    of questions, correct?

23       A.   Yes.

24       Q.   And you reported to them that due to

25    all your life experiences as it relates to

Page 287

1    his educational work related challenges, that

2    you usually end up with quitting school or

3    getting terminated; do you remember saying

4    that?

5         A.   I didn't say that.  That -- that's

6    probably -- I don't know if that was his

7    assessment.

8         Q.   No, this is the questions they asked

9    you and they're quoting you directly in their

10   records so this is what you said to them.

11   You're denying that?

12        A.   That can't be true.  I've been to two

13   colleges, I only left one.  I didn't leave --

14   I didn't quit the other one, it quit on me.

15   They canceled the football program so.

16        Q.   Did you tell them "in most jobs I

17   was terminated"?

18        A.   Actually it's him.  I told him that

19   after -- I feel like after I left that

20   airport job I just felt like I was a target.

21   I told him that same thing.

22        Q.   Didn't you tell him in most jobs you

23   were terminated, yes or no?

24        A.   Honestly, I can't recall if I told

25   him that most jobs, but I'm quite sure I told

Page 288

1    him after -- after I got that job at the

2    airport I just felt like every other job I

3    had after that I was targeted.  It was after

4    the airport --

5        Q.   Every job you had you were targeted?

6        A.   After the airport.  I had no issues

7    with jobs before that.  I had no issues with

8    jobs -- I can't even say I had issues with

9    coworkers because I never had issues with

10   coworkers and I -- I -- I -- I don't, I

11   won't.  That's part of -- that was one of the

12   questions they asked me with the V.R.

13   program.  They asked me could I get along

14   with coworkers, I told them yes.

15           That's -- that's they're thought of

16   me.  That -- that wasn't true and it was

17   proven through the EEOC.

18       Q.   Sir --

19       A.   I don't know what else to say.

20       Q.   -- when the records indicate this is

21   the answers you gave to the individuals, what

22   do you mean it's proven that it's not true?

23       A.   Well, what records are you talking

24   about?

25       Q.   I just told you I read it from the

Page 289

1    foundation testing.  That's the records --

2        A.   Whatever he said --

3        Q.   -- they have of your questions and

4    your answers.  You're saying it was proven

5    it's not true; what do you mean by that?

6        A.   He said that I was detested by the

7    police.  After the Hialeah Housing --

8        Q.   No, he said that you told him that

9    --

10       A.   What does detested mean?

11       Q.   -- you told them every place you go

12   you get terminated.

13       A.   Read -- read -- read what he said.  I

14   told him -- I told him about the incident

15   with y'all -- with the Hialeah Housing.  He

16   said I was detested

17            MS. GOODWIN:  Just hold on a second.

18       Listen to the question he asks and only

19       answer that 'cause I think you're going

20       too far afield.

21            THE WITNESS:  Trying to see how long

22       my hips can hold out.

23            MS. GOODWIN:  He says if you need to

24       stand you can stand.

25            MR. SWITKES:  Any time you need a

Page 290

1      break or you want to stand, just let me

2      know.

3            THE WITNESS:  I'm good.  I'm used to

4      taking the pain.

5  BY MR. SWITKES:

6      Q.   At New Horizons you didn't tell them

7  that you used cocaine?

8      A.   No.

9           Use cocaine, no.

10     Q.   Did you tell them you were drinking

11  seven drinks a week?

12     A.   No.

13     Q.   Do you drink seven drinks a week?

14     A.   No.

15     Q.   Were you drinking seven drinks while

16  you were taking --

17     A.   Seven drinks every week?

18     Q.   -- Oxycodone?

19          Yeah, that's like one a day --

20     A.   No.

21     Q.   -- or you're having a lot of fun on

22  weekends.

23     A.   One drink a day, yeah.  I had one

24  drink a day, it's my right if I want to

25     Q.   Okay.  The question was not whether

Page 291

1    it's your right.  Is that what you we're

2    doing?

3         A.   No, and that's not what I told him.

4              I have -- I have one drink a day.

5         Q.   Is that true or is that false?

6              MS. GOODWIN:  Object to the form.

7    BY MR. SWITKES:

8         Q.   You said it's true, it's my right

9    and then you're saying it's not true and I

10   don't know which of those answers to -- you

11   want me to understand.

12             MS. GOODWIN:  If you understand what

13        he's asking you can -- if not you can ask

14        for clarification.

15             THE WITNESS:  No, I don't need

16        clarification.

17   BY MR. SWITKES:

18        Q.   Are you drinking every day one drink

19   on average?

20        A.   Yeah.

21        Q.   Okay.  And you taking Oxycodone four

22   to five times a day?

23        A.   Now?

24        Q.   Or you were?

25        A.   Back then?

Case 1:18-cv-24594-CMA   Document 86-3   Entered on FLSD Docket 11/30/2019   Page 292 of 317

Page 292

1      Q.    When you were drinking?

2      A.    Oh, man, back then I was in so much

3  pain I -- I didn't even know that that was

4  something bad to do --

5      Q.    And back then is when?

6      A.    -- until it was brought to my

7  attention.

8      Q.    Back then is when?

9      A.    When I was being prescribed it.

10      Q.    Which is when?  Give me a timeframe?

11      A.    When was he prescribing that?

12            That was -- actually it was shortly

13  after the arrest.  My pain was -- my pain was

14  skyrocketed so high I was drinking to help

15  alleviate my pain, I was taking my pain

16  medication.

17      Q.    And this was --

18      A.    All legally.

19      Q.    -- in two thousand and what?

20      A.    '16.

21      Q.    Okay.  After your Workman Comp

22  injury?

23      A.    After my arrest with Hialeah Housing.

24      Q.    And have you ever had suicidal

25  ideas?

Page 293

1       A.    No, honestly I didn't.

2       Q.    So when the hospital records say

3   that was true, you're saying you never told

4   them that?

5       A.    They -- they did a survey.  They

6   concluded that I definitely wasn't suicidal,

7   but that I partly --

8       Q.    That was before they left you out?

9       A.    Huh?

10      Q.    That's was before they let you out.

11            When you came in, they said you had

12  suicidal ideation.  When you were released,

13  obviously --

14      A.    I don't even know ideation means

15  'cause I didn't tell them --

16      Q.    It means you have idea of committing

17  suicide.

18      A.    -- ideation suicide.

19      Q.    Do you understand what that means?

20      A.    If that's -- if that was their

21  interpretation of what I said, then that's

22  their interpretation.  Ideal -- I can't even

23  say the word.

24            I'ma try to say it.

25            Ideation.

Page 294

1      Q.    You did it.  Don't -- don't do it

2   again.  You got it.

3      A.    Ideation.  I don't know what it means

4   though.

5            Oh, man.

6      Q.    Have you ever submitted any further

7   documents to H.H.A. since the date of your

8   appeal?

9      A.    Since my appeal victory?

10     Q.    Yes, sir.

11     A.    No, I have no -- I have no

12  communication with them after that.  I -- I'm

13  still waiting to be contacted after I won my

14  appeal.

15     Q.    Did you ever go back?

16     A.    Oh, no, no.

17     Q.    Did you ever complete the

18  application process?

19     A.    Did I ever complete the application

20  process?

21     Q.    Yeah.

22     A.    Like I said, I don't know the way the

23  process goes.  All -- all I know is --

24     Q.    You never --

25     A.    -- that it was halted for a frivolous

Page 295

1    reason.  I fought it, I beat it, I won it, I

2    was the demanded to be placed back on list.

3    They had enough time to counter that,

4    evidently, they didn't and I still haven't

5    received the call.  I've checked.

6         Q.   Haven't you said you don't want to

7    go there?

8         A.   After the fact in the mediation?

9         Q.   Yeah.

10        A.   Why would I want to go somewhere

11   where there's nothing available for me?

12        Q.   I don't understand that answer.

13        A.   Meaning you told -- I was told that

14   what you all would do is you all would allow

15   me to reapply for public housing.  First of

16   all, I never applied for public housing that

17   was Section 8 voucher.  Second of all, the

18   public housing opening that -- that was

19   started from October 1st to October 4th, it

20   didn't include any one bedroom or two

21   bedrooms.  So there was nothing there for me

22   so what was I going to apply to?

23        Q.   What were you looking for.

24        A.   Huh?

25        Q.   What were you looking for in terms

Page 296

1    of accommodations?

2        A.    What I last had on my application.

3    Just a one bedroom, one bedroom.

4        Q.    So if you had --

5        A.    Efficiency.

6        Q.    So if you had a studio you wouldn't

7    accept that?

8        A.    Yeah, I would have accepted it.

9        Q.    So what do you mean they didn't have

10   anything?

11       A.    Meaning how can you offer somebody a

12   studio if you're not even offering a one

13   bedroom?  A studio -- I thought studio and

14   one bedroom they go hand and hand.  I didn't

15   think --

16       Q.    Well, a studio is a studio and a one

17   bedroom is a one bedroom; do you understand

18   the difference?

19       A.    I thought -- like I say, my

20   interpretation of it is that they're one in

21   the same.  A one bedroom can be as equ -- can

22   be equal to a studio.

23       Q.    So why did you say you never went

24   back and asked for it 'cause they didn't have

25   what you want?  I'm trying to follow your

Page 297

1    logic and you've lost me.

2         A.   No, you're asking me why didn't I

3    accept to reapply, right, when I was offered?

4         Q.   After your appeal was granted why

5    didn't you go back?

6         A.   But where was I supposed to go back

7    to though?

8         Q.   H.H.A.?

9         A.   For what?  To get rearrested?

10        Q.   You could have asked for something

11   in the mail.  Did you send any letters to

12   them?

13        A.   First of all, why would I --

14        Q.   Timeout.

15        A.   Go ahead.

16        Q.   Did you send any letter to them?

17        A.   I didn't have to send anything.

18        Q.   Did you call --

19        A.   The decision was made.

20        Q.   Did you call them?

21        A.   It wasn't sent to me.

22        Q.   Did you call them?

23        A.   Oh, no.

24        Q.   What do you mean the decision wasn't

25   sent to you?

Page 298

```
 1      A.    The decision was made --

 2      Q.    The decision was sent to you.

 3      A.    -- for -- for everything to be

 4  overturned and that they had enough time to

 5  counter it.  I don't know how much they had

 6  to counter it so why didn't I get a response

 7  after nobody countered it?  Like, You know

 8  why, you're placed back on the list. You

 9  should be receiving something in the mail

10  soon.

11      Q.    Who told you that?

12      A.    Who told me what?

13      Q.    What you just said?

14      A.    That's in the letter.  That's what I

15  read.

16      Q.    Okay.  So what did you do about

17  getting a unit at H.H.A. after you won your

18  appeal?

19      A.    I'm waiting to get a call or a mail

20  like I've gotten all the other times.

21      Q.    Did you call H.H.A.?

22      A.    I was not going to call them to

23  harass them.

24      Q.    Did you write --

25      A.    I was not going to go there.
```

Page 299

1      Q.   Did you write to them?

2      A.   No, I didn't do anything.

3      Q.   Did you have anybody write to them

4   about the unit?

5      A.   For what reason?  I won my case.

6      Q.   Okay.

7      A.   Why would I win my case and still go

8   run -- beg somebody for something?

9           Hey, I won my case.  Can I get it

10   now?

11          It's not my job.

12          MS. GOODWIN:  Just one moment.

13          THE WITNESS:  Oh, gosh.

14   BY MR. SWITKES:

15     Q.   Didn't you articulate through your

16   attorney that you don't want to live at

17   H.H.A. Section 8 Housing?

18     A.   From what I've been through off the

19   top, no, why would I want to go live

20   somewhere where I was --

21     Q.   Okay.

22     A.   -- discriminated against --

23     Q.   Okay.

24     A.   -- falsely arrested, and then I like

25   I said there's nothing for me to live.

Page 300

1    There's nowhere for me to live.

2        Q.   Have you applied for any jobs other

3    than the security guard?

4        A.   Like I told you, that's the first job

5    that I applied for after I felt like I got to

6    a point where my mind and my body felt

7    better.

8        Q.   Did any of your psychologists or

9    psychiatrists tell you you should not work?

10       A.   Poitier told me that.  He told me

11   that.

12       Q.   Poitier told you you should not

13   work?

14       A.   Yes.

15       Q.   When was the last time you saw

16   Poitier?

17       A.   2018.

18       Q.   And did he tell you why you

19   shouldn't work?

20       A.   Whatever his -- whatever his

21   assessments are, man.  He just told me, no.

22   I remember him telling him, Man, I'm thinking

23   of going back to work.

24            He said, No.  He said, No, you don't

25   need to go back to work.

Page 301

1           I made this decision to try to go

2    back to work myself.

3       Q.    Okay.  Give me five minutes, I think

4    we're done.

5           THE VIDEOGRAPHER:  We'll go off the

6       record.  Standby.

7       (A brief recess was taken at 6:37 p.m.)

8           THE VIDEOGRAPHER:  We're back on the

9       record at 6:43.

10   BY MR. SWITKES:

11          MR. SWITKES:  Counsel, I'm going to

12      show you what I'm going to mark into

13      evidence before I do.

14      (Whereupon, Defendant's Exhibit No. 3

15       was marked for Identification.)

16   MR. SWITKES:

17      Q.    Sir, I'm going to hand you now what

18   has been marked as Defendant's Exhibit No. 3

19   and ask you to examine this document.

20          Now do you see that document was

21   addressed to you?

22      A.    Yes.

23      Q.    And it was addressed to you at your

24   ex-wife's house?

25      A.    Yes.

Page 302

1        Q.    Did you receive this document?

2        A.    Yes.

3        Q.    Okay.  And in that document if

4    you'll hand it me a second it says, "After

5    careful consideration of testimony

6    documentation by both parties during the

7    Informal Review held of Thursday, August 11,

8    2016, the decision has been made overturn the

9    Hialeah Housing Authority's decision to

10   terminate your Section 8 Application process.

11            Please see attached notice of

12   decision."

13            And attached to it has the

14   individual present.

15       A.    Yes.

16       Q.    And it has decision reviewed, denial

17   of Section 8, the evidence presented, and on

18   the last page it gives the reasons for the

19   decision.  And then at the bottom of the page

20   it has some language that maybe you are

21   referring to about a rehearing.  If you want

22   to refer to that and please explain to me if

23   that's what you were referring to.

24       A.    Talking about five?

25       Q.    Yes, sir.

Page 303

1      A.    I thought you meant all that down

2    there.

3            Under the authorities administrative

4    plans within 15 business days of the day of

5    this mailing of the decision either the

6    authority or applicant.

7            15 days, 15 business days?

8      Q.    Okay.  Well, the court reporter has

9    to take down what you say and she made a

10   grimace because you were kind of mumbling at

11   the end.

12           I didn't ask you to read it out

13   loud.  Is that number five what you are

14   referring to when you talked about asking for

15   a rehearing?

16     A.    Yeah.

17     Q.    Okay.  So the language at the bottom

18   of there under five, "five rehearing or

19   further hearing," indicates that either party

20   within 15 business days of the date of the

21   mailing of this decision may ask for a

22   rehearing?

23     A.    Yes.

24     Q.    Did you ask for a rehearing?

25     A.    For what?

Page 304

1      Q.   For winning your appeal.

2      A.   Do I want to be reheard to re-win?

3  No, I had already won.

4      Q.   Okay.  And you're not aware whether

5  the housing authority made any request for

6  rehearing?

7      A.   I'm not aware.

8      Q.   Did you receive anything in writing

9  that the housing authority asked for a

10  rehearing?

11      A.   No, I didn't.

12      Q.   Did you ever appear again at a

13  hearing relating to your decision of your

14  housing application?

15      A.   No, I didn't.

16      Q.   So this letter told you you won --

17      A.   Yes.

18      Q.   -- your appeal?

19      A.   Yes.

20      Q.   And then you did nothing, correct?

21      A.   I checked.  I checked the database

22  every -- every week but...

23      Q.   You mentioned the database.  Now,

24  you talked about public housing.  You never

25  made an application for public housing, did

Page 305

1   you?

2       A.   No, I never did that.

3       Q.   You made an application for Section

4   8 housing?

5       A.   Yeah, for that one, yeah.

6       Q.   And then you never asked for Section

7   8 housing after you won that appeal; isn't

8   that correct?

9       A.   That's what I'm not clear on.

10      Q.   Well, what did you do if anything?

11      A.   I was -- I was placed back on the

12  list.

13           Can you read that part.

14      Q.   You want to read that and see where

15  it says anything about --

16      A.   I was told to be placed back on the

17  list, yeah.

18      Q.   Okay.

19      A.   I was told to be placed back on the

20  list.

21      Q.   By who?

22      A.   By Alonzo Hudson.

23      Q.   Okay.  Where does it that in that

24  document?

25      A.   We'll get to it.  I'll get with my

Page 306

1    lawyer and we'll point it out.

2        Q.    Okay.   The document speaks for

3    itself?

4        A.    I ain't talking about this one here,

5    it's somewhere.   It may not be in this one

6    here, it may be in something else.

7        Q.    Okay.   And --

8        A.    I got you on that one.

9        Q.    Did you ever request to be placed

10   back?   I thought you said you don't want to

11   live there after your arrest?

12       A.    Excuse me?

13       Q.    Didnr't you just testify under oath

14   that you didn't want to live there after your

15   arrest?

16       A.    Who would want to?

17             I want to live somewhere.

18       Q.    Okay.

19       A.    I don't know how it's gon' get done,

20   but it just can't go down like that.   You

21   can't just, you know what I'm saying,

22   interrupt somebody process in the middle of

23   it and then they fight to get back on and

24   think it's just -- it's just that.   So some

25   kind of way I'll need to find somewhere to

Page 307

1    live just like I did here.

2            I tried to find somewhere to live

3    with this -- with this process here and it

4    was interrupted for -- for the reason it was.

5        Q.   Okay.  You hired your attorney when?

6        A.   I think it was September 2016 if I'm

7    not mistaken.

8        Q.   And was there any documents

9    specifically requesting that you be given

10   Section 8 housing by either you or your

11   attorney since that day?

12       A.   Only thing I recall us conversing

13   about was had I heard anything --

14       Q.   I -- I'm defending your attorney

15   that I don't want to -- my question ask you

16   to tell me anything that you and your

17   attorney discussed.

18       A.   Good.

19       Q.   That's work product, that's

20   privileged between your attorney and the

21   client.

22            My question is was anything sent in

23   writing to the housing authority after the

24   date when your appeal was granted, yes or no?

25       A.   Not that I know of.

Page 308

1      Q.   Okay.

2      A.   Not for me.

3      Q.   I have no further questions.

4              CROSS-EXAMINATION

5           MS. GOODWIN:  Just a couple

6      followups here.

7   BY MS. GOODWIN:

8      Q.   The -- when H.H.A. or Ms. De la Cruz

9   or anybody there asked you for -- to amend

10  documents did you do that?

11     A.   Yes.

12     Q.   Okay.  Did you provide documentation

13  that you felt was adequate whenever you were

14  asked?

15     A.   Yes.

16          MR. SWITKES:  Object to the form of

17     the question.

18  BY MS. GOODWIN:

19     Q.   Did you believe that the information

20  you -- the documentation you provided to them

21  was adequate?

22          MR. SWITKES:  Object to the form.

23          THE WITNESS:  Yes.

24  BY MS. GOODWIN:

25     Q.   Okay.  At the time that your hip

Page 309

1    started hurting you, did you know they were

2    not part of your Worker's Comp injury?

3        A.   Yes.

4        Q.   Okay.

5        A.   I definitely did.

6        Q.   Okay.  When did you find out they

7    were degenerative arthritis or something from

8    birth I think you --

9            MR. SWITKES:  I object to the last

10       part of that sentence.

11   BY MS. GOODWIN:

12       Q.   Okay.

13       A.   I officially found out about it -- it

14   wasn't with Dr. Meli, it was when I saw

15   Dr. Edward Silverman.  He confirm -- yeah,

16   he confirmed that.

17       Q.   What are your symptoms of -- of

18   anxiety?  How does that -- what does that

19   produce in you?

20       A.   Well, I never had anxiety.  I'ma

21   prideful person, man.  I'ma --

22       Q.   But as we sit here today, what's

23   your -- you've been diagnosed with anxiety,

24   right?

25       A.   Yeah.

Page 310

1      Q.   So what are the symptoms of that?

2      A.   It's just irritability, being

3   irritable.  Just anxious about things and

4   uncertain about, you know what I'm saying,

5   about what I may be accused of next.  That's

6   one of the reasons why I haven't been in a

7   rush throughout those years to run and go

8   back to work.  I'm just trying to figure --

9   figure things out.

10      Q.   And any -- and your depression what

11   are your symptoms today from that?

12      A.   Actually, today I'm actually --

13      Q.   Let me rephrase that.  I don't mean

14   today as in today as this date.

15      A.   Oh.

16      Q.   I mean in general nowadays.

17      A.   You mean not -- not during like the

18   arrest or anything?

19      Q.   Right.  Yeah, just present day,

20   right.

21      A.   Nah, man, as far as I'm concerned I'm

22   not depressed anymore.

23      Q.   Okay.  Do you have any other

24   psychological diagnosis that --

25      A.   I was just told -- I was just told by

Page 311

1    my psychologist that I suffer from PTSD.

2    That I got -- now I got a phobia.

3        Q.   Okay.  What are the symptoms that

4    you experienced from your PTSD?

5        A.   I just feel like I'ma be falsely

6    accused of something again.  Like I said,

7    that's one of the reasons why even though I'm

8    prescribed the cane to walk with, I stopped

9    walking with it 'cause I don't wanna -- I

10   don't wanna have to have an incident like

11   that.  Somebody falsely accuse me of

12   something that didn't happen.  I take the

13   pain.

14       Q.   Okay.  And then one more question.

15   When Officer Gutierrez asked you outside, Mr.

16   Switkes was asking you whether or not why

17   didn't you just leave.  Did you feel free to

18   go?

19       A.   Oh, no, that -- especially at that

20   time, that would have been the last thing I

21   would have did.  I -- I -- I felt like I

22   would have got tased or shot in the back.

23            Nah, I wasn't gonna leave anywhere

24   until -- I actually gave him that benefit of

25   the doubt, sort of respect to like, What,

Page 312

1    tell me what's going on, man.  What -- What

2    am I here for?  Why you got me out here?

3           'Cause I wasn't really sure.  So

4    just me saying "Man, the hell with you" and

5    walking away, nah, I wasn't going to do that.

6           MS. GOODWIN:  I don't have anything

7       further.

8                 REDIRECT EXAMINATION

9    BY MR. SWITKES:

10     Q.   Sir, counsel asked you about filling

11   out all the documents.  You never amended

12   your personal declaration even after Ms. De

13   la Cruz told you to do so, did you?

14     A.   My personal declaration.  Now, what's

15   that again?

16     Q.   It's the document that you provided

17   showing your financial abilities and back --

18   and backup for that.

19     A.   No, is -- is that part of the

20   application?

21     Q.   Yes, sir, it was part of the

22   orientation.  You were told that the

23   documents you were going to have to fill out

24   and you filled it out.

25     A.   I did.

Page 313

1    Q.   You never amended it with the

2    information that Ms. De la Cruz asked you,

3    did you?

4         MS. GOODWIN:  Object to the form.

5         THE WITNESS:  There was -- whatever

6         was amended was if I'm not mistaken was

7         my last income, was the money my mother

8         signed off on giving me the $150.00 a

9         month --

10   BY MR. SWITKES:

11   Q.   Sir, you said --

12   A.   Aside from Work Comp.

13   Q.   -- you answered to questions of

14   counsel that you never had anxiety.

15   A.   Nah, before this --

16   Q.   You realize --

17   A.   -- I was never -- I was never -- I

18   was never diag -- I don't recall being

19   diagnosed with anxiety.

20   Q.   Okay.  But you were diagnosed with

21   anxiety and depression while you were still

22   working at C&S; are you aware of that?

23   A.   By who?  By who?

24   Q.   By the psychologist the psychiatrist

25   that were treating you --

Page 314

1      A.   Who?

2      Q.   -- in 2016.

3           Are you aware of that?

4      A.   No, as far as I'm concerned, Dr.

5   Poitier diagnosed me with severe depression.

6      Q.   And anxiety.

7      A.   I'm not -- I'm not aware of that.

8      Q.   Okay.

9      A.   I haven't see -- I haven't seen

10  anxiety on any of his reports of me.

11     Q.   Okay.  And you said Dr. Poitier told

12  you you shouldn't return to work for four

13  years; is that what your testimony is?

14     A.   Every time I was seeing him he just

15  told me, Nah, you -- you don't need to go

16  back to work right now.  Have you gotten your

17  disability yet?

18     Q.   And when did your depression go

19  away?

20     A.   Actually the beginning of -- I'm

21  trying to see.

22          The beginning of 2018 when I started

23  this process with this disability work

24  agency, I just -- I just felt like I was

25  trying my best to put my depression behind

Page 315

1    me.

2        Q.    And your application for SSDI is

3    based only on your hips?

4        A.    No, it's based on anxiety.  I know --

5    I know it's based on my hips, it's based on

6    anxiety.

7        Q.    I -- I -- you just lost me 'cause

8    you said you never suffered from anxiety, but

9    yet, now you're testifying that your SSDI is

10   based on anxiety?

11            MS. GOODWIN:  Object to the form.

12            THE WITNESS:  Like I said, I'm under

13       the impression that I didn't.  I'm under

14       the impression that I was suffering from

15       severe depression.

16   BY MR. SWITKES:

17       Q.    Not anxiety?

18       A.    No, I used to try to figure the

19   anxiety part out and I was like, You know

20   what, maybe I don't suffer from anxiety.  I

21   never had heard -- I never really had heard

22   that diagnosis.  I don't recall hearing that

23   diagnosis from a -- a treating physician.

24       Q.    Okay.  Sir, you have a right to read

25   the deposition once it's typed.

Page 316

1          MR. SWITKES:  Counsel, if you want

2     to waive for him or read for him.

3          MS. GOODWIN:  When it's typed up you

4     can come down here and read -- you have

5     to make an appointment -- well not here,

6     to her officer probably and read the

7     appointment -- read the transcript and

8     decide whether, you know, look for

9     anything that she took down wrong.  You

10    can's change your mind and answer

11    different answer --

12         THE WITNESS:  I'm cool.  I'm cool.

13    I'm cool.

14         MS. GOODWIN:  Or you can trust her.

15    Most people waive it.

16         So he'll waive.

17         MR. SWITKES:  He waives.  I'm

18    ordering.

19         THE WITNESS:  I'm cool.  I'm cool

20    with that.

21         THE VIDEOGRAPHER:  We'll go off the

22    record at 6:57.

23     (Thereupon, the deposition was concluded

24      at 6:57 p.m.)

25

Page 317

```
 1                      CERTIFICATE
 2   STATE OF FLORIDA:
                 :SS.
 3   COUNTY OF MIAMI-DADE

 4          I, ADRIANA REYES, COURT REPORTER AND
     NOTARY PUBLIC, IN AND FOR THE STATE OF
 5   FLORIDA AT LARGE, DO HEREBY CERTIFY THAT
     ELGIN HILLIARD WAS BY ME FIRST DULY SWORN TO
 6   TESTIFY THE WHOLE TRUTH; THAT I WAS
     AUTHORIZED TO AND DID REPORT SAID DEPOSITION
 7   IN STENOTYPE; THAT A FOREGOING PAGES NUMBERED
     1 TO 317, INCLUSIVE, ARE A TRUE AND CORRECT
 8   TRANSCRIPT OF MY SHORTHAND NOTES OF SAID
     DEPOSITION.
 9
            I FURTHER CERTIFY THAT SAID DEPOSITION
10   WAS TAKEN AT THE TIME AND PLACE HEREINABOVE
     SET FORTH AND THAT THE TAKING OF SAID
11   DEPOSITION WAS COMMENCED AND COMPLETED AS
     HEREINABOVE SET OUT.
12
            I FURTHER CERTIFY THAT I AM NOT AN
13   ATTORNEY OR COUNSEL OF ANY OF THE PARTIES,
     NOR AM I A RELATIVE OR EMPLOYEE OF ANY
14   ATTORNEY OR COUNSEL OF ANY PARTY CONNECTED
     WITH THE ACTION, NOR AM I FINANCIALLY
15   INTERESTED IN THIS ACTION.

16          THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
17   OF THE SAME BY ANY MEANS UNLESS UNDER THE
     DIRECT CONTROL AND/OR DIRECTION OF THE
18   CERTIFYING REPORTER.

19
            DATED IN MIAMI, MIAMI-DADE COUNTY,
20    FLORIDA, THIS 21TH DAY OF OCTOBER, 2019

21
22   _____
     ADRIANA REYES, NOTARY PUBLIC
23   STATE OF FLORIDA, AT LARGE.
     My Commission expires: 09/20/21
24   My Commission Number:  GG 1449052

25
```